**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SHRAVAN REDDY KAMBAM FAMILY PROTECTION TRUST, BY AND THROUGH ITS TRUSTEE, JAYAKUMAR REDDY KAMBAM,<br><br>               Plaintiff,<br><br>    v.<br><br>IOVANCE BIOTHERAPEUTICS, INC., FREDERICK G. VOGT, and IGOR P. BILINSKY,<br><br>               Defendants. | Case No. 26-cv-06492<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

# TABLE OF CONTENTS

I.　NATURE OF THE ACTION .................................................................................1

II.　JURISDICTION AND VENUE............................................................................16

III.　PARTIES ..............................................................................................................18

IV.　GENERAL ALLEGATIONS ...............................................................................20

　　A.　Plaintiff's Review of Public Statements, Representations, and Disclosures Made by Iovance and Its Senior Executives.................................................................20

　　B.　Plaintiff's Trading History in Long-Term Iovance Call Options and a Related Spread Transaction.................................................................................................24

　　C.　Summary of the AMTAGVI Treatment Regimen and the Degree of Coordination That is Required for an AMTAGVI Infusion to Occur. ..........35

　　D.　In 2023, Iovance Portrayed Itself as Looking to Treat, and as Capable of Treating, "Thousands of Patients a Year Out of the Gate"..............................39

　　E.　The FDA Imposed Certain Manufacturing and Product Quality Constraints Associated With the AMTAGVI Treatment Regimen Prior to its Approval of AMTAGVI on February 16, 2024. .......................................................................47

　　F.　Plaintiff Maintained Its Bullish Position in Iovance Long-Term Call Options After the FDA's Approval of AMTAGVI on February 16, 2024, in Reliance Upon Statements and Representations From Defendants as to the Strength and Success of AMTAGVI's Commercial Launch. .................................................49

　　G.　During April and May 2024, Iovance Continued to Portray All Aspects of AMTAGVI's Commercial Launch as Very Positive, While Also Claiming That Its Manufacturing Was Setting a New Bar for Cell Therapy Launches. .......60

　　H.　In June 2024, Iovance Continued to Portray Its AMTAGVI Launch as "Going Great," While Stating That AMTAGVI Infusions Were "Ramping Up."......72

　　I.　In August 2024, Iovance Reported 25 Second-Quarter AMTAGVI Infusions but Simultaneously Issued 2025 Revenue Guidance and Claimed Detailed Internal Visibility Into the Expected Growth. .................................................73

　　J.　From September 2024 Through January 2025, Iovance Disclosed Limited Adverse Information but Repeatedly Reaffirmed Its 2025 Total Product Revenue Guidance and Claimed Continued Visibility Into Key Operational Data. ...................................................................................................................82

　　K.　On February 27, 2025, Plaintiff Learned Additional Facts Concerning Iovance's Commercial and Operational Performance....................................90

　　L.　Post-Liquidation Developments Later Corroborated the Operational Concerns Alleged Above...........................................................................................98

M.      Iovance Raised Substantial Capital While Maintaining the Allegedly
        Misleading Narrative, Including After Representing That It Had Sufficient
        Cash on Hand. .................................................................................................102

V.   COURSE OF CONDUCT AND PATTERN OF MATERIAL MISREPRESENTATIONS
     AND MISLEADING HALF-TRUTHS ...............................................................................105

        A.      Defendants Presented a Misleading Picture of Existing Commercial Readiness.
                ..........................................................................................................................105

        B.      Defendants Used Authorized Treatment Center Counts as a Misleading Proxy
                for Completed Infusions. .................................................................................109

        C.      Defendants Minimized or Omitted Material Manufacturing Constraints...112

        D.      The August 2024 Guidance and Reaffirmations Maintained the Misleading
                Narrative. .........................................................................................................113

        E.      Iovance's Capital Raises Provide Supplemental Evidence of the Pattern....118

        F.      The Pattern of Misrepresentations and Half-Truths Affected Plaintiff's Actual
                Option Transactions. ......................................................................................118

VI.  SCIENTER.................................................................................................................120

        A.      Defendants Claimed Detailed, Present-Tense Visibility Into the Relevant
                Operational Data..............................................................................................120

        B.      Defendants Had Access to Contrary Information Yet Repeatedly Reinforced
                Their Narrative. ...............................................................................................122

        C.      Later Disclosures Corroborate the Earlier Knowledge and Recklessness
                Allegations. .......................................................................................................124

        D.      Iovance's Capital Raises and Acquisition Positioning Provide Supplemental
                Context...............................................................................................................125

        E.      Defendant Vogt's Scienter................................................................................126

        F.      Defendant Bilinsky's Scienter..........................................................................128

        G.      Iovance's Scienter and the Holistic Inference. ...............................................130

VII. LOSS CAUSATION AND DAMAGES ...........................................................................132

        A.      Plaintiff's Federal Securities Losses Are Tied to Actual Option Transactions
                and a Series of Disclosures and Reassurances...............................................132

        B.      Damages Calculation. .....................................................................................146

VIII. ACTUAL RELIANCE AND, IN THE ALTERNATIVE, THE FRAUD-ON-THE-
      MARKET PRESUMPTION ........................................................................................148

IX.  NO SAFE HARBOR ..................................................................................................150

X.   COUNT I – VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT AND
     RULE 10(b)(5)............................................................................................................151

　　　　A.　　Material Misstatements and Misleading Half-Truths Under Rule 10b-5(b).152

　　　　B.　　Reliance, Loss Causation, and Damages..........................................................154

XI.　COUNT II – CONTROL-PERSON LIABILITY UNDER SECTION 20(a).............155

XII.　COUNT III – COMMON-LAW FRAUD.......................................................................158

XIII.　PRAYER FOR RELIEF...................................................................................................168

XIV.　JURY DEMAND ..............................................................................................................168

## I.   NATURE OF THE ACTION

1.   This lawsuit is brought by the Shravan Reddy Kambam Family Protection Trust, by and through its trustee, Dr. Jayakumar Reddy Kambam ("Plaintiff"), to recover damages for significant trading-related losses that it incurred due to its reliance upon materially false and misleading statements – including statements rendered misleading by omitted material facts – made by the following Defendants:

- Iovance Biotherapeutics, Inc. ("Iovance");

- Frederick G. Vogt, Iovance's Interim Chief Executive Officer and President, and General Counsel; and

- Igor P. Bilinsky, Iovance's Chief Operating Officer (each, a "Defendant," and collectively, the "Defendants").

These statements were made from January 2023 through February 2025, a period encompassing the time leading up to, and following, the U.S. Food and Drug Administration's ("FDA") February 16, 2024 approval of Iovance's flagship commercial product, AMTAGVI (lifileucel), as a treatment for certain patients with advanced melanoma.

2.   Defendants' materially false and misleading statements, including statements rendered misleading by their omissions of material facts, defrauded Plaintiff, all of whose trading decisions during the relevant time period were directed by Dr. Shravan Kambam ("Dr. Kambam"), the sole beneficiary of Plaintiff.

3.   Dr. Kambam is a radiation oncologist with approximately two decades of professional experience. In his medical practice, Dr. Kambam works and consults with other medical professionals who routinely treat patients with melanoma (*i.e.*, the type of skin cancer targeted by Iovance's flagship commercial product, AMTAGVI).

1

4. AMTAGVI, unlike traditional cancer drugs or therapies, is a treatment regimen that is personalized for each patient. AMTAGVI is not a mass-produced pill or vial sitting on a shelf. Instead, AMTAGVI is made from each patient's own tumor tissue.

5. For each patient undergoing AMTAGVI therapy, the treatment regimen features a series of steps, occurring over a number of weeks. The first major step for a patient who has been enrolled in the AMTAGVI treatment regimen is to undergo surgery (*i.e.*, at a hospital or other healthcare facility authorized by Iovance, referred to by Iovance as an "authorized treatment center" or "ATC") so that a portion of the patient's melanoma tumor tissue can be (i) harvested from his or her body by an oncologic surgeon; and then (ii) shipped to an Iovance manufacturing facility (*e.g.*, Iovance's primary manufacturing facility in the Navy Yard in Philadelphia, Pennsylvania). Several of the major steps that follow are depicted in the image below:[1]



Excised tumor cells from patient     Isolation of tumor-infiltrating lymphocytes (TILs)     Expansion of anti-tumor T cell     T cells infused in patient

Per the steps depicted above:

- Isolation of TIL cells: At an Iovance manufacturing facility, tumor-infiltrating lymphocytes (referred to as "TIL cells" for readability) – *i.e.,* white blood cells from the patient's body that previously moved into the patient's tumor tissue

---

[1] Source: Simran Deep Kaur et al., Current Perspectives on Lifileucel Tumor-Infiltrating Lymphocyte Therapy: A Paradigm Shift in Immunotherapy, 59 Current Problems in Cancer 101252, at 3 fig. 1 (2025), https://doi.org/10.1016/j.currproblcancer.2025.101252.

2

and acted like "soldiers" by recognizing and attacking the cancer cells there – are isolated from the patient's harvested tumor tissue;

- <u>Growth of Additional TIL Cells</u>:   Additional TIL cells are then grown/multiplied for the patient (based on the TIL cells that were isolated from the patient's tumor tissue at an Iovance manufacturing facility); and

- <u>AMTAGVI Infusion</u>:   If the process is successful, back at the authorized treatment center, the patient is infused with the TIL cells that were grown/multiplied for the patient.

6.     The AMTAGVI treatment regimen for any patient thus involves two sides – *i.e.*, (i) a patient treatment side (handled by an Iovance authorized treatment center); and (ii) a manufacturing side (handled by an Iovance manufacturing facility) – that are required to work in close coordination and synchronization with one another.

7.     For any patient undergoing the AMTAGVI treatment regimen, Iovance recognizes AMTAGVI product revenue <u>only</u> if the patient progresses through the treatment regimen to the point when he or she ultimately receives an infusion with the TIL cells that were grown/multiplied for the patient at an Iovance manufacturing facility (referred to as an "AMTAGVI infusion").  In 2024, Iovance charged approximately $515,000 per AMTAGVI infusion.

8.     Dr. Kambam, through his years of medical practice, has developed a deep understanding of the real-world practicalities of cancer therapies.  He was aware that treating physicians are often reluctant to switch patients from existing therapies to new therapies, such as AMTAGVI, when they first hit the market.  He was also aware that other companies offering cellular therapy products similar to AMTAGVI had confronted difficulties in administering their respective product launches.  However, he also understood that if AMTAGVI could be adopted

3

rapidly and administered reliably at scale – as Iovance led him to believe would occur (and was occurring) through its public statements and representations – then with a price tag of approximately $515,000 per AMTAGVI infusion, Iovance could generate substantial revenue and profitability.

9. In 2023, accordingly, Plaintiff built up a bullish trading position in Iovance, using long-term call options expiring in January 2025, more than one year later.

10. The FDA approved AMTAGVI on February 16, 2024, and AMTAGVI commercially launched on February 20, 2024, the next business day. At that time, Plaintiff held a substantial long-term call option position in Iovance. On February 28, 2024, Iovance's stock price appreciated to an intraday high of $18.33 and closed at $17.43, at which time the value of Plaintiff's long-term call option position reached approximately $6,921,769.00, reflecting an **unrealized profit of approximately $5,681,304.00**.

11. Plaintiff does not plead this February 28, 2024 mark-to-market peak as a standalone federal securities-law damages measure. It is pleaded as reliance and but-for context: Absent Iovance's alleged fraud, Plaintiff would have reduced or exited its long-term Iovance call option exposure. Instead, however, Plaintiff continued to monitor, hold, adjust, and extend its long-term Iovance call option exposure in reliance upon the accuracy of Iovance's statements and representations concerning AMTAGVI, including, *inter alia*, the following:

(1) Iovance (through Defendant Vogt and Defendant Bilinsky) described its manufacturing side as "setting a new bar" for cell therapy launches, with an industry-leading manufacturing success rate of more than 90%.

(2) Iovance (through Defendant Vogt) stated that it was looking to treat "thousands of patients a year out of the gate" with AMTAGVI, and that this

4

was why its iCTC facility (*i.e.*, its primary manufacturing facility, located in the Navy Yard in Philadelphia, Pennsylvania) was "built to go to 2,000 [patients] today."

(3) Months prior to AMTAGVI's commercial launch, Iovance (including through Defendant Vogt) stated that its authorized treatment centers were already "stood up" and "ready to go."

(4) Also months prior to AMTAGVI's commercial launch, Iovance (through Defendant Vogt and Defendant Bilinsky) described itself as containing everything that was needed so that it – in its then-current condition – could be acquired by, and bolted onto, a larger pharmaceutical company.

(5) Iovance (through Defendant Vogt) contended that it had "**billions of dollars** of revenue coming." [emphasis added]

(6) After AMTAGVI's commercial launch, Iovance (including through Defendant Vogt and Defendant Bilinsky) characterized certain issues that had been spotted by sophisticated industry analysts as "easily and quickly addressable" or as having been in line with its expectations.

(7) Iovance stated in the first half of 2024 that it was well capitalized at the moment, and that it felt great about its cash position.

(8) Iovance (through Defendant Vogt and Defendant Bilinsky) communicated that the number (and growth in the number) of its authorized treatment centers that had been "onboarded" (*i.e.*, authorized, prepared, and ready to treat patients) would translate into significant and sustained growth in the number of patients to be infused with AMTAGVI.

5

(9)    On August 8, 2024, Iovance issued total product revenue guidance for 2025, the following year, that reflected a **nearly threefold increase** in its total product revenue guidance for 2024, the current year.

(10)    Iovance (through Defendant Vogt) also stated at this time that the "**whole point**" in providing this guidance was so that the public (which included Plaintiff) could "**rely**" on its internal understanding of AMTAGVI infusions (and demand for another one of its products, PROLEUKIN) and "**see what the upswing is going to look like here**."

(11)    Iovance (through Defendant Vogt) further explained that this total product revenue guidance was based on, among other factors, its "ongoing experience and confidence" in AMTAGVI's uptake and its "visibility" into the growth rate of AMTAGVI infusions; and an Iovance executive stated shortly thereafter that Iovance knew and was confident that "**the trajectory is set already**."

(12)    Thereafter in 2024, and through the early part of 2025, Iovance (including through Defendant Vogt and Defendant Bilinsky) repeatedly **reaffirmed** its aggressive total product revenue guidance for 2025, including in the face of questioning from sophisticated industry analysts.

(13)    Defendant Bilinsky stated on November 19, 2024, that he thought that it was "very underappreciated" that Iovance may have been executing "the most successful cell therapy launch in history so far."

12.    As it turned out, however, Defendants were acutely aware of facts contradicting and undercutting their public statements and representations in these areas when made.  Moreover,

6

Defendants omitted material facts that were necessary to make their affirmative statements and representations, in light of the circumstances under which they were made, not false or misleading when made.  Plaintiff does not allege liability based on silence alone; it alleges that Defendants' omissions of these material facts rendered the identified affirmative statements and representations materially misleading when made.  To demonstrate, on information and belief:

(1)    While Iovance claimed to have an industry-leading manufacturing success rate of more than 90% and that its manufacturing side was "setting a new bar" for cell therapy launches, Iovance's real-world results told a very different story: **Iovance's "out-of-specification" rate for its manufactured batches of AMTAGVI was materially higher than it led the public to believe**.  (A manufactured batch of AMTAGVI that is "out of specification" is both unusable and not billable by Iovance.)  As one real-world example, from among a group of patients (i) who were referred to an Iovance authorized treatment center (believed to be the Knight Cancer Institute at the Oregon Health & Science University) for AMTAGVI therapy between February 15, 2024 and December 31, 2024; and (ii) who underwent surgical procedures to have tumor tissues harvested from their bodies, the "out-of-specification" rate for the batches of AMTAGVI that were generated for them by an Iovance manufacturing facility was **38.5%** – meaning that for *more than 1 in 3* **of the patients who made it through their tumor harvesting surgeries, their AMTAGVI treatment regimens failed, because Iovance had failed to manufacture suitable batches of AMTAGVI for them**.  *See* A. Desai et al., Real World Experience of a

Single-Center Tumor Infiltrating Lymphocyte (TIL) Melanoma Therapy Program: Primary Referral to TIL Infusion (Brain to Vein), 27 *Cytotherapy* S171–S172, Abstract No. 924 (May 2025), doi:10.1016/j.jcyt.2025.03.346, https://www.sciencedirect.com/science/article/pii/S1465324925004323 (the "Oregon Health & Science University Study"). Moreover, on information and belief, Iovance participated in coordinating manufacturing slots for the patients at the authorized treatment center that was featured in the Oregon Health & Science University Study (whether the manufacturing was ultimately performed at Iovance's iCTC facility in Philadelphia, Pennsylvania or by a third-party contract manufacturer), and Iovance or its contractor received and processed the tumor tissue harvested from each of the patients at this authorized treatment center who proceeded to surgery; Iovance therefore had contemporaneous access to the patient-specific manufacturing-specification results – including whether resulting AMTAGVI batches were out-of-specification – that the Oregon Health & Science University Study later disclosed in the aggregate in May 2025, after Plaintiff had liquidated its entire remaining long-term Iovance call option position.

(2)     Notwithstanding Iovance's frequent representations that its iCTC facility then had capacity to support manufacturing AMTAGVI for more than 2,000 patients per year, it could not accommodate this type of patient volume upon AMTAGVI's commercial launch; and, moreover, Iovance lacked the

8

manufacturing technology to produce a suitable supply of AMTAGVI for more than 2,000 patients.

(3)     The FDA, upon its approval of AMTAGVI, severely <u>limited</u> the number of monthly manufacturing "slots" that Iovance's manufacturing side could make available for candidate patients.  Since (i) each patient's AMTAGVI product is uniquely made for him or her; and (ii) Iovance has limited manufacturing capacity, Iovance establishes a unique "manufacturing slot" for each patient enrolled in AMTAGVI therapy (*i.e.,* in order to receive the patient's tumor tissue from an authorized treatment center and then process it).  The FDA's imposition of such a manufacturing slot cap limited the number of AMTAGVI infusions that could be performed per month – **thereby reducing prospects for Iovance's revenue generation** – and it also rendered Iovance's attainment of its total product revenue guidance for 2025 as highly impracticable.  Nevertheless, Iovance failed to adequately disclose this manufacturing slot limitation to the public, along with the associated implications and consequences.

(4)     Prior to AMTAGVI's commercial launch in February 2024, the FDA also materially increased the threshold number of TIL cells that Iovance was required to grow/manufacture on behalf of each patient undergoing AMTAGVI therapy to 7.5 billion cells (from, on information and belief, 1.8 billion cells, representing a significant increase) – in order for the resulting AMTAGVI product to be compliant and suitable for infusion in patients. The FDA's imposition of this higher potency threshold of 7.5 billion cells

9

was a contributing factor toward the material "out-of-specification" manufacturing issue that Iovance was experiencing. Yet, Iovance failed to adequately disclose the practical implications and consequences of the FDA's imposition of this higher potency threshold to the public.

(5) Many of Iovance's purportedly onboarded authorized treatment centers, in fact, were not operationally ready (or had not been actively treating patients under the AMTAGVI treatment regimen), contradicting Iovance's public statements that its authorized treatment centers were already "stood up" and "ready to go."

(6) Iovance's statements that the number of its authorized treatment centers, and growth in that number, would translate into significant growth in the number of patients successfully treated with AMTAGVI were likewise false or misleading when made, since many of its authorized treatment centers were not operationally ready (or had not been actively treating patients under the AMTAGVI treatment regimen). Information in support of this position came from Iovance itself (through Defendant Vogt): During Iovance's Q4 2024 and Full Year 2024 Earnings Call on February 27, 2025 (*i.e.,* the day before Plaintiff liquidated its entire remaining long-term option position), Iovance disclosed that in 2024, the prior year, (i) 76% of its authorized treatment centers had completed surgeries to harvest tumor tissues from patients (*i.e.,* the first major step in the AMTAGVI treatment regimen for enrolled patients); and (ii) 64% of its authorized treatment

10

centers had infused one or more patients with AMTAGVI. This meant, by implication, that:

- **Nearly 1 in 4 of Iovance's authorized treatment centers (24%)** *had **not** completed a single surgery to successfully harvest tumor tissue from a patient in 2024*;[2] and

- **More than 1 in 3 of Iovance's authorized treatment centers (36%)** *had **not** performed a single AMTAGVI infusion* **in 2024**.[3]

(7)    While Iovance also stated on February 27, 2025, that AMTAGVI adoption was "on track to **continue accelerating** [emphasis added] throughout 2025," growth in the number of patients infused with AMTAGVI from the third to the fourth quarter of 2024 had been lackluster and had in fact *decelerated*.

(8)    Notwithstanding Iovance's statements about its being well capitalized at the moment and that it felt great about its cash position, shortly after making these statements, Iovance sold its own stock into the market (using an equity financing facility that it had in place) to raise cash – including, on information and belief, to address material manufacturing issues that had arisen (and which Iovance had failed to adequately disclose) – which had

---

[2]    Since, in 2024 (as Iovance subsequently disclosed on February 27, 2025), 76% of Iovance's authorized treatment centers had completed surgeries to harvest tumor tissues from patients, this meant that **24% of them** (*i.e.,* 100% - 76%) had not completed a single surgery to successfully harvest tumor tissue from a patient in 2024.

[3]    Since, in 2024 (as Iovance subsequently disclosed on February 27, 2025), 64% of Iovance's authorized treatment centers had infused one or more patients with AMTAGVI, this meant that **36% of them** (*i.e.,* 100% - 64%) had not performed a single AMTAGVI infusion in 2024.

the effect of diluting existing shareholders and pressuring the price of Iovance's stock downward.

(9)    Iovance itself ultimately effectively acknowledged that it had incorrectly minimized or trivialized certain issues that industry analysts had spotted and questioned Iovance about.

13.    On information and belief, Defendants' materially false or misleading statements and representations were due, at least in part, to Defendants' desire to (i) provide cover for Iovance's earlier self-promotion, including through Defendant Vogt and Defendant Bilinsky, as a company then positioned to be acquired by, and bolted onto, a larger pharmaceutical company, and to maintain that image; and (ii) assist Iovance in raising cash through sales of its own stock at artificially inflated or otherwise higher prices.

14.    One salient illustration of the reckless and misleading conduct engaged in by Defendants, upon which Plaintiff **<u>relied</u>** – **since, as mentioned above and described in further detail below, <u>Iovance expressly told investors (which included Plaintiff) that they could do so</u>** – is the following:  On August 8, 2024, Iovance announced that 25 patients had been infused with AMTAGVI over the second quarter of 2024 (*i.e.*, the first full quarter after AMTAGVI's commercial launch on February 20, 2024).  This was a severely underwhelming result in view of Iovance's earlier statements and representations as to the strength and success of AMTAGVI's commercial launch.  At the same time, however, Iovance introduced total product revenue guidance (for the first time), and this guidance reflected significant projected growth in the number of patients to be treated with AMTAGVI.  In particular, Iovance's total product revenue guidance for 2025 (the following year) reflected a **nearly threefold increase** in its total product revenue guidance for 2024 (the current year).  In issuing this total product revenue guidance, Iovance

12

(through Defendant Vogt) stated that "**the whole point**" in its doing so was so that the public could "**rely**" on its internal understanding of AMTAGVI infusions (along with demand for another of its products, PROLEUKIN) and "**see what the upswing is going to look like here**."  This thoroughly convinced Plaintiff that Iovance stood firmly behind its public statements and representations in connection with AMTAGVI.   Thereafter, Iovance (including through Defendant Vogt and Defendant Bilinsky) reaffirmed its total product revenue guidance on at least four occasions before February 2025 and repeatedly stated that it was highly confident in achieving that guidance – going so far as to say that it knew and was confident that "**the trajectory is set already**" – notwithstanding that it possessed non-public information indicating that the results necessary to achieve that guidance were highly implausible.  However, it was only well into 2025 (*i.e.*, on May 8, 2025, more than three months after Plaintiff liquidated its long-term Iovance call option position) that Iovance (through Defendant Vogt) made statements and admissions indicating that its prior total product revenue guidance for 2025 had rested on operational inputs that were materially inconsistent with what Iovance was actually seeing at its authorized treatment centers, at which time Iovance slashed its total product revenue guidance for 2025.

15.     Iovance's statement (through Defendant Vogt) that its total product revenue guidance could be **relied upon** is highly significant because it converted this guidance from a generic projection into a representation that this guidance rested on reliable and then-existing internal data concerning AMTAGVI infusions, patient demand, manufacturing capacity, and authorized treatment center readiness.  Plaintiff does not allege merely that Iovance's 2025 forecast later proved wrong.  Rather, Plaintiff alleges that when Iovance stated to its investors that its guidance could be **relied upon**, Iovance already knew or recklessly disregarded facts showing that its 2025 guidance's operational assumptions were materially unreliable.

16.     Likewise, many of Iovance's statements were actionable present-tense or then-existing factual representations, not merely forecasts. Iovance did not only predict future demand; it represented that a 2,000+ patient manufacturing capacity already existed, that its authorized treatment centers were already stood up, prepared, staffed, and ready to treat patients, that manufacturing slots were sufficiently available, and that commercial manufacturing and patient drop-off/attrition were consistent with clinical experience. These representations were materially misleading when made because Iovance knew – or recklessly disregarded – material facts that contradicted them, yet failed to disclose those facts. Those same undisclosed facts also undermined the operational basis Iovance claimed for its later projections and guidance.

17.     Iovance did not merely misjudge its readiness to commercialize its AMTAGVI therapy. Rather, it pursued an accelerated and aggressive launch strategy that prioritized speed to market over the development of a fully mature and scalable commercialization infrastructure.

18.     Upon information and belief, Iovance sought to capitalize on its perceived first-mover advantage in TIL therapy by bringing its product to market as quickly as possible, before key operational components (including authorized treatment center readiness, along with its manufacturing capacity and technology) were sufficiently developed to support sustainable delivery at scale. In reality, Iovance lacked the operational infrastructure necessary to execute on the commercialization narrative that it had presented to the public. These deficiencies were known to Defendants or, at a minimum, recklessly disregarded by Defendants at the time that they made or authorized the challenged statements.

19.     This premature commercialization strategy created the appearance of near-term growth and market adoption, while masking the material limitations in Iovance's ability to reliably and consistently deliver AMTAGVI to patients. In turn, this approach supported an elevated

14

market valuation of Iovance during AMTAGVI's post-FDA approval period, during which time Plaintiff held and adjusted its bullish option position (rather than simply exiting it after the run-up in Iovance's stock price around the time of the FDA's approval of AMTAGVI).

20.    On February 27, 2025, approximately one year after AMTAGVI's commercial launch, Plaintiff (through Dr. Kambam) finally realized that it had been defrauded by Iovance. **Plaintiff then acted at once.  It immediately closed out its entire open long-term Iovance call option position on February 28, 2025, the next business day, *right after the market opened (i.e., between 9:38 a.m. and 9:54 a.m.).***

21.    Plaintiff did not discover, and could not through reasonable diligence have discovered, the facts constituting the violations alleged herein before February 27, 2025.  Before that date, the public received only limited and incomplete indications of operational problems, which Iovance accompanied or promptly followed with reassurances concerning the strength of AMTAGVI's launch, patient conversion, manufacturing performance, manufacturing-slot availability, authorized treatment center activity, and the reliability of its 2025 total product revenue guidance.  These limited indications did not reveal the full extent of the concealed problems or facts sufficient to establish that Defendants knew or recklessly disregarded that their statements were false or misleading.  This action is timely under 28 U.S.C. § 1658(b).

22.    Plaintiff ultimately incurred an aggregate net economic loss of approximately **$1,875,664** on its specifically identified long-term Iovance option positions (after crediting the gain from the related offsetting short call option position described in Paragraph 56 below).  The chart in Paragraph 58 below shows how the gains and losses attributable to each identified position combine to produce this aggregate net economic loss.

15

23.     Several months later, on May 8, 2025, Iovance (through Defendant Vogt) made statements and admissions indicating that its 2025 total product revenue guidance had rested on operational inputs that were materially inconsistent with what Iovance was actually seeing at its authorized treatment centers, further confirming Plaintiff's conclusion.

## II.     JURISDICTION AND VENUE

24.     This action arises under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the U.S. Securities and Exchange Commission ("SEC"), 17 C.F.R. § 240.10b-5. This action also asserts related common-law fraud claims against all Defendants under New York law or, alternatively, under the law determined applicable by the Court.

25.     This Court has subject matter jurisdiction over the federal securities-law claims pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331, because these claims arise under the laws of the United States.  This Court has supplemental jurisdiction over Plaintiff's related common-law fraud claims against all Defendants pursuant to 28 U.S.C. § 1367 because those claims form part of the same case or controversy as Plaintiff's federal securities-law claims.

26.     This Court has personal jurisdiction over Defendants pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, because Iovance transacted business in this District and Defendants committed acts within this District constituting part of the violations alleged herein. Among other matters, Iovance, through its senior executives and agents, including Defendant Vogt and Defendant Bilinsky, made materially false and misleading statements in New York, New York, within this District, at investor conferences including Iovance presentations at the Jefferies Global Healthcare Conference on June 9, 2023, the Citizens JMP Life Sciences Conference on

16

May 13, 2024, the Jefferies Global Healthcare Conference on June 6, 2024, and the Stifel 2024 Healthcare Conference on November 19, 2024.  Defendants also disseminated materially false and misleading statements into this District and to investors nationwide.  This Court also has personal jurisdiction over Defendant Vogt and Defendant Bilinsky with respect to Plaintiff's common-law fraud claims because those claims arise from the same nucleus of operative facts as the Exchange Act claims, because Defendant Vogt and Defendant Bilinsky purposefully directed the challenged investor communications to investors nationwide, including in this District, and because, as alleged above, materially false and misleading statements by or on behalf of Defendants were made in New York, New York and were received, reviewed, and relied upon by Plaintiff.

27.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa(a), because acts and transactions constituting the violations alleged herein occurred in this District.  Venue is also proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this District.  Among other matters, a number of the materially false and misleading statements described herein were made by or on behalf of Defendants in New York, New York, within this District, at the Jefferies Global Healthcare Conference on June 9, 2023, the Citizens JMP Life Sciences Conference on May 13, 2024, the Jefferies Global Healthcare Conference on June 6, 2024, and the Stifel 2024 Healthcare Conference on November 19, 2024.  These statements formed part of the fraudulent course of conduct alleged herein and were received, reviewed, and relied upon by Plaintiff.

28.     In connection with the acts, conduct, and other wrongs alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the United States mails, interstate telephone communications, and the facilities of the national securities exchanges.

17

29. Litigating this action in this District also serves the convenience of the parties and witnesses and the interests of justice. Multiple statements were made in person in New York, New York, within this District, and this District has a direct nexus to the investor-facing misconduct alleged herein. Adjudicating this action in this District therefore is reasonable and appropriate.

30. Plaintiff's claims are independent of, and distinct from, the claims asserted in the putative class action captioned *In re Iovance Biotherapeutics, Inc. Securities Litigation*, No. 5:25-cv-04177-EKL (N.D. Cal.) (the "Class Action"). Plaintiff does not believe that it is a member of the putative class defined in the Class Action. Plaintiff purchased exchange-traded call options on Iovance common stock – *i.e.*, derivative instruments issued by the Options Clearing Corporation, not securities issued by Iovance – and Plaintiff's loss-causation theory rests on a series of disclosures and operating results beginning with Iovance's May 9, 2024 disclosures and the market reaction on May 10, 2024, continuing through the November 7 and 8, 2024 disclosures and market reaction; and culminating in the February 27 and 28, 2025 disclosures and liquidation while Plaintiff still held the relevant options. The May 8 and 9, 2025 developments that form the basis of the Class Action's claims are pleaded here only as later confirmation, after Plaintiff had liquidated its remaining Iovance option position. Plaintiff's damages theory, damages period, and the securities at issue are each materially distinct from those of the putative class. To the extent any certified class were later construed to encompass Plaintiff's claims, Plaintiff reserves all rights to seek exclusion from that class.

### III. PARTIES

31. Plaintiff Shravan Reddy Kambam Family Protection Trust is a trust created under the laws of Nevada. Plaintiff brings this action by and through its trustee, Dr. Jayakumar Reddy Kambam, who has authority to prosecute claims on behalf of Plaintiff and has authorized this

action.  Plaintiff purchased, held, adjusted, and sold the exchange-traded call options on Iovance common stock at issue in this action and suffered the losses alleged herein.  Throughout Plaintiff's existence, including from January 11, 2023 through February 28, 2025 (the "Relevant Period"), all of Plaintiff's trading decisions were made by Dr. Kambam, the sole beneficiary of Plaintiff, pursuant to a trading agreement between him and the trustee of Plaintiff.  Under this trading agreement, Dr. Kambam acted as Plaintiff's authorized trading agent and investment decision-maker.  Dr. Kambam reviewed and relied on Defendants' statements and representations in that authorized capacity and on Plaintiff's behalf; and he directed the transactions in Plaintiff's brokerage account pursuant to this trading agreement.

32.     Defendant Iovance Biotherapeutics, Inc. ("Iovance") is a biopharmaceutical company incorporated under the laws of the State of Delaware, with its principal executive offices located in San Carlos, California.  Iovance's common stock trades on the Nasdaq Global Market under the ticker symbol IOVA.  During the Relevant Period, Defendant Frederick G. Vogt served as Iovance's Interim Chief Executive Officer and President and as its General Counsel, and Defendant Igor P. Bilinsky served as Iovance's Chief Operating Officer.  Defendant Vogt and Defendant Bilinsky are referred to together as the "Individual Defendants."  As specifically alleged below, Defendant Vogt personally made challenged investor-facing statements concerning, among other matters, (i) AMTAGVI's commercial launch; (ii) authorized treatment center readiness and activity; (iii) patient demand, throughput, and attrition; (iv) manufacturing-slot availability; (v) cash sufficiency; and (vi) Iovance's total product revenue guidance, and exercised ultimate authority over the content and communication of certain additional challenged statements.  As specifically alleged below, Defendant Bilinsky personally made challenged investor-facing statements concerning, among other matters, (i) iCTC capacity and readiness; (ii) manufacturing

19

flexibility and performance; (iii) manufacturing-slot availability and scheduling; (iv) patient attrition and tumor-sample quality; (v) authorized treatment center activity and launch execution; and (vi) Iovance's total product revenue guidance, and exercised ultimate authority over the content and communication of certain additional challenged statements.

33.    Iovance had ultimate authority over the challenged statements contained in its SEC filings, press releases, earnings releases, prepared investor presentations, social-media posts, and other formal corporate communications.  At all relevant times, the Individual Defendants were authorized to speak to investors on Iovance's behalf concerning the subjects that they addressed, acted within the scope of their employment and authority, and acted for Iovance's benefit.  Iovance is therefore responsible for statements made on its behalf by its senior officers and agents acting within the scope of their authority, as specifically alleged herein.  The claims against each Individual Defendant are based on (i) statements that he personally made or over which he exercised ultimate authority; (ii) material facts allegedly omitted from statements for which he was responsible, thereby rendering those statements misleading; (iii) his actual authority and control, as specifically alleged; and (iv) his personal participation in the misconduct alleged herein – not merely his corporate title.

## IV.    GENERAL ALLEGATIONS

### A.    **Plaintiff's Review of Public Statements, Representations, and Disclosures Made by Iovance and Its Senior Executives.**

34.    Plaintiff alleges the matters concerning its own trading, reliance, and damages based on personal knowledge.

35.    Prior to the FDA's approval of AMTAGVI on February 16, 2024, the information reviewed and monitored by Plaintiff, through Dr. Kambam, in establishing and maintaining its

20

long-term Iovance call option position included live feeds, transcripts, or recordings of the following:

- Iovance J.P. Morgan 41st Annual Healthcare Conference (held on January 11, 2023);

- H.C. Wainwright Cell Therapy Virtual Conference (held on February 28, 2023);

- Iovance Q4 2022 and Full Year 2022 Earnings Call (held on February 28, 2023);

- Cowen Health Care Conference (held on March 7, 2023);

- Oppenheimer 33rd Annual Healthcare Conference (held on March 14, 2023);

- Barclays 2023 Global Healthcare Conference (held on March 15, 2023);

- Chardan's 7th Annual Genetic Medicine and Cell Therapy Manufacturing Summit (held on April 24, 2023);

- Iovance Q1 2023 Earnings Call (held on May 9, 2023);

- JMP Securities Life Sciences Conference (held in New York, New York on May 16, 2023);

- Jefferies Global Healthcare Conference (held in New York, New York on June 9, 2023);

- Iovance Q2 2023 Earnings Call (held on August 8, 2023);

- Wells Fargo Healthcare Conference (held on September 7, 2023); and

- Iovance Q3 2023 Earnings Call (held on November 7, 2023).

36.    As of and after February 16, 2024 (*i.e.,* when the FDA approved AMTAGVI), the material reviewed and monitored by Plaintiff, through Dr. Kambam, to ensure that it was up-to-

21

date on relevant information that could affect its position in Iovance – and upon which it relied in holding and adjusting its long-term Iovance call option position – included live feeds, transcripts, or recordings of the following:

- Iovance AMTAGVI FDA Approval Call (held on February 16, 2024);

- Iovance February 16, 2024 Form 8-K, including an attached press release (filed on February 20, 2024);

- Iovance February 28, 2024 Form 8-K (filed on February 28, 2024);

- Iovance Q4 2023 and Full Year 2023 Earnings Call (held on February 28, 2024);

- TD Cowen 44th Annual Health Care Conference (held on March 4, 2024);

- Barclays 26th Annual Global Healthcare Conference (held on March 12, 2024);

- H.C. Wainwright 2nd Annual Cell Therapy Virtual Conference (held on March 26, 2024);

- Iovance Q1 2024 Earnings Call (held on May 9, 2024);

- Citizens JMP Life Sciences Conference (held in New York, New York on May 13, 2024);

- TD Cowen 5th Annual Oncology Innovation Summit (held on May 28, 2024);

- Jefferies Global Healthcare Conference (held in New York, New York on June 6, 2024);

- Goldman Sachs 45th Annual Global Healthcare Conference (held on June 10, 2024);

- Iovance Q2 2024 Earnings Call (held on August 8, 2024);

22

- Iovance Form 8-K regarding Q2 2024 financial results (filed on August 8, 2024);

- Wells Fargo 2024 Healthcare Conference (held on September 4, 2024);

- Baird 2024 Global Healthcare Conference (held on September 10, 2024);

- Iovance Q3 2024 Earnings Call (held on November 7, 2024);

- Iovance Form 8-K regarding Q3 2024 financial results (filed on November 7, 2024);

- Stifel 2024 Healthcare Conference (held in New York, New York on November 19, 2024);

- A statement published by Iovance on its X (formerly Twitter) account on January 13, 2025;

- A press release issued by Iovance (February 27, 2025);

- Iovance Q4 2024 and Full Year 2024 Earnings Call (held on February 27, 2025);

- Iovance Form 8-K regarding Q4 2024 and full-year 2024 financial results (filed on February 27, 2025); and

- Iovance Annual Report on Form 10-K for fiscal year 2024 (filed on February 27, 2025).

37.    As to all other matters, Plaintiff alleges on information and belief based on Plaintiff's and its counsel's investigation, including their review of scientific literature concerning AMTAGVI and the Consolidated Amended Class Action Complaint filed on April 15, 2026, in *In re Iovance Biotherapeutics, Inc. Securities Litigation*, No. 5:25-cv-04177-EKL (N.D. Cal.), ECF No. 101 (the "Iovance Class Complaint").

38.    The Iovance Class Complaint alleges that it was based in part on interviews of former Iovance employees, and it describes those former employees by position, responsibilities, and basis of knowledge.  Unless otherwise indicated, allegations attributed in this Complaint to individuals identified as "FE1," "FE2," or "FE3" are based on the Iovance Class Complaint, are pleaded on information and belief, and are limited to the periods, responsibilities, and bases of knowledge attributed to those sources in that pleading.

39.    Statements personally made by Defendant Vogt are alleged against Defendant Vogt and Iovance; and statements personally made by Defendant Bilinsky are alleged against Defendant Bilinsky and Iovance.  Statements made by other Iovance officers or employees are alleged as statements of Iovance.  Iovance had ultimate authority over its SEC filings, press releases, prepared earnings materials, investor presentations, and other official corporate communications.  Plaintiff does not allege individual liability against Defendant Vogt or Defendant Bilinsky for a statement made by another executive merely because of his title, absent allegations that the Individual Defendant made, adopted, authorized, or had ultimate authority over that statement.

**B.    <u>Plaintiff's Trading History in Long-Term Iovance Call Options and a Related Spread Transaction</u>.**

40.    Between September 29, 2023 and December 18, 2023, Plaintiff established a bullish long-term position in Iovance call options by purchasing the following:

(i)    5,000 Iovance call options with an exercise price of $5.00 and an expiration date of January 17, 2025 (*i.e.*, expiring more than one year after the call options were purchased); and

24

(ii)    1,250 Iovance call options with an exercise price of $10.00 and an expiration date of January 17, 2025.[4]

Thus, by the close of trading on December 18, 2023 (*i.e.,* approximately two months before the FDA's approval of AMTAGVI on February 16, 2024), Plaintiff had established the long-term Iovance call option position set forth below:[5]

| Number of Calls | Expiration Date | Exercise Price | Cost Basis[6] |
|---|---|---|---|
| 5,000 | January 17, 2025 | $5.00 | $1,047,186.74 |
| 1,250 | January 17, 2025 | $10.00 | $340,664.51 |

41.    At the close of trading on December 18, 2023, Iovance's stock price was at $7.85.

42.    On January 8–9, 2024, Plaintiff sold 550 of its Iovance January 17, 2025 call options with a $10.00 exercise price, thereby reducing the number of its call options at this exercise

---

[4]    Plaintiff also engaged in short-term trading in options on Iovance common stock (including day trades and other short-dated option transactions) during the time period covered by this lawsuit, and it briefly held Iovance common stock on certain occasions due to option exercises. This option trading position summary does not purport to catalog every such transaction. Rather, it focuses on Plaintiff's long-term Iovance option positions, and adjustments to these positions, that Plaintiff entered into, maintained, or adjusted in reliance on Iovance's statements and representations during the Relevant Period.

[5] Plaintiff initially sold Iovance call options expiring on March 15, 2024 and with an exercise price of $10.00 against these longer-dated Iovance call options (creating a so-called "bullish calendar spread" with these longer-dated Iovance call options), but Plaintiff closed out these short call options shortly thereafter, with the last closing purchase having been completed on January 4, 2024, and with Plaintiff recognizing an aggregate net economic loss of approximately $375,937.72. (The March 2024 short calls are otherwise excluded from the summary presented in this Section IV.B because they were a short-term pre-FDA AMTAGVI approval hedge that was closed before the challenged post-AMTAGVI approval reliance period.)

[6] In this Section IV.B, the position tables report broker-reported tax-lot cost basis, including trade commissions. The economic profit-and-loss figures use broker-reported proceeds and basis, adjusted where necessary to prevent the same wash-sale loss from being counted more than once. A wash-sale loss is a real economic loss, but a loss carried into the tax basis of a replacement position is not treated as an additional economic outlay when that same loss is already reflected in another position included in the selected-position calculation.

price from 1,250 to 700.[7]  Thus, as of January 9, 2024, Plaintiff's Iovance January 17, 2025 call option position consisted of the following:

| Number of Calls | Expiration Date | Exercise Price | Cost Basis |
| --- | --- | --- | --- |
| 5,000 | January 17, 2025 | $5.00 | $1,047,186.74 |
| 700 | January 17, 2025 | $10.00 | $192,602.50 |

43.     On February 16, 2024, the date of the FDA's approval of AMTAGVI, Iovance's stock closed at $9.15.

44.     On February 20, 2024, the next business day (which was also the date of AMTAGVI's commercial launch), Iovance's stock closed at $12.03.

45.     On February 22, 2024 and February 27, 2024, Plaintiff sold and repurchased, respectively, one Iovance January 17, 2025 call option with a $10.00 exercise price.  Thus, as of February 27, 2024, Plaintiff's position in Iovance January 17, 2025 call options was effectively unchanged from its position as of February 16, 2024, and consisted of the following:

| Number of Calls | Expiration Date | Exercise Price | Cost Basis |
| --- | --- | --- | --- |
| 5,000 | January 17, 2025 | $5.00 | $1,047,186.74 |
| 700 | January 17, 2025 | $10.00 | $193,278.26 |

46.     On February 28, 2024, Iovance's stock appreciated to an intraday high of $18.33, and it closed at $17.43.  Plaintiff's January 17, 2025 call options then had substantial intrinsic value because their exercise prices (*i.e.,* $5.00 and $10.00) were materially below Iovance's then-current stock price (*i.e.,* $17.43).

---

[7]     Plaintiff's sales of Iovance January 17, 2025 call options with a $10.00 exercise price during this time period consisted of the following sales: (i) 300 call options on January 8, 2024; and (ii) 250 call options on January 9, 2024.

47.     As of the close of February 28, 2024, the profitability in Plaintiff's long-term call option position was approximately **$5,681,304.00** (calculated using (i) the closest available mark-to-market records reflecting the value of this position at approximately $6,921,769.00; and (ii) the cost basis of Plaintiff's long-term call option position of approximately $1,240,465.00).[8]

48.     On June 4, 2024 (after Iovance's May 13 and May 28, 2024 statements alleged in Paragraphs 122–135 below), Plaintiff purchased 300 additional Iovance January 17, 2025 call options with a $10.00 exercise price, thereby increasing the number of call options that it held at the $10.00 exercise price from 700 to 1,000.  Thus, Plaintiff's Iovance January 17, 2025 call option position at this time consisted of the following:

| Number of Calls | Expiration Date | Exercise Price | Cost Basis |
| --- | --- | --- | --- |
| 5,000 | January 17, 2025 | $5.00 | $1,047,186.74 |
| 1,000 | January 17, 2025 | $10.00 | $248,353.09 |

49.     Between June 13, 2024 and June 24, 2024 (shortly after (i) Iovance's June 6, 2024 statements in New York; and (ii) its June 10, 2024 statements, as alleged in Paragraphs 145–148 below) Plaintiff:

- Purchased 4,700 additional Iovance January 17, 2025 call options with a $10.00 exercise price, thereby increasing the number of call options that it held at the $10.00 exercise price from 1,000 to 5,700;[9] and

---

[8]     This estimate is based on the closest available brokerage mark-to-market and transaction data, since, on information and belief, the records provided to Plaintiff did not include a separate February 28, 2024 end-of-day mark-to-market statement for these options.

[9]     Plaintiff's purchases of 4,700 additional Iovance January 17, 2025 call options with a $10.00 exercise price during this time period consisted of the following: (i) 100 call options on June 13, 2024; (ii) 200 call options on June 14, 2024; (iii) 900 call options on June 21, 2024; and (iv) 3,500 call options on June 24, 2024.

27

- Sold 1,907 of its 5,000 Iovance January 17, 2025 call options with a $5.00 exercise price[10] (generating a net profit of approximately $352,101.58, and proceeds of approximately $710,373.35), thereby reducing the number of call options open at this exercise price from 5,000 to 3,093.

Thus, Plaintiff's Iovance January 17, 2025 call option position at this time consisted of the following:

| Number of Calls | Expiration Date | Exercise Price | Cost Basis |
|---|---|---|---|
| 3,093 | January 17, 2025 | $5.00 | $688,914.97 |
| 5,700 | January 17, 2025 | $10.00 | $1,060,599.03 |

Thus, at this time, Plaintiff effectively combined:

(i)   its sale proceeds of approximately $710,373.35 from selling its 1,907 Iovance January 17, 2025 call options with a $5.00 exercise price; with

(ii)   approximately $156,947.42 in additional cash,

in order to purchase 5,000 additional January 17, 2025 call options with a $10.00 exercise price, consisting of (a) the 300 calls that it purchased on June 4, 2024; and (b) the 4,700 calls that it purchased between June 13 and June 24, 2024 (*i.e.,* at a combined cost of approximately $867,320.77).

By increasing its exposure at the $10.00 exercise price in this manner, Plaintiff acquired greater leverage for a potential significant upside move in Iovance's stock price.

50.   On August 2, 2024, Plaintiff sold 432 of its Iovance January 17, 2025 call options with a $5.00 exercise price (generating a net profit of approximately $95,851.43).   Shortly thereafter, on August 5, 2024, Plaintiff sold 111 additional Iovance January 17, 2025 call options

---

[10]   This sale occurred on June 21, 2024.

28

with a $5.00 exercise price (generating a net profit of approximately $20,532.89).  These trades reduced the number of Plaintiff's call options at the $5.00 exercise price from 3,093 to 2,550. Thus, as of August 5, 2024, Plaintiff's Iovance long-term call option position consisted of the following:

| Number of Calls | Expiration Date | Exercise Price | Cost Basis |
|---|---|---|---|
| 2,550 | January 17, 2025 | $5.00 | $620,118.06 |
| 5,700 | January 17, 2025 | $10.00 | $1,060,599.03 |

51.    On August 19, 2024 (shortly after Iovance issued total product revenue guidance for the first time on August 8, 2024, reflecting a projected **nearly threefold increase** in its total product revenue guidance from 2024 to 2025, along with a statement that this guidance could be **relied upon**), Plaintiff:

- Purchased 1,250 additional Iovance January 17, 2025 call options with an exercise price of $10.00, thereby increasing the total number of calls at this exercise price from 5,700 to 6,950; and

- Sold 50 Iovance January 17, 2025 call options with a $5.00 exercise price (generating a net profit of approximately $14,714.71), thereby reducing the number of call options open at the $5.00 exercise price from 2,550 to 2,500.

Thus, as of August 19, 2024, Plaintiff's Iovance January 17, 2025 call option position consisted of the following:

| Number of Calls | Expiration Date | Exercise Price | Cost Basis |
|---|---|---|---|
| 2,500 | January 17, 2025 | $5.00 | $604,341.11 |
| 6,950 | January 17, 2025 | $10.00 | $1,446,648.49 |

29

52.    On August 20, 2024, Plaintiff purchased 50 additional Iovance January 17, 2025 call options with an exercise price of $10.00, thereby increasing the total number of calls at this exercise price from 6,950 to 7,000.  Thus, as of August 20, 2024, Plaintiff's Iovance January 17, 2025 call option position consisted of the following:

| Number of Calls | Expiration Date | Exercise Price | Cost Basis |
|---|---|---|---|
| 2,500 | January 17, 2025 | $5.00 | $604,341.11 |
| 7,000 | January 17, 2025 | $10.00 | $1,462,873.33 |

53.    Between September 10, 2024 and October 7, 2024, Plaintiff:

- Purchased 300 additional Iovance January 17, 2025 call options with a $10.00 exercise price, consisting of 200 call options purchased on September 10, 2024 and 100 call options purchased on September 18, 2024;

- Sold an aggregate of 7,300 Iovance January 17, 2025 call options with a $10.00 exercise price, thereby closing its entire position at that exercise price;[11] and

- Purchased 6,500 Iovance January 17, 2025 call options with a lower exercise price of $9.00.

Plaintiff's sale of the 7,300 Iovance January 17, 2025 call options with a $10.00 exercise price resulted in a net economic loss of approximately $380,542.20 (and generated proceeds of approximately $1,141,649.90).  Thus, as of October 7, 2024, Plaintiff's Iovance January 17, 2025 call option position consisted of the following:

---

[11]    On September 10, 2024, Plaintiff purchased 200 January 17, 2025 call options with a $10.00 exercise price; and on September 18, 2024, it purchased 100 January 17, 2025 call options with a $10.00 exercise price.

| Number of Calls | Expiration Date | Exercise Price | Cost Basis |
|---|---|---|---|
| 2,500 | January 17, 2025 | $5.00 | $604,341.11 |
| 6,500 | January 17, 2025 | $9.00 | $1,334,980.78 |

Plaintiff's total net cash outlay for these transactions was approximately $252,676.18.[12]

As a result of these trades, Plaintiff acquired greater bullish exposure to Iovance at a lower exercise price (*i.e.,* at the $9.00 exercise price instead of the $10.00 exercise price, referred to in option trading vernacular as a "roll-down").

54.    On November 15, 2024, and November 18, 2024 (the following business day) – shortly after Iovance's November 7, 2024 reaffirmation of its total product revenue guidance for 2025 – Plaintiff sold 500 of its Iovance January 17, 2025 call options with an exercise price of $5.00[13] (generating a net profit of approximately $89,291.23, and proceeds of approximately $164,590.40), thereby reducing its holding of Iovance January 17, 2025 call options with an exercise price of $5.00 from 2,500 to 2,000.  Additionally, on November 18, 2024, Plaintiff:

- Sold all 6,500 of its Iovance January 17, 2025 call options with an exercise price of $9.00 (generating a net economic loss of approximately $810,013.60, and proceeds of approximately $524,967.18); and

---

[12]    This net cash outlay of approximately $252,676.18 reflected (i) approximately $1,334,992.96 in cash paid for the 6,500 newly purchased January 17, 2025 call options with a $9.00 exercise price; plus (ii) approximately $59,319.26 in cash paid for the 300 additional January 17, 2025 call options with a $10.00 exercise price; minus (iii) approximately $1,141,636.03 in cash received from selling the 7,300 January 17, 2025 call options with a $10.00 exercise price.  The small differences between these transaction-level cash amounts and the broker-statement proceeds and basis figures elsewhere in this paragraph reflect commissions, fee rebates, and transaction-level rounding.

[13]    Plaintiff's sales of Iovance January 17, 2025 call options with a $5.00 exercise price during this time period consisted of the following sales: (i) 362 contracts sold on November 15, 2024; and (ii) 138 contracts sold on November 18, 2024.

31

- Purchased 6,500 Iovance January 17, 2025 call options with an exercise price of $7.50 (*i.e.,* an exercise price $1.50 lower than the $9.00 exercise price associated with the call options that it sold), for approximately $1,008,730.09 in actual cash.

The net cash outlay to Plaintiff for these November 15 and 18, 2024 transactions, through which it increased its bullish exposure to Iovance – *i.e.*, by again lowering (or in option trading vernacular, "rolling down") the exercise price of a portion of its call position (this time from the $9 exercise price to the $7.50 exercise price) – was approximately $319,172.51.[14]

Thus, after these transactions, as of November 18, 2024, Plaintiff's Iovance January 17, 2025 call option position consisted of the following:

| Number of Calls | Expiration Date | Exercise Price | Cost Basis |
|---|---|---|---|
| 2,000 | January 17, 2025 | $5.00 | $529,041.94 |
| 6,500 | January 17, 2025 | $7.50 | $1,582,988.27 |

55. In the following month, on December 18, 2024, Plaintiff sold:

- All 6,500 of its Iovance January 17, 2025 call options with an exercise price of $7.50 (generating a net economic loss of approximately $627,790.24); and

- 900 of its 2,000 Iovance January 17, 2025 call options with an exercise price of $5.00 (generating a net profit of approximately $13,859.73).

Plaintiff's total net economic loss from these sales was approximately $613,930.51 (and its total proceeds from these sales were approximately $574,842.41).

---

[14] This net cash outlay of approximately $319,172.51 reflects (i) approximately $1,008,730.09 in actual cash paid for the 6,500 newly purchased January 17, 2025 call options with a $7.50 exercise price; minus (ii) approximately $524,967.18 in proceeds from selling the 6,500 January 17, 2025 call options with a $9.00 exercise price; and minus (iii) approximately $164,590.40 in proceeds from selling 500 January 17, 2025 call options with a $5.00 exercise price.

32

Thus, after these sales, Plaintiff's Iovance January 17, 2025 call option position consisted of the following:

| Number of Calls | Expiration Date | Exercise Price | Cost Basis |
|---|---|---|---|
| 1,100 | January 17, 2025 | $5.00 | $348,999.11 |

56.     Beginning on December 18, 2024 and continuing through January 15, 2025, Plaintiff entered into a call spread position by:

- Purchasing 3,800 Iovance January 16, 2026 call options with an exercise price of $7.50; and

- Selling 3,800 Iovance June 20, 2025 call options with an exercise price of $12.00, against the purchased 3,800 January 16, 2026 call options with an exercise price of $7.50.

By (i) purchasing call options with an expiration date more than one year away (*i.e.*, on January 16, 2026) with an exercise price of $7.50; while (ii) selling call options against them expiring approximately six months later (*i.e.,* June 20, 2025) with an exercise price of $12.00, Plaintiff entered into a call option position providing it with an <u>additional</u> one-year window (*i.e.*, extending to January 2026, from January 2025) to profit from an upswing in Iovance's stock price.

Plaintiff's cost basis in this call spread position was approximately $710,352.85. After applying the approximately $574,842.41 in proceeds derived by Plaintiff from its December 18, 2024 call option sales, the additional cash outlay required by Plaintiff to establish this call spread position was approximately $135,510.44. Thus, after these transactions, Plaintiff's long-term Iovance option position consisted of the following:

| Number of Calls | Expiration Date(s) | Exercise Price(s) | Cost Basis |
|---|---|---|---|
| 1,100 | January 17, 2025 | $5.00 | $348,999.11 |

A call spread:

| 3,800 long calls; and | January 16, 2026 / | $7.50 / | $710,352.85 |
| 3,800 short calls | June 20, 2025 | $12.00 | |

On January 14 and 15, 2025, Plaintiff sold its remaining 1,100 Iovance January 17, 2025 call options with an exercise price of $5.00 (generating a net loss of approximately $217,144.91, and proceeds of approximately $131,854.20).[15]  Thus, after these transactions, Plaintiff's long-term Iovance option position consisted of the following:

| **Number of Calls** | **Expiration Date(s)** | **Exercise Price(s)** | **Cost Basis** |
| --- | --- | --- | --- |
| A call spread: | | | |
| 3,800 long calls; and | January 16, 2026 / | $7.50 / | $710,352.85 |
| 3,800 short calls | June 20, 2025 | $12.00 | |

57.     Finally, as is described further below in this Complaint, during Iovance's Q4 2024 and Full Year 2024 Earnings Call on February 27, 2025, Plaintiff came to the realization that it had been defrauded by Iovance.  Accordingly, on February 28, 2025, the next business day, ***between approximately 9:38 a.m. and 9:54 a.m. (i.e., right after the market opened)***, Plaintiff liquidated its entire remaining Iovance option position, resulting in a net loss of approximately $504,681.14.

58.     Using broker-reported proceeds and basis, adjusted to prevent the same wash-sale loss from being counted more than once, the identified long-term option positions (after crediting the offsetting gain from the June 20, 2025 short calls) produced an aggregate net economic loss of approximately $1,875,664.  The aggregate net economic profit or loss from the identified long-term option positions is summarized below:

---

[15]     Plaintiff's sales of Iovance January 17, 2025 call options with a $5.00 exercise price during this time period consisted of the following sales: (i) 600 contracts sold on January 14, 2025; and (ii) 500 contracts sold on January 15, 2025.

| Identified Long-Term Option Position | Aggregate Net Economic Profit/Loss |
|---|---|
| Jan. 17, 2025 Call Options With an Exercise Price of $5.00 | $369,206.66 |
| Jan. 17, 2025 Call Options With an Exercise Price of $10.00 | -$302,385.92 |
| Jan. 17, 2025 Call Options With an Exercise Price of $9.00 | -$810,013.60 |
| Jan. 17, 2025 Call Options With an Exercise Price of $7.50 | -$627,790.24 |
| Jan. 16, 2026 Call Options With an Exercise Price of $7.50 | -$682,375.67 |
| June 20, 2025 Short Call Options With an Exercise Price of $12.00 | $177,694.53 |
| **Total Profit/Loss** | **-$1,875,664.24** |

**C.** **Summary of the AMTAGVI Treatment Regimen and the Degree of Coordination That is Required for an AMTAGVI Infusion to Occur.**

59. The AMTAGVI treatment regimen features a set of coordinated and synchronized steps, taking place over a number of weeks:

**(1)** **Initial Identification of a Candidate Patient:** The process begins when an oncologist:

- Identifies a patient with melanoma who may be eligible for treatment under the AMTAGVI treatment regimen; and

- Refers the patient to an Iovance authorized treatment center.

A suitable patient should be physically fit and capable of handling chemotherapy (along with subsequent treatment with high-dose interleukin-2 (PROLEUKIN)).

**(2)** **Screening at an Iovance Authorized Treatment Center:** After a candidate is referred to an authorized treatment center, the center conducts further screening to determine the candidate's suitability for treatment under the

35

AMTAGVI regimen.   The authorized treatment center also handles various administrative matters (*e.g.,* billing).

**(3)      Surgery to Harvest Tumor Tissue From the Patient**: A suitable patient who is enrolled can then undergo surgery at the authorized treatment center, at which time an oncologic surgeon will harvest a portion of his or her melanoma tumor tissue (also referred to as a "resectable lesion").  The harvested tumor tissue will contain a number of TIL cells – *i.e.,* white blood cells from the patient's body that moved into the patient's tumor tissue, where they recognized and attacked the cancer cells there.

**(4)      Shipment to an Iovance Manufacturing Facility**: If the process has been coordinated properly, an Iovance manufacturing facility (*e.g.*, Iovance's iCTC facility in Philadelphia, Pennsylvania or a facility belonging to a third-party contractor) will have a manufacturing slot ready to receive a shipment of the patient's tumor tissue from the authorized treatment center that harvested it.

**(5)      Growing/Manufacturing Additional TIL Cells for the Patient (Based on the TIL Cells That are Already in the Patient's Own Harvested Tumor Tissue)**: At the Iovance manufacturing facility, TIL cells are isolated from the patient's harvested tumor tissue and are used to grow/manufacture additional TIL cells for the patient.  The manufacturing facility then freezes the additional TIL cells (referred to as a batch of AMTAGVI for the patient) and sends them back to the applicable authorized treatment center.

**(6)      Patient Conditioning**: While TIL cells are being grown/manufactured for the patient at an Iovance manufacturing facility, the patient returns to the authorized

treatment center.  Next, in order to prepare the patient for an infusion of the TIL cells that were manufactured for him or her at an Iovance manufacturing facility (and after the infusion is scheduled), the patient undergoes lymphodepleting chemotherapy to suppress his/her immune system.

**(7)    Infusion**: The authorized treatment center receives the patient's manufactured TIL cells from an Iovance manufacturing facility and infuses the patient with them (*i.e.,* the patient receives an "AMTAGVI infusion").  Iovance recognizes revenue from AMTAGVI only if this infusion step occurs.

**(8)    Interleukin-2 Treatment:** Shortly after infusion, the authorized treatment center treats the patient with interleukin-2 (PROLEUKIN), in order to stimulate the activity of the infused TIL cells in his/her body.

In view of the number of steps and the coordination required for a patient to be successfully treated, the AMTAGVI treatment regimen for any patient will fail – and consequently, Iovance will not generate AMTAGVI product revenue – if any of the following occurs:

- The patient starts on the AMTAGVI treatment regimen but drops out before he or she is infused with AMTAGVI (*e.g.*, due to death, illness, or difficulty handling the chemotherapy that is required);

- A surgical failure occurs at an Iovance authorized treatment center;

- The batch of AMTAGVI generated for the patient is "out of specification"; or

- A breakdown occurs in the coordination that is required between an authorized treatment center and a manufacturing facility.

60.    Essentially, for each patient, his or her AMTAGVI treatment regimen is delivered and administered through two sides, working in close coordination with one another:

37

- **An authorized treatment center:**  This is the hospital or other healthcare facility authorized by Iovance to handle the patient treatment and administrative matters described in steps (2)-(4) and (6)-(8) in Paragraph 59 above, including patient screening and billing, surgery to harvest tumor tissue, AMTAGVI infusion (if the treatment regimen has progressed to this point), and follow-on treatment with interleukin-2 (PROLEUKIN); and

- **A manufacturing facility (*e.g.*, Iovance's iCTC facility):**  This is the facility that receives the patient's harvested tumor tissue from the applicable authorized treatment center, grows/manufactures additional TIL cells for the patient, freezes the additional TIL cells, and then sends the additional TIL cells back to the applicable authorized treatment center to be infused into the patient (as described in step (5) in Paragraph 59 above).

61.     Leading up to AMTAGVI's commercial launch on February 20, 2024, Iovance engaged in a course of conduct designed to convince the public that both of the locations/sides in its AMTAGVI treatment regimen – (1) the patient treatment side (handled and administered through Iovance's authorized treatment centers); and (2) the manufacturing side (handled by Iovance's iCTC facility or another manufacturing facility owned by a third-party contractor) – were "ready to go" on day one, and that as a result of Iovance's thorough and meticulous planning, Iovance was ready, willing, and able to treat thousands of patients a year out of the gate.  Iovance's statements and omissions to this effect in 2023 (described below), when Plaintiff was building up its bullish option position in Iovance, served to artificially inflate the price of Iovance's stock leading up to AMTAGVI's commercial launch on February 20, 2024.

38

**D.**    **In 2023, Iovance Portrayed Itself as Looking to Treat, and as Capable of Treating, "Thousands of Patients a Year Out of the Gate".**

62.    On January 11, 2023, at the J.P. Morgan 41st Annual Healthcare Conference, Defendant Vogt stated that Iovance was looking to treat "thousands of patients a year out of the gate."  He added that this was why Iovance's iCTC facility, its primary manufacturing facility (located in the Navy Yard in Philadelphia, Pennsylvania) was "built to go to 2,000 [patients] today."

63.    Thereafter, in at least 14 other instances in 2023, Iovance described its iCTC facility as having the capacity to handle 2,000 or more patients each year.[16]

64.    On February 28, 2023, during Iovance's Q4 2022 and Full Year 2022 Earnings Call, Iovance Executive Vice President of Commercial Jim Ziegler ("VP Ziegler") stated that Iovance was expecting to see a "bolus" of patients upon AMTAGVI's commercial launch.

---

[16]    Iovance Biotherapeutics, Inc., Current Report (Form 8-K) (Feb. 28, 2023) ("capacity … for 2,000+ patients"); Iovance Biotherapeutics, Inc., Q4 2022 and Full Year 2022 Earnings Call (Feb. 28, 2023) ("capacity … for more than 2,000 patients"); TD Cowen Healthcare Conference (Mar. 7, 2023) ("one cell therapy center up to 2,000 patients per year"); Oppenheimer 33rd Annual Healthcare Conference (Mar. 14, 2023) ("reach the 2,000 patient per year that we want to have at the time of launch"; "getting ready for the 2,000 plus patient"); Barclays 2023 Global Healthcare Conference (Mar. 15, 2023) ("capacity … of about more than 2,000 patients per year"); Chardan's 7th Annual Genetic Medicine and Cell Therapy Manufacturing Summit (Apr. 24, 2023) ("can supply 2,000 patients per year"); Iovance Biotherapeutics, Inc., Current Report (Form 8-K) (May 9, 2023) ("capacity … for 2,000+ patients"); Iovance Biotherapeutics, Inc., Q1 2023 Earnings Call (May 9, 2023) ("supply TIL products for more than 2000 patients annually"); Jefferies Global Healthcare Conference (June 9, 2023) ("over 2000 patients per year"); Iovance Biotherapeutics, Inc., Current Report (Form 8-K) (Aug. 8, 2023) ("capacity … for 2,000+ patients"); Iovance Biotherapeutics, Inc., Q2 2023 Earnings Call (Aug. 8, 2023) ("supply TIL products for more than 2,000 patients annually"); Iovance Biotherapeutics, Inc., Current Report (Form 8-K) (Nov. 7, 2023) ("capacity … for 2,000+ patients"); Iovance Biotherapeutics, Inc., Q3 2023 Earnings Call (Nov. 7, 2023) ("supply TIL products for more than 2,000 patients annually"); Iovance Biotherapeutics, Inc., Q3 2023 Earnings Call (Nov. 7, 2023) ("capacity as built today for the 2,000-plus patients"; "constructed to go even beyond 2,000 patients a year").

39

Iovance used the term "bolus" (of patients) interchangeably with the term "wave" (of patients). [17]

65.     Iovance further stated in at least three instances on February 28, 2023 – and in at least six other instances thereafter in 2023 – that its iCTC facility had available shell space that could be built out to supply TIL products to more than 5,000 patients each year. [18]

66.     Iovance added in at least three instances on February 28, 2023 – and in at least nine other instances thereafter in 2023 – that it had outside manufacturers under contract with it to provide *additional* manufacturing capacity. [19]   (During Iovance's Q3 2023 Earnings Call on November 7, 2023, Iovance also described this additional manufacturing capacity as "quite large.")

---

[17]     *See, e.g.*, Brian Gastman, Barclays 26th Annual Global Healthcare Conference 2024 (March 12, 2024), stating, "[s]o the term bolus or wave…" and "[s]o I expect this just to be the beginning of the wave or the bolus…".

[18]     Iovance Biotherapeutics, Inc., Current Report (Form 8-K) (Feb. 28, 2023) ("The iCTC facility as currently built has annual capacity to supply TIL therapies for 2,000+ patients, with available shell space that can be built to supply TIL therapies for 5,000+ patients from this facility."); Iovance Biotherapeutics, Inc., Q4 2022 and Full Year 2022 Earnings Call (Feb. 28, 2023) ("The iCTC is currently built as annual capacity to supply TIL products for more than 2,000 patients with available shelf space that we can build out to supply products for more than 5,000 patients annually from this facility."; "Beyond that, we can continue hiring the staff as needed and then also build out the shelf space that we have within the existing iCTC facility that can bring us to over 5,000 patients per year."); Chardan's 7th Annual Genetic Medicine and Cell Therapy Manufacturing Summit (Apr. 24, 2023) ("So the iCTC facility as currently built can supply 2,000 patients per year or 2,000 doses.  With flexibility then to build out the shell space, which is part of that facility, to supply over 5,000 patients per year or 5,000 doses per year."); Iovance Biotherapeutics, Inc., Current Report (Form 8-K) (May 9, 2023) ("The iCTC facility as currently built has annual capacity to supply TIL therapies for 2,000+ patients, with available shell space that can be built to supply TIL therapies for 5,000+ patients from this facility."); Iovance Biotherapeutics, Inc., Q1 2023 Earnings Call (May 9, 2023) ("Ultimately, by building out the additional existing shelf space, the iCTC is designed to supply TIL products for more than 5,000 patients annually."); Iovance Biotherapeutics, Inc., Q2 2023 Earnings Current Report (Form 8-K) (Aug. 8, 2023) ("The iCTC facility currently has annual capacity to supply TIL therapies for 2,000+ patients, with buildable shell space to ultimately supply TIL therapies for 5,000+ patients from this facility."); Iovance Biotherapeutics, Inc., Q3 2023 Earnings Current Report (Form 8-K) (Nov. 7, 2023) ("The iCTC facility currently has annual capacity to supply TIL therapies for 2,000+ patients, with buildable shell space to ultimately supply TIL therapies for 5,000+ patients."); Iovance Biotherapeutics, Inc., Q3 2023 Earnings Call (Nov. 7, 2023) ("By building out additional existing shelf space, iCTC may ultimately supply TIL products for more than 5,000 patients annually.").

[19]     Iovance Biotherapeutics, Inc., Current Report (Form 8-K) (Feb. 28, 2023) ("Contract manufacturers provide additional flexibility and capacity for Iovance to meet potential commercial and clinical demand."); Iovance Biotherapeutics, Inc., Q4 2022 and Full Year 2022 Earnings Call (Feb. 28,

67.     By June 2023 (*i.e.,* more than eight months prior to AMTAGVI's commercial launch on February 20, 2024), Iovance described its iCTC facility, its primary manufacturing facility, as "ready to go."  To demonstrate, on June 9, 2023, at the Jefferies Global Healthcare Conference, Defendant Bilinsky stated that Iovance's iCTC facility was "built, **ready to go**" to handle more than 2,000 patients per year.  [emphasis added]

68.     During the first half of 2023, Iovance also touted that its manufacturing success rate in its clinical trials made it "by far the industry leader."  For instance, at the H.C. Wainwright Cell Therapy Virtual Conference on February 28, 2023, Iovance Chief Financial Officer Jean-Marc Bellemin ("CFO Bellemin") stated that, based on Iovance's clinical trials, it was "**by far the industry leader** with also 90%+ manufacturing [success] rate."  [emphasis added]  Additionally, during Iovance's Q4 2022 and Full Year 2022 Earnings Call on the same day, Defendant Bilinsky

---

2023) ("The iCTC is expected to supply most of the commercial TIL therapies upon approval with contract manufacturers to provide additional flexibility to optimally balance capacity and patient demand."); Iovance Biotherapeutics, Inc., Annual Report (Form 10-K) (Feb. 28, 2023) ("We expect iCTC to supply most of our commercial TIL therapies at launch, with CMOs to supplement our internal manufacturing capacity under various manufacturing services agreements, or MSAs."); Oppenheimer 33rd Annual Healthcare Conference (Mar. 14, 2023) ("[W]e do have a contract manufacturing still in place that will provide additional flexibility for commercial and clinical if needed."); Iovance Biotherapeutics, Inc., Current Report (Form 8-K) (May 9, 2023) ("Contract manufacturers provide additional flexibility and capacity for Iovance to meet potential commercial and clinical demand."); Iovance Biotherapeutics, Inc., Q1 2023 Earnings Call (May 9, 2023) ("In addition, our contract manufacturers provide further flexibility to optimally balance capacity and patient demand."); JMP Securities Life Sciences Conference (May 16, 2023) ("We have two manufacturing sites, our own site and our contract manufacturer, ready for FDA PLI, pre-licensing inspections and ready for launch with the kind of capacity that we anticipate we will need in terms of our forecasting at launch."); Iovance Biotherapeutics, Inc., Current Report (Form 8-K) (Aug. 8, 2023) ("Iovance has additional flexibility and capacity through contract manufacturers to meet potential commercial and clinical demand."); Iovance Biotherapeutics, Inc., Quarterly Report (Form 10-Q) (Aug. 8, 2023) ("Second WuXi Manufacturing and Services Agreement … WuXi agreed to provide commercial and clinical manufacturing services and related testing services."); Iovance Biotherapeutics, Inc., Q2 2023 Earnings Call (Aug. 8, 2023) ("The iCTC is expected to supply most of the commercial TIL therapies upon approval with our contract manufacturers providing further flexibility to optimally balance capacity and patient demand."); Iovance Biotherapeutics, Inc., Current Report (Form 8-K) (Nov. 7, 2023) ("Iovance also has additional contract manufacturing flexibility and capacity to meet potential commercial and clinical demand."); Iovance Biotherapeutics, Inc., Q3 2023 Earnings Call (Nov. 7, 2023) ("[W]e have our CDMO, Wuxi that has considerable capacity… It could represent a good portion of our capacity at launch.").

stated that Iovance had a consistent manufacturing success rate of more than 90% in treating more than 600 patients with Iovance TIL therapy to date.

69.     Meanwhile, during 2023, on the patient treatment side of the AMTAGVI treatment regimen, Iovance represented that it had been working with prospective authorized treatment centers to complete their preapproval "onboarding" steps and to prepare them to administer the AMTAGVI treatment regimen upon approval.  A hospital or other healthcare facility cannot begin treating patients under the AMTAGVI treatment regimen right away.  It must, among other matters, (i) be able to identify eligible patients; (ii) have a specialized oncology infrastructure (including trained staff) and operational capabilities in place to safely store and handle human cellular products (including sufficient cryopreservation facilities); and (iii) have trained surgical and auxiliary staff and possess the expertise necessary to complete all of the required medical steps (*e.g.*, surgery to harvest tumor tissue, subsequent infusion with AMTAGVI, and follow-up immunotherapy treatment).  The "onboarding" process for a hospital or other healthcare facility is slow and resource-intensive, requiring months of training, qualification, and validation.

70.     Iovance stated on at least 9 different occasions during 2023 that it expected to have 40 or more authorized treatment centers onboarded upon AMTAGVI's commercial launch.[20]

---

[20]     J.P. Morgan 41st Annual Healthcare Conference (Jan. 11, 2023) ("we intend to, as we said publicly before, we intend to launch with at least 40 sites"); H.C. Wainwright Cell Therapy Virtual Conference (Feb. 28, 2023) ("Our goal is to have 40 of them available at the time of launch"); Cowen Health Care Conference (Mar. 7, 2023) ("Yes, we will launch with 40, but you can imagine that we will be also increasing the number of centers post launch"); Oppenheimer 33rd Annual Healthcare Conference (Mar. 14, 2023) ("Again, going into launch activities, preparing 40 ATCs and meeting the demand at the time of launch"); Barclays 2023 Global Healthcare Conference (Mar. 15, 2023) ("The plan is to have 40 authorized treatment centers onboarded around launch time within 3 months of launch"); Chardan's 7th Annual Genetic Medicine and Cell Therapy Manufacturing Summit (Apr. 24, 2023) ("So we're planning for about 40 authorized treatment centers around the time of launch"); JMP Securities Life Sciences Conference (May 16, 2023) ("What we said is we want 40 treatment sites up and running within 90 days of launch"); JMP Securities Life Sciences Conference (May 16, 2023) ("But goal is to have 40 of the best cancer centers in the country available with our product within 90 days of launch"); Wells Fargo Healthcare Conference (Sept. 7, 2023) ("Our goal is to onboard 40 centers within the first 90 days").

71.     By November 7, 2023, the number of authorized treatment centers that Iovance stated that it expected to have onboarded upon AMTAGVI's commercial launch increased from 40 to 50.[21]

72.     On May 9, 2023 (*i.e.,* more than nine months prior to AMTAGVI's commercial launch on February 20, 2024), an industry analyst (*i.e.,* Mara Goldstein, at Mizuho Americas) asked Defendant Vogt about the timeframe for Iovance's authorized treatment centers to begin treating patients after AMTAGVI was approved by the FDA.  Defendant Vogt responded by describing the timeframe as "**very, very rapid**."  Defendant Vogt also described Iovance's authorized treatment centers as "stood up" (*i.e.,* at attention), while adding that everything (including with respect to financial and operational sides) would be ready upon AMTAGVI's commercial launch, stating as follows:

> Yes, so **it's very, very rapid, Mara.  It's something that they can do very quickly.  We have the ATCs stood up.**  In fact, I visited one last week and **saw how ready they were** for this.  We have a great team and Jim's team as well as our medical affairs team and our ATC operations team are out there making sure that the sites are ready to go as soon as the product is approved.  **So it's something that the structure will be in place**.  **The financial side will be in place, the operational side will be in place.  Everything will be ready for the launch** as if it was a traditional, like a launch of the CAR-Ts.[22]  [emphases added]

---

[21]     Iovance Biotherapeutics, Inc., Current Report (Form 8-K) (Nov. 7, 2023) ("Approximately 50 ATCs are expected to be onboard within 90 days of the PDUFA date"); Iovance Biotherapeutics, Inc., Q3 2023 Earnings Call (Nov. 7, 2023) ("Based on our onboarding progress, we now expect to onboard approximately 50 centers within 90 days of the PDUFA date"); Iovance Biotherapeutics, Inc., Q3 2023 Earnings Call (Nov. 7, 2023) ("We did announce, as you saw, that we anticipate 50 ATCs within 90 days of PDUFA date.  It's possible we can go beyond that").

[22]     CAR-T cell therapies, similar to Iovance's AMTAGVI therapy (which is a type of "TIL therapy" or tumor-infiltrating lymphocyte therapy), are personalized, patient-derived cell therapies for cancer.

For both CAR T-cell therapy and TIL therapy, including AMTAGVI, a patient's own T cells are collected and sent to a manufacturing facility, where they are prepared for reinfusion as a personalized cell therapy.  The two approaches differ primarily in the source of the T cells and whether the cells are genetically engineered.  In CAR T-cell therapy, the T cells are collected from the patient's circulating blood and then genetically engineered in a laboratory to recognize and attack cancer cells before being grown, or

73.    During Iovance's Q2 2023 Earnings Call on August 8, 2023, VP Ziegler stated that Iovance was actively working with its authorized treatment centers "to ensure multidisciplinary teams at **each center** are ready to administer the lifileucel [*i.e.*, AMTAGVI] treatment regimen **upon FDA approval**." [emphases added]

74.    Additional reinforcement of Iovance's position that its authorized treatment centers would be ready to treat patients upon the FDA's approval of AMTAGVI came from VP Ziegler during Iovance's Q3 2023 Earnings Call on November 7, 2023. VP Ziegler stated, at this time, in connection with the first 30 of Iovance's authorized treatment centers that had completed Iovance's pre-AMTAGVI approval onboarding steps, that they were "educated in all aspects of the Lifileucel treatment regimen **with staff and processes to begin treating patients pending the approval** [*i.e.*, of AMTAGVI by the FDA]." [emphasis added]  VP Ziegler then added that "when we say that these centers are ready to go, **they're ready to go**." [emphasis added]

75.    Thus, throughout 2023, leading up to AMTAGVI's commercial launch, Iovance portrayed itself as looking to treat, and as capable of treating, thousands of patients per year starting on day one, having both (i) a network of authorized treatment centers that were already "stood up" and "ready to go"; and (ii) a primary manufacturing facility that was also "ready to go" and featured an industry-leading manufacturing success rate.

76.    On information and belief, a key motivation on Iovance's part underlying these statements from it was its desire to make itself appear as a more attractive candidate to be acquired by a larger pharmaceutical company.  To demonstrate, at the Jefferies Global Healthcare

---

expanded, and infused back into the patient.  By comparison, in AMTAGVI therapy, tumor-infiltrating lymphocytes (referred to as "TIL cells" for readability) are collected from the patient's tumor tissue.  Those TIL cells are then grown, or expanded, but are not genetically engineered, before being infused back into the patient.

Conference in New York, New York, on June 9, 2023, *which was more than eight months before AMTAGVI's commercial launch*, Defendant Bilinsky described Iovance as "by definition" a "bolt-on opportunity" (*i.e.,* a company that could be acquired in its current form and bolted on to the company acquiring it), stating as follows:

> … We think we believe there's a lot of potential interest from the big players out there including the CAR-T companies, CAR-T commercial companies, in a potential bolt-on acquisition of a novel cell therapy company for solid tumors such as Iovance. The reason I'd say that is we are truly fully integrated. So, it would be a truly a bolt-on acquisition. We have a strong research capability, developing next generations of TIL, we have a clinical team that knows how to run these trials. We've built our own manufacturing facility, which is a major competitive advantage in the space, and we have the strongest IP position we believe in the entire TIL area by far, and certainly the most experience. **So it is a by definition, it's a bolt-on opportunity** that had the precommercial a commercial stage could be quite attractive to many of the players out there. [emphasis added]

77.    Defendant Vogt added to what Defendant Bilinsky stated here by describing Iovance as a "true bolt on you don't have to do anything" with "everything you need," stating as follows:

> … You've seen some of the big players try to dabble in cell therapies but little deals and playing around with early-stage stuff. This would be a ballpoint [sic], a true like Igor [Bilinsky] says **a true bolt-on you don't have to do anything**. It's already imagine **it's a proof product with all the capacity there, all the know-how there, everything you need** until it's just your -- you can imagine that some of these drug companies that had a commercial can drive a lot of these conversations about what was the acquisition should look like. That's the kind of the dynamic I'd expect in an M&A situation. [emphases added]

78.    Thus, even though, as of this time, AMTAGVI's approval was still months away, Iovance was already portraying itself as containing everything that was needed so that it – in its then-current condition – could be acquired by, and bolted onto, a larger pharmaceutical company.

79.    On information and belief, Iovance had strong internal incentives (in favor of one or more of its key shareholders and directors) to maintain and preserve this acquisition-ready and "bolt-on" opportunity narrative, and to project commercial readiness and operational maturity.

45

80.    In support of the allegation that Iovance knew or recklessly disregarded that its public statements concerning the iCTC facility's manufacturing capacity were inconsistent with its practical capacity, the Iovance Class Complaint attributes to FE1 – an individual whom the detailed source allegations identify as having (i) served as Iovance's Senior Vice President of Technical Operations from May 2019 through February 2024; (ii) reported directly to Defendant Bilinsky after Defendant Bilinsky joined Iovance in March 2021; and (iii) attended FDA meetings concerning AMTAGVI's approval and launch (*see* Iovance Class Complaint ¶ 117) – the statements that the iCTC facility (i) had only one quarter of the existing space completed (*see id.* ¶ 140); (ii) could not accommodate the stated 2,000-patient volume upon AMTAGVI's FDA approval (*see id.* ¶¶ 128, 171); and (iii) lacked manufacturing technology sufficient to produce AMTAGVI for more than 2,000 patients per year (*see id.* ¶¶ 144, 171).

81.    Likewise, the statements in Paragraphs 69–74 concerning authorized treatment center readiness were materially false or materially misleading when made, and omitted material information necessary to make them not misleading when made.  These statements suggested that Iovance had an operationally ready network of authorized treatment centers in place that could begin treating patients rapidly upon the FDA's AMTAGVI approval and support a launch measured in thousands of patients per year.  However, as alleged in Paragraph 69 above, authorized treatment centers required specialized oncology infrastructure, trained staff, cryopreservation capabilities, surgical and auxiliary support, and months of training, qualification, and validation before they could actually treat AMTAGVI patients.  The Iovance Class Complaint attributes to FE1 the statements that (i) only a small number of Iovance's authorized treatment centers were actually in a position to treat patients; and (ii) many lacked the training, qualification, or infrastructure necessary to do so (*see* Iovance Class Complaint ¶¶ 119–26, 171).  Additionally, the

46

Iovance Class Complaint attributes to FE2 – a former Iovance Executive Director of Field Medical Affairs – the statement that an authorized treatment center being "Iovance ready" did not mean that it was truly operational (*see id.* ¶¶ 101, 104). These attributed allegations also rendered misleading Iovance's related portrayal of itself in Paragraphs 75–78 as a ready-made, acquisition-ready "bolt-on" company with the capacity and operational maturity needed to support a large-scale AMTAGVI launch.

> **E.**    **The FDA Imposed Certain Manufacturing and Product Quality Constraints Associated With the AMTAGVI Treatment Regimen Prior to its Approval of AMTAGVI on February 16, 2024.**

82.    On information and belief, prior to the FDA's approval of AMTAGVI on February 16, 2024, the FDA tightened certain requirements associated with the AMTAGVI treatment regimen.

83.    On information and belief, one of the FDA's tightening actions was to limit the number of manufacturing "slots" that Iovance's manufacturing side could make available per month. Since each patient's AMTAGVI product has to be manufactured separately for him or her at an Iovance manufacturing facility, Iovance establishes a unique "manufacturing slot" for each patient – in order to receive the tumor tissue that is harvested from the patient's body by an oncologic surgeon at an authorized treatment center and then grow or manufacture a batch of AMTAGVI for the patient based on the TIL cells isolated from the patient's tumor tissue. The Iovance Class Complaint attributes to FE1 the statement that, as of AMTAGVI's commercial launch in February 2024, the FDA had granted Iovance approval to make only 30–32 manufacturing slots per month available (*see* Iovance Class Complaint ¶¶ 131, 133–37). On information and belief, this limitation severely restricted Iovance's ability to generate the number of AMTAGVI infusions that it had led the public to expect. By way of example, even if Iovance

had experienced no manufacturing failures in generating AMTAGVI – which, as alleged further below in Paragraph 143, was not the case – a cap of 30–32 manufacturing slots per month meant that Iovance could generate AMTAGVI for 360–384 patients per year, before accounting for other constraints. Additionally, on information and belief, certain manufacturing slots were dedicated to patients in Iovance's confirmatory clinical trials (*see id.* ¶ 137), thereby further reducing the number available for commercial patients. Plaintiff alleges that Iovance thereafter continued to make affirmative statements concerning manufacturing capacity, flexibility, and slot availability without disclosing the alleged limitation and its practical effects.

84. On information and belief, a second FDA tightening action was to increase the threshold number of TIL cells that Iovance was required to grow or manufacture on behalf of each patient undergoing AMTAGVI therapy to 7.5 billion cells – from, on information and belief, 1.8 billion cells – in order for the resulting AMTAGVI product to be compliant and suitable for infusion. On information and belief, the higher potency threshold materially contributed to the "out-of-specification" manufacturing issue that Iovance experienced during the Relevant Period. Batches of AMTAGVI that are "out-of-specification" are not suitable for infusion, with the result that Iovance does not generate AMTAGVI revenue from them. Plaintiff alleges that Iovance thereafter continued to make affirmative statements concerning manufacturing performance, manufacturing success, and the consistency of commercial manufacturing with clinical experience without disclosing the alleged higher potency threshold and its practical effects.

85. After Iovance learned of the alleged monthly manufacturing slot limitation and higher potency threshold, its subsequent repetition, reaffirmation, or continued use of statements that its manufacturing capacity and launch readiness remained as previously represented were materially misleading unless Iovance disclosed the alleged constraints and their practical effects.

48

Plaintiff does not allege liability based merely on silence. Rather, Plaintiff alleges that Iovance continued to make affirmative statements concerning manufacturing capacity, manufacturing flexibility, manufacturing slot availability, manufacturing performance, and launch readiness that were incomplete and misleading without disclosure of the alleged FDA constraints.

**F.      Plaintiff Maintained Its Bullish Position in Iovance Long-Term Call Options After the FDA's Approval of AMTAGVI on February 16, 2024, in Reliance Upon Statements and Representations From Defendants as to the Strength and Success of AMTAGVI's Commercial Launch.**

86.      The FDA approved AMTAGVI on February 16, 2024, and AMTAGVI's commercial launch took place on February 20, 2024, the next business day. On February 28, 2024, Plaintiff's position in Iovance call options had grown in value to approximately $6,921,769.00, reflecting an unrealized profit of approximately **$5,681,304.00**.

87.      Plaintiff retained its bullish position on February 28, 2024 – rather than closing it out and recognizing the then-existing unrealized profit – in reliance on the statements then available. Plaintiff continued to retain that position over the following weeks in reliance on the additional March 2024 reassurances alleged below. Those statements and representations included, among other things, that:

(1)   AMTAGVI's commercial launch was going very well and was exceeding Iovance's expectations;

(2)   Iovance was expecting for a "large bolus" (*i.e.,* a large wave[23]) of patients to come through (and that this would go on for quite some time);

(3)   Iovance thought that each of its authorized treatment centers had a backlog of patients waiting for AMTAGVI treatment;

---

[23]      *See supra* note 17 (explaining that Iovance used the term "bolus" interchangeably with the term "wave").

(4)   The onboarding of 30 authorized treatment centers (expected to increase to 50 before the end of May 2024) provided a strong indication of their commitment;

(5)   Iovance's onboarded authorized treatment centers were "ramping right away" (not merely taking on one patient at a time) and were moving patients through the AMTAGVI treatment regimen with a "clear sense of urgency";

(6)   Iovance's manufacturing already had annual capacity for up to several thousand patients a year;

(7)   Iovance's manufacturing was expected to be completely flexible in accommodating what its authorized treatment centers needed to do in terms of treating their patients;

(8)   Among the considerations that Iovance claimed made it attractive to a larger pharmaceutical company was that it had **billions (*i.e.,* $2 billion or more) in revenue coming**; and

(9)   Iovance stated that it was well capitalized at the moment, with enough cash to last it until well into the second half of 2025, and without needing to raise additional cash (except to bridge with breakeven profitability).

88.   On February 16, 2024, during Iovance's FDA approval call for AMTAGVI, Defendant Vogt stated that Iovance thought that <u>each</u> of its authorized treatment centers had a backlog in the number of patients waiting for treatment with AMTAGVI (ranging from a few patients to double digits).  He added that "the sites … we spend a lot of time talking about … can handle anywhere from a few patients a month to several times that."

50

89.     Defendant Vogt further stated at this time that Iovance was expecting "a lot of patients **in each [authorized treatment] center**." [emphasis added]

90.     Approximately two weeks later, on February 28, 2024, during Iovance's Q4 2023 and Full Year 2023 Earnings Call, VP Ziegler stated that Iovance was seeing that its authorized treatment centers were scheduling multiple patients (and even multiple patients on a given day). Defendant Vogt added that Iovance expected for a "large bolus" (*i.e.,* a large wave) of patients to come through, and that this bolus of patients was "going to go on for quite some time."

91.     In the following week, on March 4, 2024, at the TD Cowen 44th Annual Health Care Conference, Defendant Vogt stated that Iovance's commercial launch of AMTAGVI was "really going well."  He also stated that Iovance's initial patient load (20 patients) represented a "tiny fraction" of the bolus/wave of patients that Iovance described as having already begun.

92.     Also at this time, Defendant Vogt claimed that a factor that made Iovance attractive to a larger pharmaceutical company as an acquisition candidate was that it had "**billions of dollars** of revenue coming." [emphasis added]

93.     Approximately one week later, at the Barclays 26th Annual Global Healthcare Conference on March 12, 2024, Defendant Bilinsky stated that Iovance's launch was "going very well, **exceeding our expectations**." [emphasis added]

94.     Also at the Barclays 26th Annual Global Healthcare Conference on March 12, 2024, Iovance Executive Vice President of Medical Affairs Brian Gastman ("VP Gastman") mentioned that Iovance's bolus of patients could be thought of as having the "shape of a mountain," and that Iovance thought that it was "just at the beginning of going up that mountain." In further support, Defendant Bilinsky mentioned that Iovance was essentially expecting to see a "**steady ramp** in the number of patients over the coming months." [emphasis added]

51

95.     The phrase "steady ramp" (as used by Defendant Bilinsky at this time) became a catchphrase for Defendant Bilinsky in speaking about Iovance and AMTAGVI.  To demonstrate (and as is further described in Paragraphs 126 and 183 below): (i) on May 28, 2024 Defendant Bilinsky stated that there was a "steady ramp" in the number of patients that Iovance expected would apply for the "coming quarters" (*vis-à-vis* the "coming months," as he had previously stated on March 12, 2024); and (ii) on November 7, 2024, Defendant Bilinsky stated that Iovance's manufacturing capacity had continued its "steady ramp up" month over month.

96.     At the H.C. Wainwright 2nd Annual Cell Therapy Virtual Conference on March 26, 2024, Iovance Senior Vice President Peter Prieto ("VP Prieto") stated that AMTAGVI's commercial launch had "exceeded our expectation."  He added that Iovance believed that this (together with Iovance's movement toward onboarding 50 authorized treatment centers by the end of May 2024) was "kind of the tip of the iceberg."

97.     As for the statuses of Iovance's authorized treatment centers at this time, Iovance stated in a press release issued on February 16, 2024, that more than 30 of its authorized treatment centers were then "prepared to collect and ship tumor tissue from patients for AMTAGVI manufacturing."

98.     VP Ziegler added during Iovance's AMTAGVI FDA Approval Call on February 16, 2024, that the onboarding of Iovance's authorized treatment centers (approximately 30 as of that time, with 50 on track to be onboarded before the end of May 2024) was a "strong indication" of their commitment and of AMTAGVI demand.  He added that Iovance's authorized treatment centers had "staffing, training and processes in place to **immediately proceed towards treating initial patients**."  [emphasis added]

99.     Approximately two weeks later, during Iovance's Q4 2023 and Full Year 2023 Earnings Call on February 28, 2024, Defendant Vogt stated that 30 of Iovance's authorized treatment centers were ready for approval.  And in the following month, at the H.C. Wainwright 2nd Annual Cell Therapy Virtual Conference on March 26, 2024, CFO Bellemin stated that "… **all our ATCs** are super excited to bring on board patients and add new patients." [emphasis added]

100.     Also at this time, Defendant Vogt made a direct association between the number of Iovance's authorized treatment centers and the number of patients that would be treated under the AMTAGVI treatment regimen.  During Iovance's Q4 2023 and Full Year 2023 Earnings Call on February 28, 2024, Defendant Vogt stated that with "most" of Iovance's authorized treatment centers (30 moving to 50) having several patients a month, "that's a **very large number of patients every month** for us to contend with." [emphasis added]  He added that "we think we're going to be **really busy here** for the next couple of months." [emphasis added]

101.      Defendant Vogt also described Iovance's onboarded authorized treatment centers at this time as "ramping right away."  During Iovance's Q4 2023 and Full Year 2023 Earnings Call on February 28, 2024, in response to a question from an industry analyst (*i.*e., Reni Benjamin, at Citizens JMP) as to whether each of Iovance's onboarded authorized treatment centers was either (i) taking on one patient at a time and then waiting several weeks until a patient was infused with AMTAGVI before taking on another patient; or (ii) just going ahead and ramping right away, he stated that they were ramping right away, as follows:

> **They're ramping right away.**  That's the easy question.  **They're ramping right way**.  They're not limited in any way by that. [emphases added]

102.     Furthermore, VP Ziegler stated at this time that the number of Iovance's authorized treatment centers engaged in the onboarding process reflected "**a sense of urgency**" to offer AMTAGVI for their advanced melanoma patients.  Approximately two weeks later, at the Barclays

26th Annual Global Healthcare Conference on March 12, 2024, VP Gastman stated that the larger and maybe less nimble of Iovance's authorized treatment centers were "just really starting to get their stride."  And later in March 2024, at the H.C. Wainwright 2nd Annual Cell Therapy Virtual Conference on March 26, 2024, CFO Bellemin stated that Iovance's authorized treatment centers were "moving patients through the journey with a **clear sense of urgency**."  [emphasis added]

103.    After the commercial launch of AMTAGVI on February 20, 2024, Iovance began receiving real-time data from its authorized treatment centers, thereby providing Iovance with a **line of sight into its future earnings**.  This real-time data included details pertaining to:

- Scheduling and throughput constraints at authorized treatment centers, including inpatient bed availability;

- The number of scheduled tumor harvesting surgeries;

- Delayed or canceled procedures;

- Patient drop-offs;

- Other operational issues or bottlenecks on the patient treatment side or in manufacturing slot coordination; and

- Completed AMTAGVI infusions.

104.    In particular, since Iovance's authorized treatment centers were required to reserve inpatient beds, schedule tumor harvesting surgeries, and coordinate manufacturing slots in advance, Iovance could accordingly see – *weeks in advance* – details pertaining to (i) how many patients were being treated under the AMTAGVI treatment regimen; (ii) how they were progressing; and (iii) how this could translate into AMTAGVI infusions (and, accordingly, revenue for Iovance from AMTAGVI).  Plaintiff, through Dr. Kambam, was acutely aware of this important consideration.  Of significant note (and as is described further in Paragraphs 152–156

54

below), when Iovance provided total product revenue guidance for the first time (*i.e.*, on August 8, 2024), Defendant Vogt stated that Iovance used its "**visibility**" into the growth rate of AMTAGVI infusions – along with information that it had obtained about the adoption of AMTAGVI therapy across its network of authorized treatment centers, its manufacturing capacity, and additional launch dynamics – in coming up with its total product revenue guidance.

105.    Regarding Iovance's manufacturing capacity at this time, Iovance stated in a Corporate Presentation dated February 16, 2024 (attached as Exhibit 99.2 to Iovance's February 16, 2024 Form 8-K filed on February 20, 2024) that its iCTC facility in the Navy Yard in Philadelphia had annual manufacturing capacity "for up to **several thousand patients as built** [emphasis added]," per the image reproduced below.



*Note:* Red box annotation added by Plaintiff for emphasis.[24]

---

[24]    Of note, approximately one year later, Iovance used a materially similar iCTC slide in its February 2025 Corporate Overview.  However, at this time, Iovance **omitted including the statement** (as captured in the annotated red box in the image below) that its iCTC facility had "[a]nnual capacity for up to several

106.    As for the readiness and flexibility of Iovance's manufacturing side at this time, during Iovance's Q4 2023 and Full Year 2023 Earnings Call on February 28, 2024, an industry analyst (*i.e.*, Joseph Catanzaro, at Piper Sandler) asked Iovance whether its authorized treatment centers would have to stagger their surgical procedures based on the availability of manufacturing slots at an Iovance manufacturing facility, or whether the timing of their surgical procedures could be "pretty much at their choosing."  Defendant Bilinsky stated in response that Iovance expected for its manufacturing side to be "**completely flexible**" in accommodating what its authorized treatment centers needed to do in treating their patients.  In further support of this point, on March 26, 2024, at the H.C. Wainwright 2nd Annual Cell Therapy Virtual Conference, CFO Bellemin stated that Iovance's manufacturing had "**plenty of capacity**" to fulfill its current and expected initial patient demand.

107.    As for Iovance's cash position during the first quarter of 2024, at the TD Cowen 44th Annual Health Care Conference on March 4, 2024, CFO Bellemin described it as follows:

> **We have enough cash until well into second half of 2025**.  So we are well capitalized at the moment, strong balance sheet. **We don't need to do anything**. If we have to do something to bridge with the breakeven profitability, then we'll do certainly, but opportunistically at the right price for the shareholders.  [emphases added]

As it turned out, however, between April and June 2024 (*i.e.,* shortly after CFO Bellemin made this statement), Iovance raised approximately $152.4 million through the sale of its common stock.  Additionally, on information and belief, as discussed in Paragraph 226 below, shortly prior to August 8, 2024, Iovance raised approximately $47.6 million, through another sale of its common

---

thousand patients as built." Compare Iovance Biotherapeutics, Inc., Corporate Presentation – February 16, 2024, at 12, Ex. 99.2 to Current Report (Form 8-K) (filed Feb. 20, 2024) (stating, on the iCTC slide, that the facility had "[a]nnual capacity for up to several thousand patients as built"), with Iovance Biotherapeutics, Inc., Corporate Overview (Feb. 2025), at 13 (using a materially similar iCTC slide but omitting this statement).

stock.  On information and belief, Iovance dedicated a portion of the proceeds that it raised through these stock sales to address material manufacturing issues that it was experiencing.  These stock sales by Iovance had the effect of diluting existing shareholders and pressuring the price of its stock downward.

108.    The statements in Paragraphs 97–102 concerning the operational readiness and performance of Iovance's onboarded authorized treatment centers were materially false or materially misleading when made, and omitted material information necessary to make them not misleading when made.  These statements included Iovance's representations that more than 30 authorized treatment centers were prepared to collect and ship tumor tissue, had staffing, training, and processes in place to proceed immediately toward treating patients, were ready for approval, were "ramping right away," and were moving patients through the AMTAGVI treatment journey with a clear sense of urgency.  As alleged in Paragraphs 69 and 81 above, an authorized treatment center that was counted or listed by Iovance could not actually treat AMTAGVI patients unless it had the necessary infrastructure, personnel, training, cryopreservation capabilities, and operational readiness.  As alleged in Paragraphs 103–104 above, Iovance also began receiving real-time data after launch showing the extent to which its authorized treatment centers were actually scheduling surgeries, coordinating manufacturing slots, moving patients through the treatment regimen, and completing infusions.  Iovance's subsequent disclosure on February 27, 2025, discussed further in Paragraph 202 below, supplied later corroboration: among approximately 70 authorized treatment centers onboarded during 2024, approximately 24% had not completed a single tumor-harvesting surgery and approximately 36% had not completed a single AMTAGVI infusion during 2024.  The Iovance Class Complaint attributes to FE1 and FE2 allegations that many authorized treatment centers counted as onboarded were not truly operationally ready (*see* Iovance Class Complaint ¶¶

101–15, 120–26).   These later-disclosed metrics and attributed allegations support Plaintiff's assertion that "onboarded" status did not necessarily mean that an authorized treatment center was actively treating AMTAGVI patients or contributing to completed AMTAGVI infusions.

109.    The statement from Iovance reproduced in Paragraph 105 that its iCTC facility had annual manufacturing capacity "for up to several thousand patients as built" was also materially false or materially misleading when made, and omitted material information necessary to make it not misleading when made.  As alleged in Paragraphs 80 and 82–85 above, Iovance knew or recklessly disregarded that its iCTC facility did not have the practical capacity that it was touting. The Iovance Class Complaint attributes to FE1 the statements that the iCTC facility had only one quarter of the existing space completed (*see* Iovance Class Complaint ¶ 140), could not accommodate the stated 2,000-patient volume when AMTAGVI was approved (*see id.* ¶¶ 128, 171), and lacked manufacturing technology sufficient to produce AMTAGVI for more than 2,000 patients per year (*see id.* ¶¶ 144, 171).  Iovance's failure to disclose the alleged higher potency threshold and monthly manufacturing slot limitation, together with their practical effects, further rendered the "several thousand patients as built" representation misleading because those alleged constraints bore directly on how much AMTAGVI Iovance could actually manufacture.

110.    The statements in Paragraph 106 concerning the purported complete flexibility of Iovance's manufacturing side, the absence of any need for authorized treatment centers to stagger surgical procedures around manufacturing slot availability, and the existence of "plenty of capacity" to meet current and expected initial patient demand were materially false or materially misleading when made, and omitted material information necessary to make them not misleading when made.  As alleged in Paragraphs 82–85 above, the FDA imposed or required a monthly manufacturing slot limitation and a higher AMTAGVI potency threshold, and certain

manufacturing slots were dedicated to patients in Iovance's confirmatory clinical trials.  These facts materially constrained Iovance's practical manufacturing flexibility and made it misleading to suggest that authorized treatment centers could schedule patient procedures largely at their choosing.  Consistent with this point, public summaries of a July 29, 2024 report from the investment bank Piper Sandler (the "Piper Sandler July 29, 2024 Report") described field work with six of Iovance's authorized treatment centers indicating that certain authorized treatment centers had experienced longer-than-anticipated waits for AMTAGVI manufacturing slots, potentially up to six weeks.[25]  Together, these facts directly contradicted Iovance's statements that manufacturing was completely flexible and that Iovance had plenty of capacity for current and expected initial demand.

111.    The generalized characterizations in Paragraphs 88–96 and 106 that AMTAGVI's launch was going very well or exceeding expectations are not alleged to be actionable in isolation. Plaintiff alleges that, considered together with the accompanying concrete representations concerning the expected "large bolus" or "steady ramp" of patients, manufacturing flexibility, and available capacity, they conveyed a materially misleading picture of then-existing launch

---

[25]    *See* Vandana Singh, Iovance Biotherapeutics Price Forecast Slashed By 40% On Mutated Uptake For Its Newly Approved Skin Cancer Cell Therapy, Benzinga (July 29, 2024), https://www.benzinga.com/analyst-ratings/analyst-color/24/07/40019272/iovance-biotherapeutics-price-forecast-slashed-by-40-on-mutated-uptake-for-its-newl (last accessed July 28, 2026) (reporting field work with six authorized treatment centers indicating that certain authorized treatment centers had experienced longer-than-anticipated waits for manufacturing slots, potentially up to six weeks).

Piper Sandler's Equities page describes Piper Sandler meetings, conferences, and reports as "client-only"; its Research page provides a link for "Research Access"; and its account-access page states that users must log in to access Piper Sandler research.  Plaintiff was not a Piper Sandler client and did not have access to the Piper Sandler July 29, 2024 Report through Piper Sandler's research-access platform.  Plaintiff's allegations concerning the Report are based on publicly available summaries reviewed at a later time.  *See* Piper Sandler, Equities, https://www.pipersandler.com/equities (last accessed July 28, 2026); Piper Sandler, Research, https://www.pipersandler.com/research (last accessed July 28, 2026); Piper Sandler, Access Your Account, https://www.pipersandler.com/log (last accessed July 28, 2026).

conditions.  As alleged in Paragraphs 82–85, 103–104, and 108–110 above, Iovance allegedly knew or recklessly disregarded that the launch was constrained by the FDA's higher potency threshold and monthly manufacturing slot limitation, practical iCTC capacity and technology limitations, and authorized treatment centers that were not ramping at the pace represented.  The manufacturing-slot waits described in Paragraph 110 further undercut the concrete capacity and scheduling representations that accompanied the optimistic characterizations.

112.    Likewise, the correlation that Iovance drew between the number and growth of its authorized treatment centers and sustained growth in AMTAGVI infusions was materially misleading when made.  As alleged in Paragraphs 69 and 81 above, a center that was counted or listed by Iovance could not treat AMTAGVI patients without the necessary infrastructure, personnel, training, cryopreservation capabilities, and operational readiness.  As alleged in Paragraphs 103–104 above, Iovance also received real-time data after launch showing whether its authorized treatment centers were scheduling surgeries, coordinating manufacturing slots, moving patients through the treatment regimen, and completing infusions.  The later-disclosed metrics and former-employee allegations described in Paragraph 108 corroborated that authorized treatment center count and growth did not reliably measure actual treatment readiness or completed infusions.  Iovance's omission of the centers' true operational status therefore made its authorized-treatment-center count and growth narrative materially misleading.

G.    **During April and May 2024, Iovance Continued to Portray All Aspects of AMTAGVI's Commercial Launch as Very Positive, While Also Claiming That Its Manufacturing Was Setting a New Bar for Cell Therapy Launches.**

113.    Throughout April and May 2024, Plaintiff continued to hold onto its position in Iovance long-term call options – instead of closing it and recognizing an extraordinary profit

therefrom – in reliance upon a set of material statements and representations from Iovance, including, *inter alia*, that:

(1)    Iovance's commercial launch of AMTAGVI was off to a "strong start";

(2)    Iovance was expecting a "high conversion" of patients from screening to treatment because the doctors at Iovance's authorized treatment centers were choosing as much as possible the right patients;

(3)    Iovance's authorized treatment centers were enrolling patients at "high capacity";

(4)    Iovance expected a "steady ramp" in patients to continue for the coming quarters;

(5)    Iovance was "very pleased" with the initial AMTAGVI launch metrics;

(6)    "Everything" was "very positive" in terms of the metrics that one might look at to gauge the strength of AMTAGVI's commercial launch;

(7)    Iovance was staffed appropriately for launch;

(8)    Iovance's manufacturing side was "setting a new bar for cell therapy launches";

(9)    Iovance had ample manufacturing capacity in place to handle current demand, along with demand for the rest of 2024 and going into 2025;

(10)    Iovance's iCTC facility, as currently built, had the capacity to provide TIL therapies for more than 2,000 patients per year.

(11)    Iovance's authorized treatment centers had observed that Iovance's manufacturing side had sufficient availability of manufacturing slots;

61

(12)   Iovance's authorized treatment centers reported having a positive experience in the scheduling process with Iovance's manufacturing;

(13)   The trends in the drop-off/attrition of patients undergoing the AMTAGVI treatment regimen were similar to what Iovance had expected, "nothing unexpected" was happening, and Iovance was "quite pleased" with the progress;

(14)   There were few, but not many, patient dropouts and manufacturing issues (which Iovance believed were playing out the way it had expected) and "**obviously**" this would be less of an issue going forward; and

(15)    Patient drop-offs prior to infusion with AMTAGVI were "rare enough that it raises an eyebrow," and were "not a very common event at all."

114.   In a press release attached to Iovance's Q1 2024 Earnings 8-K (May 9, 2024), Defendant Vogt stated that Iovance's commercial launch of AMTAGVI was off to a "strong start." He added that Iovance expected for its AMTAGVI launch momentum "to remain strong and continue to build as we ramp up the U.S. launch throughout 2024 with the authorization of additional ATCs."  Thus, here, Defendant Vogt drew a correlation between the onboarding of additional authorized treatment centers and a continued build-up in AMTAGVI's commercial launch momentum.

115.   Defendant Vogt also contended at this time that from among the more than 100 patients that were then enrolled in the AMTAGVI treatment regimen, "most" were expected to be ready for infusion across the second and early third quarters of 2024.  Thus, as of this time, Iovance was projecting a **greater-than-50% success rate** for patients that were enrolled as of that time in the AMTAGVI treatment regimen.  In further support of this projection, approximately two weeks later, at the TD Cowen 5th Annual Oncology Innovation Summit on May 28, 2024, Defendant

62

Bilinsky stated that Iovance was expecting for "most" of the patients enrolled in AMTAGVI therapy as of May 9, 2024 to receive AMTAGVI infusions.

116. Also during Iovance's Q1 2024 Earnings Call on May 9, 2024, VP Ziegler added that Iovance expected a "high conversion" of patients from screening to enrollment in the AMTAGVI treatment regimen because the doctors at Iovance's authorized treatment centers were choosing "as much as possible the right patients."

117. Defendant Vogt further mentioned at this time that Iovance had authorized treatment centers that were enrolling patients at "high capacity," and that some of them were making statements to analysts along the lines of increasing their patient enrollments by 3 or 5 **additional** patients per month (in six months). Defendant Vogt added that Iovance expected this to be the case across many of its authorized treatment centers.

118. Iovance also announced at this time that it expected to have more than 70 authorized treatment centers onboarded by the end of 2024 (up from 50). Moreover, according to VP Ziegler, Iovance anticipated sustained growth throughout the year as the number of its authorized treatment centers expanded.

119. On Iovance's manufacturing side, <u>each</u> of Defendant Vogt and Defendant Bilinsky stated during Iovance's Q1 2024 Earnings Call on May 9, 2024, that in terms of commercial manufacturing, Iovance was "**setting a new bar** for cell therapy launches."  [emphasis added] <u>Each</u> of Defendant Vogt and Defendant Bilinsky also added that Iovance was staffed appropriately for launch.

120.  Defendant Vogt further stated at this time that Iovance's authorized treatment centers had observed "sufficient availability of manufacturing slots" and reported "positive experience" in the scheduling process.

63

121.    Also at this time, Defendant Bilinsky stated (as he had stated throughout 2023) that Iovance's iCTC facility, as currently built, had the capacity to provide TIL therapies for more than 2,000 patients per year.

122.    In the following week, at the Citizens JMP Life Sciences Conference, held in New York, New York on May 13, 2024, Iovance Chief Business Officer Howard Johnson ("CBO Johnson") stated that Iovance was "very pleased with the initial launch metrics."

123.    CBO Johnson further stated at the Citizens JMP Life Sciences Conference on May 13, 2024, that "**everything is very positive**" [emphasis added] in terms of the metrics that one might look at to gauge the strength of the launch.

124.    Additionally, CBO Johnson stated at the Citizens JMP Life Sciences Conference on May 13, 2024, that Iovance had ample manufacturing capacity in place to handle current demand, along with demand for the rest of 2024 and going into 2025.

125.    Approximately two weeks later, at the TD Cowen 5th Annual Oncology Innovation Summit on May 28, 2024, Defendant Bilinsky stated that, in general, Iovance's authorized treatment centers were doing well in terms of navigating the entire AMTAGVI patient treatment journey.  He added that they commented positively back to Iovance on "the availability of manufacturing slots and the just overall generally positive experience with the scheduling process."

126.    Defendant Bilinsky also stated at this time that Iovance's authorized treatment centers may start with one or two patients and "**then they ramp up**."  He added that Iovance expected for the "**steady ramp**" in patients to continue for the coming quarters.

127.    Around this time, industry analysts began to question Iovance regarding patient drop-off/attrition and manufacturing matters.  Iovance's general response, which it adopted

throughout 2024 and into 2025, was to minimize or trivialize matters that industry analysts had asked about, or to characterize these matters as having been in line with its expectations.

128.    For example, during Iovance's Q1 2024 Earnings Call on May 9, 2024, Defendant Vogt mentioned that Iovance had a few patient dropouts, but that "most of the time" this was due to patient health issues (*e.g.*, death) before AMTAGVI could be fully manufactured and tested for them.

129.    Defendant Vogt further stated at this time that the rate of patient drop-off/attrition was "in line" with Iovance's expectations.  He added that there were "a few dropouts as well as manufacturing aspects, not many and based on our experience we feel like **it's playing out the way we had expected.**  We're only going to get better at this… **obviously** that will be less of an issue as we go forward with the launch here."  [emphases added]

130.    Similarly, during Iovance's Q1 2024 Earnings Call on May 9, 2024, Iovance was asked by an industry analyst (*i.e.,* Ben Burnett, at Stifel):

> … Are you seeing any bottlenecks popping up, like for example, are there any, have there been any learnings that have needed to happen sort of efficiently coordinate with the surgeon or anything like that?

Defendant Vogt stated in response that it *was the opposite,* and that most of the things that it encountered were "really just sort of small questions on details," commenting as follows:

> **Actually, I would say the opposite**.  We've really seen a tremendous enthusiasm from the surgeon all the way through the cell therapists and the nurses that treat these patients.  We've seen a hospital bend over backwards to find **operating room time, space in the hospital**.  **We really haven't experienced any of the potential bottlenecking even as we increase**.  **Most of the things that we encounter are really just sort of small questions on details**, but not the big issues like having a time or place to treat a patient.  [emphases added]

131.    Iovance was then asked by this same industry analyst (*i.e.,* Ben Burnett, at Stifel) about (i) the quality of the tumor samples that were being harvested by surgeons at Iovance's

authorized treatment centers and sent to Iovance's manufacturing; and (ii) how the specifications around these tumor samples compared with what Iovance saw in its AMTAGVI clinical trials. Defendant Bilinsky stated in response that Iovance's experience had been "**very consistent with our clinical experience**, including the quality and the size and the quality of the tumor samples for manufacturing." [emphasis added]

132. VP Gastman added at this time that "the patient selection overall has been pretty good" and that the "actual drop off because of progression" (*i.e.,* the drop off as patients progressed through the AMTAGVI treatment regimen) was "rather low." He further stated: "What happens is it's rare enough that it raises an eyebrow, but it's not a very common event at all. It's just something that's happened at least once. **But it's definitely no more maybe even less than what we were expecting." [emphasis added]** VP Gastman provided further context here by saying that Iovance's "education to this [these] authorized treatment centers has paid off."

133. Approximately three weeks later, at the TD Cowen 5th Annual Oncology Innovation Summit on May 28, 2024, Iovance was again asked about patient attrition, from patient screening to enrollment, and from patient enrollment to infusion. Defendant Bilinsky stated in response that **"**for now, the trends we see are very similar to what we're expecting. **So nothing unexpected is happening so far, and** we're quite pleased with the progress." [emphasis added]

134. Moreover, when Iovance was asked at this time about reasons for a patient not getting an infusion after enrollment, Defendant Bilinsky stated in response: "That's rare. That is rare… the frequency of them happening [is] **what we've been expecting in advance of launch**." [emphasis added]

135. As for Iovance's cash position at this time, CBO Johnson stated at the JMP Life Sciences Conference on May 13, 2024, that "[w]e feel great about the cash position. It takes us

**late into next year** [*i.e.,* late into 2025]." [emphasis added]  Notwithstanding this statement from CBO Johnson, however, Iovance raised (i) approximately $152.4 million between April and June 2024 through the sale of its common stock; and (ii) on information and belief, as discussed in Paragraph 226 below, approximately $47.6 million in additional proceeds through the sale of its common stock shortly prior to August 8, 2024.

136.   On information and belief, Iovance dedicated a portion of the proceeds of these stock sales to address its manufacturing issues.  These stock sales by Iovance had the effect of diluting existing shareholders and pressuring the price of its stock downward.

137.   The statements in Paragraphs 115–116 concerning "most" enrolled patients being expected to be ready for infusion and Iovance's expected "high conversion" of patients from screening to enrollment were materially false or materially misleading when made, and omitted material information necessary to make them not misleading when made.  The Iovance Class Complaint attributes to FE2 the allegations that Iovance was aware that weekly patient drop-off levels approached 40–50% and that Iovance's commercial team, led by VP Ziegler, advocated signing up "any and all" patients regardless of treatment appropriateness (*see* Iovance Class Complaint ¶¶ 151–54, 226).  Those attributed allegations support Plaintiff's assertion that the uniformly favorable conversion and attrition picture presented by Iovance omitted materially adverse information then available to it.

138.   The statements in Paragraphs 114 and 117–118 concerning launch momentum remaining strong as more authorized treatment centers were onboarded, authorized treatment centers enrolling patients at "high capacity," and sustained growth throughout 2024 as the number of authorized treatment centers expanded were materially false or materially misleading when made, and omitted material information necessary to make them not misleading when made.  As

alleged in Paragraphs 69, 81, and 108 above, many centers that Iovance counted or described as onboarded lacked the training, qualification, infrastructure, or operational readiness necessary to treat AMTAGVI patients.  The later-disclosed metrics and source allegations described in Paragraph 108 corroborated that public authorized-treatment-center counts overstated actual treatment readiness and patient-throughput capability.

139.    For the same reasons, Iovance's repeated linkage between authorized treatment center counts and expected infusion growth was materially misleading when made.  As alleged in Paragraphs 114 and 118 above, Iovance told investors that the authorization of additional centers would support sustained growth.  But as alleged in Paragraphs 69, 81, 103–104, and 108 above, Iovance knew or recklessly disregarded that many authorized treatment centers were not operationally ready or were not actively moving patients through the AMTAGVI treatment regimen.  Because those centers could not meaningfully contribute to infusion growth until they could actually move patients to infusion, Iovance's omission of their true operational status made its authorized-treatment-center count and growth narrative misleading.  The later-disclosed activity metrics described in Paragraph 108 corroborated why authorized-treatment-center count could not reliably serve as a proxy for completed infusions.

140.    The statements in Paragraphs 119–121 and 124–126 concerning Iovance's manufacturing capacity, sufficient manufacturing slot availability, positive scheduling experience, and ability to provide manufacturing support for current demand, the rest of 2024, and going into 2025 were materially false or materially misleading when made, and omitted material information necessary to make them not misleading when made.  As alleged in Paragraphs 80 and 82–85 above, Iovance's practical manufacturing capacity was constrained by (i) the state of its iCTC facility build-out; (ii) manufacturing-technology limitations; (iii) the FDA's monthly manufacturing slot

68

limitation; and (iv) the FDA's higher potency threshold.  FE1, the former Iovance Senior Vice President of Technical Operations identified in the Iovance Class Complaint, stated that Iovance's iCTC facility had only one quarter of the existing space completed (*see* Iovance Class Complaint ¶ 140), could not accommodate the stated 2,000-patient volume when AMTAGVI was approved (*see id.* ¶¶ 128, 171), and lacked manufacturing technology sufficient to produce AMTAGVI for more than 2,000 patients per year (*see id.* ¶¶ 144, 171).

141.    The statements in Paragraphs 125–126 concerning authorized treatment centers doing well in navigating the AMTAGVI patient journey, reporting positive scheduling experience, and producing an expected "steady ramp" in patients were also materially false or materially misleading when made, and omitted material information necessary to make them not misleading when made.  As alleged in Paragraphs 82–85 and 110 above, Iovance's manufacturing side was constrained by FDA-imposed or FDA-required limitations, including limited monthly manufacturing slots and the higher potency threshold.  As alleged in Paragraphs 103–104 above, Iovance had real-time visibility into the patient journey, including scheduling constraints, patient drop-offs, and manufacturing slot coordination.  These facts undercut Iovance's portrayal of a smooth scheduling process and steady patient ramp.  The manufacturing-slot waits described in Paragraph 110 further undercut Iovance's portrayal of a smooth scheduling process and a steady patient ramp.

142.    The generalized descriptions in Paragraphs 122–124 that Iovance was "very pleased" with the initial launch metrics and that "everything is very positive" are not alleged to be actionable in isolation.  Considered together with the concrete representation that Iovance had ample manufacturing capacity for current demand, the rest of 2024, and demand going into 2025, those statements conveyed a materially misleading picture of then-existing launch conditions.  As

alleged in Paragraphs 103–104 and 108–111 above, Iovance had real-time data concerning scheduled tumor-harvesting surgeries, delayed or canceled procedures, patient drop-offs, manufacturing-slot coordination, and completed AMTAGVI infusions, against a backdrop of authorized-treatment-center readiness problems, slot constraints, and manufacturing limitations. The manufacturing-slot waits described in Paragraph 110 further undercut the concrete capacity and scheduling representations that accompanied the optimistic characterizations.

143.    The statements in Paragraphs 119-121, 129, and 131 concerning Iovance's manufacturing side "setting a new bar" for cell therapy launches, its staffing being appropriate for launch, its iCTC capacity, the supposedly limited nature of its manufacturing issues, and its tumor-sample experience being consistent with clinical experience were materially false or materially misleading when made, and omitted material information necessary to make them not misleading when made.  Plaintiff does not allege that the generalized phrase "setting a new bar" is actionable in isolation.  Rather, Plaintiff alleges that, considered together with the accompanying concrete representations concerning staffing, annual capacity, manufacturing-slot availability, tumor-sample quality, and consistency with clinical experience, it conveyed a materially misleading picture of then-existing manufacturing operations.  Later real-world evidence corroborated the type and materiality of the alleged manufacturing problems.  The Oregon Health & Science University Study reported that, among patients in its single-center cohort who proceeded to tumor-harvesting surgery, the "out-of-specification" rate for the AMTAGVI batches generated by Iovance was 38.5% – meaning that Iovance failed to generate a suitable batch of AMTAGVI for more than 1 in 3 of those patients.  Stated in manufacturing-success terms, this 38.5% out-of-specification rate indicated a manufacturing success rate of only 61.5% for the Oregon cohort – at least 28.5 percentage points below the greater-than-90% manufacturing success rate that

70

Defendant Bilinsky represented Iovance had achieved in its clinical experience prior to AMTAGVI's launch.  Moreover, on information and belief, Iovance participated in coordinating manufacturing slots for the patients at the authorized treatment center that was featured in the Oregon Health & Science University Study (regardless of whether the manufacturing was ultimately performed at Iovance's iCTC facility or by a third-party contract manufacturer), and Iovance or its contractor received and processed the tumor tissue harvested from each of the patients at this authorized treatment center who proceeded to surgery;  Iovance therefore had contemporaneous access to the patient-specific manufacturing-specification results – including whether resulting AMTAGVI batches were out-of-specification – that the Oregon Health & Science University Study later disclosed in the aggregate in May 2025, after Plaintiff had liquidated its entire remaining long-term Iovance call option position.  Plaintiff does not rely on this later-published study, standing alone, to establish Defendants' earlier knowledge; it is pleaded as corroboration of the nature and materiality of the same manufacturing-specification results that Iovance allegedly generated and tracked during the Relevant Period.  The Iovance Class Complaint attributes to FE2 the allegation that Iovance's "out-of-specification" rate at launch was approximately 50%, and attributes to FE1 the allegation that the rate worsened after approval because the FDA's higher potency threshold increased the number of batches that failed to meet manufacturing specifications (*see* Iovance Class Complaint ¶¶ 148–49).  It also attributes to FE3 – a former Iovance Quality Operations specialist from January 2025 through August 2025 (*see id.* ¶ 157) – later observations concerning quality-control and infrastructure issues, including documentation, storage security, sterile-environment layout, labeling, leaks, and power outages (*see id.* ¶¶ 161–65).  Those FE3 observations are pleaded as later corroboration of the type of quality-control and infrastructure problems alleged, not as independent proof that the same

71

conditions existed on each earlier statement date. The Iovance Class Complaint further attributes to FE1 the statement that Iovance lacked a fully built-out quality-control team (*see id.* ¶ 166).

144. The statements in Paragraphs 127–134 concerning patient attrition, patient selection, patient drop-offs supposedly being rare or in line with expectations, reasons for patients not getting infusions being rare, and patient selection being "pretty good" were materially false or materially misleading when made, and omitted material information necessary to make them not misleading when made. As alleged in Paragraphs 103–104 above, Iovance had direct visibility into patient progress and attrition through the AMTAGVI treatment regimen. The Iovance Class Complaint attributes to FE2 allegations reflecting materially higher attrition than Iovance's public statements suggested (*see* Iovance Class Complaint ¶¶ 151–54). Separately, the manufacturing evidence described in Paragraph 143 undercut the broader representation that the reasons patients failed to reach infusion were rare and that commercial experience was consistent with clinical experience.

**H.    In June 2024, Iovance Continued to Portray Its AMTAGVI Launch as "Going Great," While Stating That AMTAGVI Infusions Were "Ramping Up."**

145. On June 6, 2024, at the Jefferies Global Healthcare Conference in New York, New York, Defendant Vogt stated that the "main things" that were giving Iovance confidence were that its existing authorized treatment centers were "ramping up" and that new authorized treatment centers were coming on, and that from this, along with community referrals, Iovance was seeing a "ramping up" in AMTAGVI infusions.

146. Four days later, at the Goldman Sachs 45th Annual Global Healthcare Conference on June 10, 2024, VP Gastman stated: "So I think overall, I think we'd all agree in the company, the launch is going great. The demand is very good."

147.    VP Gastman, at this time, also portrayed the number of Iovance's onboarded authorized treatment centers (30 upon AMTAGVI's commercial launch, and 50 within 90 days thereafter) as a "great leading indicator" of AMTAGVI demand, interest and patient need.

148.    VP Gastman further added at this time that "the majority of patients" enrolled in the AMTAGVI treatment regimen follow through, thereby supporting the position previously adopted by each of Defendant Vogt and Defendant Bilinsky during Iovance's Q1 2024 Earnings Call on May 9, 2024, as described in Paragraph 115 above, that "most" (*i.e.,* more than 50%) of the patients then enrolled in the AMTAGVI therapy regimen were expected to be ready for infusion.

149.    The generalized characterization in Paragraphs 145–148 that the launch was "going great" is not alleged to be actionable in isolation.  Plaintiff alleges that, considered together with the accompanying concrete representations that existing authorized treatment centers were ramping, authorized-treatment-center count was a leading indicator of demand, and most enrolled patients would proceed toward infusion, the statements conveyed a materially misleading picture of then-existing launch conditions.  The later-disclosed authorized-treatment-center metrics and former-employee allegations described in Paragraph 108, the manufacturing evidence described in Paragraph 143, and the manufacturing-slot waits described in Paragraph 110 undercut the representation that the authorized-treatment-center and manufacturing sides were functioning smoothly and producing a reliable ramp toward billable AMTAGVI infusions.

I.    **In August 2024, Iovance Reported 25 Second-Quarter AMTAGVI Infusions but Simultaneously Issued 2025 Revenue Guidance and Claimed Detailed Internal Visibility Into the Expected Growth.**

150.    On August 8, 2024, Iovance announced its earnings results for the second quarter of 2024 and disclosed that 25 patients had been infused with AMTAGVI during the quarter.  This

result materially undercut aspects of Iovance's prior statements concerning patient backlog, authorized-treatment-center ramping, launch growth, operational readiness, and manufacturing performance.

151.    Rather than acknowledge that the 25-infusion result materially undercut aspects of its prior launch narrative, Iovance simultaneously emphasized purported "early success," stated that it was pleased with the results, represented that its authorized treatment centers and manufacturing operations were performing as expected, and minimized or characterized as expected the operational concerns that analysts had raised.

152.    Iovance also introduced two important elements to its public narrative at that time. First, Iovance delivered future product revenue guidance for the first time, projecting that (i) its total product revenue for 2024 would be in the range of $160 to $165 million; and (ii) its total product revenue for 2025 would be in the range of $450 to $475 million, a range nearly three times the range projected for 2024.  Second, Defendant Vogt stated that "the whole point" of providing the guidance was so that the public could "rely" on Iovance's internal understanding of AMTAGVI infusions and "see what the upswing is going to look like here," stating as follows:

> But **the whole point** of us giving guidance is so **that you can *rely* on our internal understanding of infusions** and PROLEUKIN demand **and see what the upswing is going to look like here**.  It's a very positive uptake of both PROLEUKIN and especially AMTAGVI.  [emphases added]

One industry analyst (*i.e.,* Tyler Van Buren at TD Cowen) subsequently characterized Iovance's total product revenue projection of $450 to $475 million for 2025 as a "monster number" for a cell therapy launch.[26]

---

[26]    TD Cowen 45th Annual Health Care Conference (March 3, 2025).

153.   Defendant Vogt added that Iovance's total product revenue guidance for 2025 was based in part upon Iovance's "**ongoing experience and confidence**" [emphasis added] in the purportedly "strong uptake and significant quarter-over-quarter growth in AMTAGVI demand and corresponding PROLEUKIN sales for the foreseeable future."

154.   Defendant Vogt further claimed at this time that Iovance had used its "**visibility**" into the growth rate of AMTAGVI infusions – along with information that it had obtained about the adoption of AMTAGVI therapy across its network of authorized treatment centers, its manufacturing capacity, and additional launch dynamics – in coming up with its total product revenue guidance.

155.   Defendant Vogt also emphasized Iovance's knowledge and sight into AMTAGVI's launch dynamics in responding to a question from an industry analyst.  To demonstrate, during Iovance's Q2 2024 Earnings Call on August 8, 2024, an industry analyst (*i.e.,* Andrea Tan, at Goldman Sachs) asked Defendant Vogt about what was driving Iovance's confidence for its full year 2025 guidance, given where Iovance stood in its AMTAGVI launch after six months. Defendant Vogt stated, in response, that Iovance knew "all the dynamics" and was "**very, very confident**" in its guidance because it had "**such a good picture of launch dynamics right now**," explaining as follows:

> But really what we're trying to do with the guidance is give you the big numbers, so you don't have to worry about enrollments and that sort of thing you can figure out exactly what we're seeing in terms of infusions.  What's giving us guidance on that fiscal year 2025 guidance, the full year 2025 guidance.  We can see the launch, we see how we're doing.  **We know all the dynamics.  We know how many ATCs are coming on board.  We know what we think they're going to do.  We know our manufacturing capacity and all the details around that stuff** that would be very difficult, I think, for the street to model in some cases.  So we're going to provide it for you **so you have clarity** on what we're seeing.  **We are very, very confident in that guidance** based on what we're seeing so far in the initial part of the launch, **because we've got such a good picture of launch dynamics right now**.  [emphases added]

75

156.   Thus, Iovance, at this time, was effectively telling industry analysts that since Iovance (i) knew "all the dynamics" associated with AMTAGVI's commercial launch; and (ii) had "such a good picture" of AMTAGVI's commercial launch dynamics (which led Iovance to become "very, very confident" in its guidance), Iovance was providing "clarity," so **that industry analysts wouldn't have to rely on aspects of their own modeling**, as they might otherwise have to do (and which might otherwise be very difficult to generate in this type of circumstance).

157.   Plaintiff alleges that these two elements – providing aggressive 2025 total product revenue guidance and representing that investors could **rely** on Iovance's internal understanding – obscured the significance of the 25-infusion result and maintained the misleading public narrative concerning the launch.

158.   During Iovance's Q2 2024 Earnings Call on August 8, 2024, Defendant Vogt stated that the initial quarter of product revenue from AMTAGVI's U.S. launch demonstrated "early success." VP Ziegler added that Iovance was "extremely pleased with the early launch performance."

159.   Defendant Vogt further stated at this time that Iovance expected "significant quarter-over-quarter growth in product revenue to continue throughout 2024, 2025, and beyond." He added that demand trends and broader utilization of AMTAGVI among Iovance's expanding network of authorized treatment centers were expected to "accelerate" quarterly growth in Iovance's total product revenue throughout 2024 and 2025.

160.   On the patient treatment side of the AMTAGVI treatment regimen, Defendant Vogt contended that Iovance had a "very engaged network" of more than 50 authorized treatment centers, while adding that these authorized treatment centers had the training, infrastructure and capabilities to treat patients with AMTAGVI. VP Ziegler further commented that Iovance's

76

network of authorized treatment centers was "scaling and expanding as planned," and that those of its authorized treatment centers that were active at the time of AMTAGVI's FDA approval were "scaling up."

161.    On the manufacturing side of the AMTAGVI treatment regimen, Defendant Vogt stated that Iovance was then staffed to provide manufacturing slots to meet current and expected demand.  Going beyond this, Defendant Bilinsky contended that:

- Iovance's experience to date had been "consistent with our expectations and with prior clinical experience";

- Iovance was executing and scaling up as planned;

- Iovance had sufficient capacity and staffing to meet "increasing AMTAGVI demand"; and

- Iovance was running its manufacturing network at "high capacity utilization while ensuring slot availability" for its authorized treatment centers.

162.    Iovance also continued to tout its manufacturing capacity at this time, stating in its Q2 2024 Earnings 8-K (August 8, 2024) that its iCTC facility and an FDA-approved contract manufacturer currently had capacity to treat several thousand patients annually, while adding that expansion was currently underway for its iCTC campus to supply TIL cell therapies (*e.g.,* AMTAGVI therapy) for more than 5,000 patients annually in the next few years (while adding that its long-term goal was to establish a manufacturing network to address more than 10,000 patients annually).

163.    Additionally, at this time, Iovance confidently identified growth in the number of its authorized treatment centers (per Defendant Vogt's statement, quoted in Paragraph 155 above,

that "[w]e know how many ATCs are coming on board") with growth in the number of AMTAGVI infusions to be expected – and in support of its total product revenue guidance for 2025.

164.    On information and belief, in order for Iovance to have matched or exceeded its total product revenue projection for 2025 (*i.e.,* $450 to $475 million), more than 700 AMTAGVI infusions would have had to have been performed over the course of 2025 (representing more than 175 AMTAGVI infusions per quarter, on average, over the course of 2025).[27]

165.    In view of the fact that Iovance had previously announced (on May 9, 2024) that it expected to have more than 70 authorized treatment centers onboarded by the end of 2024, this effectively meant the following:

> (1)    If, in 2025, each of Iovance's 70 authorized treatment centers had performed <u>only one AMTAGVI infusion per month</u> (amounting to three AMTAGVI infusions per quarter, per authorized treatment center, in 2025), then 210 AMTAGVI infusions would have been performed per quarter in 2025, amounting to **840 AMTAGVI infusions over the course of 2025**; and

---

[27]    On information and belief, revenue from AMTAGVI infusions was expected to generate approximately 85% of Iovance's total product revenue (as projected to be $450 to $475 million), with revenue from PROLEUKIN sales generating the remaining approximately 15%. *See, e.g.*, Iovance Biotherapeutics, Inc., Barclays 27th Annual Global Healthcare Conference transcript, Investing.com (Mar. 13, 2025), https://www.investing.com/news/transcripts/iovance-at-barclays-conference-strategic-growth-and-expansion-93CH-3927491 (last accessed July 28, 2026) (statement of Dan Kirby, Chief Commercial Officer) ("I think we've stated 10% to 15% on the long run . . . it usually has been 15% is what we project PROLEUKIN's contribution.").

Thus, taking into account that the cost of an AMTAGVI infusion was approximately $515,000, this effectively meant that if 85% of Iovance's total product revenue was generated from AMTAGVI (*i.e.,* 100% minus 15% attributable to PROLEUKIN), then Iovance was projecting that approximately 743 to 784 patients would be infused with AMTAGVI over the course of 2025 (with 743 to 784 being the results obtained by multiplying the $450 to $475 million total product revenue range by 85%, and then dividing the resulting AMTAGVI revenue range by $515,000).

(2)     If 840 total AMTAGVI infusions had occurred in 2025, then Iovance would have exceeded the 700 AMTAGVI infusions that, on information and belief, were required for Iovance to have satisfied its total product revenue projection for 2025 (*i.e.,* $450 to $475 million).

Thus, even though Iovance's total product revenue projection for 2025 (*i.e.*, $450 to $475 million) reflected a significant increase from its total product revenue projection for 2024 (*i.e.,* $160 to $165 million), after taking into account Iovance's prior statements and representations – including in connection with the operational readiness of, and degree of activity at, its authorized treatment centers and its manufacturing side – its total product revenue guidance for 2025 (*i.e.*, $450 to $475 million) seemed to Plaintiff to be quite achievable.  A salient countervailing consideration, however, was that if Iovance could <u>not</u>, in view of its prior statements and representations, generate this type of revenue (which, as described above, required, on average, ***only one AMTAGVI infusion per month at each of its authorized treatment centers***), then this would have evidenced that material aspects of Iovance's narrative were materially false or materially misleading when made.

166.    Also during Iovance's Q2 Earnings Call, an industry analyst (*i.e.,* Yanan Zhu, at Wells Fargo) raised the topic of the "ongoing attrition rate" among patients enrolled in AMTAGVI therapy.  Defendant Vogt addressed this by stating that the patient dropout rate and manufacturing success rate remained consistent with what Iovance observed in the clinical trial experience, adding that:

> Part of the reason we're giving guidance is so that **you don't have to necessarily factor that all in**.  We can see that pretty clearly and understand that.  And as we go, we may provide more details on that once we have a larger end in our data set here.  But right now, **we feel very good about those numbers**.  [emphases added]

167.   Additionally, during Iovance's Q2 Earnings Call on August 8, 2024, VP Ziegler responded to a question from an industry analyst (*i.e.*, Reni Benjamin, at JMP Securities) as to potential constraints at Iovance's authorized treatment centers and how they were dealing with prioritizing CAR-T therapies versus AMTAGVI therapy by stating that while there had been a lot of concern before AMTAGVI's commercial launch around the lack of hospital beds at Iovance's authorized treatment centers for the treatment of patients with AMTAGVI therapy, this did not appear to be any type of a constraint at all.  Thus, here again, Iovance minimized or trivialized a concern that had been asked about by an industry analyst.

168.   The generalized descriptions in Paragraphs 158–160 and 163 of "early success," an "extremely pleased" management team, and a "very engaged" authorized-treatment-center network are not alleged to be actionable in isolation.  Plaintiff alleges that, considered together with the concrete representations that the network had the training, infrastructure, and capabilities to treat patients, was scaling as planned, and supported infusion growth, they conveyed a materially misleading picture of then-existing launch operations.  As alleged in Paragraphs 69, 81, 108–111, 138–139, and 149 above, Iovance knew or recklessly disregarded that many authorized treatment centers it counted as onboarded were not treatment-ready, were not generating meaningful patient volume, or were not progressing patients efficiently through the AMTAGVI treatment regimen. The later-disclosed metrics and former-employee allegations described in Paragraph 108 corroborated that authorized-treatment-center growth and nominal onboarding did not reliably establish treatment readiness or infusion growth.

169.   The statements in Paragraphs 161–162 and 166–167 concerning manufacturing performance, manufacturing-slot availability, manufacturing capacity, commercial manufacturing being consistent with clinical experience, the absence of a backlog or slot problems, and the

purported resolution of patient-selection or slot-related issues were likewise materially false or materially misleading when made, and omitted material information necessary to make them not misleading when made. As alleged in Paragraphs 80, 82–85, and 109–110 above, Iovance knew or recklessly disregarded that the FDA had imposed or required a monthly manufacturing slot limitation and higher potency threshold, that the iCTC facility lacked the practical build-out and manufacturing technology publicly touted, and that authorized treatment centers were experiencing real-world slot constraints. The manufacturing evidence described in Paragraph 143 and the manufacturing-slot waits described in Paragraph 110 further undercut the claimed consistency with clinical experience and the asserted adequacy of slot availability.

170. The statements in Paragraphs 152–157, 159, and 163–165 concerning Iovance's 2024 and 2025 total product revenue guidance, the supposed basis for that guidance, Iovance's claimed visibility into launch dynamics, its assertion that investors could "rely" on its internal understanding of AMTAGVI infusions and PROLEUKIN demand, and its asserted confidence in significant quarter-over-quarter growth were materially false or materially misleading when made, and omitted material information necessary to make them not misleading when made. As alleged in Paragraph 164 above, the 2025 guidance required a dramatic increase in completed infusions. Yet, as alleged in Paragraphs 80–85, 108–111, and 137–144 above, Iovance knew or recklessly disregarded manufacturing limitations, practical iCTC constraints, authorized-treatment-center readiness problems, and manufacturing-quality issues that materially impaired the operational assumptions underlying that growth. The manufacturing evidence described in Paragraph 143, the slot waits described in Paragraph 110, and the later-disclosed authorized-treatment-center activity metrics described in Paragraph 108 further corroborated that those assumptions were materially

81

unreliable.   These then-existing facts materially undermined Iovance's claimed visibility, reliability, and confidence in the guidance.

171.   Taken together, the statements in Paragraphs 152–167 did not merely express optimism about future performance.  Iovance affirmatively represented that it had a present-tense internal view of the key inputs needed to support its 2025 guidance, including AMTAGVI infusion growth, authorized treatment center adoption, manufacturing capacity, manufacturing slot availability, and patient-throughput dynamics.  As alleged in Paragraphs 80–85, 108–111, 137–144, 149, and 168–170 above, however, Iovance possessed or recklessly disregarded contrary information showing that those inputs were materially impaired.  Iovance's failure to disclose these facts, while telling investors that the guidance could be relied upon and that Iovance knew "all the dynamics" of the launch, rendered the statements in Paragraphs 152–167 materially false or materially misleading when made, and omitted material information necessary to make them not misleading when made.

**J.     From September 2024 Through January 2025, Iovance Disclosed Limited Adverse Information but Repeatedly Reaffirmed Its 2025 Total Product Revenue Guidance and Claimed Continued Visibility Into Key Operational Data.**

172.   At the Wells Fargo 2024 Healthcare Conference on September 4, 2024, which took place almost one month after Iovance provided total product revenue guidance for 2025 reflecting significant projected growth (*i.e.,* on August 8, 2024), CBO Johnson stated that Iovance was "very comfortable" with its revenue projections.  He added that Iovance would not have offered this guidance if it didn't have "**great confidence** in being able to meet it and hopefully exceed it." [emphasis added]  He further explained that Iovance had a "**deep understanding**" of its authorized treatment centers – including "how many patients they're going to treat early on in their cycle" – and twice stated that Iovance knew "what their potential is."

173. One industry analyst (*i.e.,* Yanan Zhu, at Wells Fargo) asked at this time whether Iovance was confident in handling 700 patients (*i.e.*, the number of patients that she estimated was required in order for Iovance to satisfy its total product revenue guidance for 2025 of $450 to $475 million), and whether Iovance was comfortable in having the capacity to deliver this guidance. CBO Johnson stated in response: "**We do.  We do.**" [emphasis added]

174. Ms. Zhu then also asked whether any of Iovance's authorized treatment centers were underperforming.  VP Gastman stated in response that "[w]ell, first of all, **I can't call any center underperforming**."  [emphasis added]  He then added that: "[w]e have some centers, I'd say, maybe are I don't want to say overperforming, but are maybe doing better than we expected at this time point..."

175. CBO Johnson further stated at this time that Iovance's manufacturing success rate was good, and that Iovance was not seeing "anything different in the commercial setting that we didn't experience in the clinical setting."

176. CBO Johnson also noted at this time that "right now," Iovance's iCTC facility "is built for 2,000 patients."

177. Approximately one week later, at the Baird 2024 Global Healthcare Conference on September 10, 2024, an industry analyst (*i.e.,* Colleen Kusy, at Baird) asked Iovance whether its total product revenue guidance was "really realistic," as follows:

> … Just trying to understand what your approach to guidance is and how we should be thinking about this guidance.  **Is this really realistic?** [emphasis added]…"

Iovance CFO Bellemin replied with a "yes," and claimed that Iovance's line of sight into the various AMTAGVI launch dynamics led it to be confident about its earnings guidance.  He added that "**we know *and* we are confident that *the trajectory is set already***" [emphasis added], stating as follows:

So why are we confident to be able to go out there and talk about those guidance? **It's because we see the launch dynamic, all the ATCs are bringing the patients, what is happening in term of the manufacturing slot scheduling, what is happening in term of the patient selection, better outcome there. So** *we know and we are confident that the trajectory is set already*. We are of course increasing to 50 ATCs, we'll have 70 as we just discussed by the end of this year. Don't forget also the PROLEUKIN revenue I just commented. **So altogether, we are really confident about those numbers** [emphases added]

178. Ms. Kusy then asked Iovance about the "main pain points" or the "bottlenecks" that its authorized treatment centers had been dealing with. VP Gastman responded by stating: "I can't say there's been a lot of actual pain points in the sense that they weren't surmountable. Pretty much everything that we've seen are things that have been **easily and quickly addressable**." [emphasis added]

179. VP Gastman acknowledged at this time that Iovance had, in fact, experienced issues with manufacturing slot availability (*e.g.*, due to surgeons who operated only on certain days per month requesting the next available manufacturing slots), but VP Gastman claimed that Iovance had resolved this as well, and that he hadn't "seen anything that has been unsurmountable."

180. Defendant Bilinsky added at this time that Iovance's manufacturing experience commercially had been consistent with its clinical experience and that there was "**nothing unexpected**." He further stated that a team at Iovance had been doing a "fantastic job" in making sure that its authorized treatment centers harvested tissue properly for manufacturing, sharing best practices, and educating them.

181. On November 7, 2024, approximately two months later, Iovance issued its earnings results for the third quarter of 2024, and announced that 82 patients had been infused with AMTAGVI in the third quarter of 2024. While this reflected an increase in the number of AMTAGVI infusions from the second quarter of 2024, going forward, the number of AMTAGVI infusions per quarter, on average, had to **more than double from this point** – *i.e.,* from 82

84

infusions (per the result in the third quarter of 2024) to at least 175 AMTAGVI infusions per quarter, on average (as alleged in Paragraph 164 above) – in order for Iovance to have been able to satisfy (or exceed) its total product revenue guidance for 2025.

182.   During Iovance's Q3 2024 Earnings Call on November 7, 2024, an industry analyst asked Defendant Vogt a general question concerning what Iovance had done to improve the overall patient dropout rate in the third quarter of 2024 compared with the second quarter of 2024.  The analyst's question was not directed specifically to manufacturing.  Defendant Vogt responded that Iovance had not done "anything in particular," but was "optimizing the launch as we go," including by teaching authorized treatment centers how to move patients through the treatment process more effectively and perform better-quality surgical resections.  After stating that he expected the dropout rate to improve quarter over quarter, Defendant Vogt added that Iovance would "eventually get up to what we think will be the manufacturing success rate that we had, or at least manufacturing experience that we had during the clinical studies."  This remark by Defendant Vogt was an indirect and ambiguous indication that some aspect of Iovance's commercial experience had not yet reached the level experienced in its clinical studies.  This remark did not (i) identify any particular manufacturing issue; (ii) disclose the nature, extent, duration, or materiality of Iovance's manufacturing issues; (iii) quantify Iovance's commercial manufacturing success rate or out-of-specification rate; (iv) distinguish manufacturing-related failures from the other causes of patient dropout; or (v) identify or correct any particular prior statement or representation.

183.   Also during Iovance's Q3 2024 Earnings Call on November 7, 2024, Iovance reported that its cost of sales for the third quarter of 2024 included $8.3 million in period costs associated with patient drop-off and manufacturing success rates.  This disclosure did not (i) state

how much of the $8.3 million was attributable to manufacturing rather than patient drop-off; (ii) disclose Iovance's actual manufacturing success rate or out-of-specification rate; (iii) quantify how many patients or manufactured batches were affected; or (iv) explain the resulting effect on patient throughput, revenue, or Iovance's ability to attain its total product revenue guidance for 2025. Also, during this same earnings call, Iovance had introduced Defendant Bilinsky to highlight its "manufacturing progress." Defendant Bilinsky stated that Iovance's "manufacturing capacity continues its steady ramp up month over month," and added, "[w]e are pleased with our commercial manufacturing experience to date, which remains consistent with prior clinical experience." Defendant Bilinsky further represented that Iovance's iCTC facility "**as built today** has the capacity to provide TIL products for more than 2,000 patients annually" [emphasis added] and that "[f]urther expansion of our manufacturing campus in Philadelphia, along with process optimization and automation is expected to bring the capacity to over 10,000 patients annually." These affirmative and contemporaneous reassurances from Defendant Bilinsky obscured, rather than disclosed, the extent and materiality of Iovance's manufacturing issues.

184. Later during Iovance's Q3 2024 Earnings Call on November 7, 2024, in response to an industry analyst's questions concerning any trends or factors at Iovance's authorized treatment centers that influenced the out-of-specification rate, Defendant Vogt stated that "we had centers come on that were good and some that struggled to do resections and select patients." While this statement from Defendant Vogt as to struggling authorized treatment centers undercut VP Gastman's prior refusal to characterize any authorized treatment center as underperforming (as alleged in Paragraph 174 above), it did not specifically identify or correct VP Gastman's prior representation. Moreover, Defendant Vogt immediately minimized the issue, stating that Iovance had helped the struggling authorized treatment centers, that "[t]hey got better," that Iovance was

86

"gaining momentum and building momentum," and that "any ATC [authorized treatment center] can really get these skills to do AMTAGVI therapy." Defendant Vogt's statements also did not (i) disclose how many authorized treatment centers had struggled; (ii) describe the severity or duration of their difficulties; (iii) identify how many purportedly onboarded authorized treatment centers had not yet completed a tumor-harvest surgery or performed an AMTAGVI infusion; or (iv) explain the resulting effect on patient throughput, revenue, or Iovance's ability to attain its total product revenue guidance for 2025. Furthermore, during the same earnings call, Iovance stated that (i) its "motivated and expanding network" of authorized treatment centers continued to drive "strong adoption and uptake" of AMTAGVI; (ii) its authorized treatment centers continued to "scale up to treat more patients"; (iii) its authorized treatment center network was "scaling and expanding as planned"; and (iv) Iovance was "extremely pleased with the early launch performance as our ATCs successfully adopt and broaden utilization of AMTAGVI." These contemporaneous assurances portrayed Iovance's authorized treatment center difficulties as limited, improving, and nonmaterial, rather than disclosing the extent to which authorized treatment center readiness and productivity were limiting patient throughput and launch performance.

185. Notwithstanding the limited and incomplete indications of manufacturing and authorized treatment center difficulties described in Paragraphs 182–184, and amid the contemporaneous reassurances that accompanied them, Iovance reaffirmed its total product revenue guidance for 2025. In its Q3 2024 earnings release, furnished as Exhibit 99.1 to its Form 8-K filed on November 7, 2024, Iovance stated that "[t]otal product revenue remains on track to be within the range of $450 to $475 million in 2025." [emphasis added] Moreover, during Iovance's Q3 2024 Earnings Call on November 7, 2024, Defendant Vogt also expressly reiterated

87

Iovance's full-year 2025 guidance of $450 million to $475 million in total product revenue and stated that Iovance expected a "significant increase in year over year growth." Following these after-market disclosures, Iovance common stock fell approximately 13.8% on November 8, 2024. The combined mark-to-market value of the January 17, 2025 call options that Plaintiff then held with exercise prices of $5.00 and $9.00 fell by approximately $1,295,175.00, or 30.6%, from approximately $4,229,645.00 to approximately $2,934,470.00. The S&P 500 rose approximately 0.4%, and the Nasdaq Composite rose approximately 0.1%, that day. Plaintiff alleges that this divergent one-day market reaction reflected a partial removal of artificial inflation, although Iovance's simultaneous reaffirmation of its 2025 guidance prevented a complete correction.

186. Approximately two weeks later, on November 19, 2024, at the Stifel 2024 Healthcare Conference in New York, Defendant Bilinsky stated that he thought that "**what's very underappreciated is that we may be executing the most successful cell therapy launch in history so far,**" [emphasis added] and that from Iovance's standpoint, "internally, the launch is going very well."

187. Defendant Bilinsky added at this time that "the growth in demand and growth in revenue is going very steadily month after month," and that Iovance was growing its manufacturing capacity month over month. He further stated that Iovance was seeing month-after-month growth in the authorized treatment centers that had onboarded early, and that the "fundamentals and the execution from our standpoint, **that's all going very well**." [emphasis added]

188. Defendant Bilinsky also noted at this time that Iovance had recently reiterated its guidance of $450 to $475 million in product revenue for 2025, and he *twice* stated that Iovance was "**confident about achieving that**" [emphasis added].

88

189.   Defendant Bilinsky further noted at this time that "**what gives us confidence**" [emphasis added] were factors including (i) the authorized treatment centers activated; (ii) trends in patient enrollment across these centers; and (iii) Iovance's monthly manufacturing capacity buildup, adding that "… **so far these trends are holding up very well**." [emphasis added]

190.   Approximately two months later, on January 13, 2025, Iovance posted on X (formerly Twitter) that it continued "to expect significant growth in line with our full-year revenue guidance for 2024 and 2025."

191.   The generalized confidence statements in Paragraphs 172–174, 178–180, and 182–190 are not alleged to be actionable in isolation.  Plaintiff alleges that, considered together with the concrete representations concerning Iovance's deep understanding of authorized-treatment-center potential, manufacturing-slot scheduling, patient selection, manufacturing performance, and the realistic basis for its 2025 guidance, they conveyed a materially misleading picture of then-existing operations.  As alleged in Paragraphs 81, 108–111, 138–139, 149, and 168–171 above, Iovance knew or recklessly disregarded that many authorized treatment centers were not operationally ready, were not generating meaningful patient volume, or were struggling with patient selection, tumor harvesting, infrastructure, slot coordination, or patient flow.  The later-disclosed metrics and source allegations described in Paragraph 108, and the manufacturing-slot waits described in Paragraph 110, supplied additional corroboration.  Iovance's repeated confidence statements were especially misleading because, as alleged in Paragraphs 152–157 and 170–171 above, it had told investors that the guidance rested on visibility, internal understanding, and knowledge of launch dynamics, even though the then-existing data and operational constraints materially undercut that guidance.

89

192.    The statements in Paragraphs 175–176, 179–180, 182–184, and 186–187 concerning Iovance's commercial manufacturing experience being consistent with clinical experience, the supposed absence of unexpected manufacturing issues, Iovance's claimed manufacturing success rate, the iCTC supposedly being built for 2,000 patients "right now," and the status of patient-selection and tumor-harvesting problems were also materially false or materially misleading when made, and omitted material information necessary to make them not misleading when made.  As alleged in Paragraphs 80, 82–85, 109–111, 140–144, and 169–171 above, the higher potency threshold, monthly manufacturing-slot limitation, practical iCTC constraints, and "out-of-specification" manufacturing issues materially limited usable AMTAGVI output.  The manufacturing evidence and source allegations summarized in Paragraph 143 further corroborated that the patient-throughput and manufacturing problems were not merely isolated, expected, or immaterial.  These facts made Iovance's statements that commercial manufacturing and patient-throughput issues were consistent with clinical experience, manageable, or in line with expectations materially misleading when made.

**K.    On February 27, 2025, Plaintiff Learned Additional Facts Concerning Iovance's Commercial and Operational Performance.**

193.    On February 27, 2025, Iovance released its earnings results for the fourth quarter of 2024.  At this time, Iovance reported AMTAGVI revenue implying that approximately 95 AMTAGVI infusions had occurred in the fourth quarter of 2024, representing **lackluster quarterly growth** in the number of AMTAGVI infusions  (*i.e.,* from 82 AMTAGVI infusions in the third quarter of 2024 to 95 AMTAGVI infusions in the fourth quarter of 2024, reflecting an increase of 13 AMTAGVI infusions on a quarter-over-quarter basis).

194.     Defendant Vogt nevertheless lauded this result (during Iovance's Q4 2024 and Full Year 2024 Earnings Call on February 27, 2025).  He stated that he thought that "quarter-over-quarter growth is quite strong," even though quarter-over-quarter growth was lackluster.

195.     Defendant Vogt added that Iovance was "seeing the growth that we need to see." However, the increase from 82 AMTAGVI infusions (in the third quarter of 2024) to 95 AMTAGVI infusions (in the fourth quarter of 2024) was materially short of the type of growth that Iovance needed to see in order to be able to achieve its total product revenue guidance in 2025: In particular, in order for Iovance to have achieved its total product revenue guidance in 2025, as alleged in Paragraph 164 above, at least 176 AMTAGVI infusions per quarter, on average, were required to have occurred in 2025.  Iovance's 95 AMTAGVI infusion result for the fourth quarter of 2024 fell well short of this 176 (or more) AMTAGVI infusion per quarter benchmark.

196.     Additionally, Iovance, in its Q4 2024 Earnings 8-K (February 27, 2025), stated that "AMTAGVI adoption is on track to **continue accelerating** throughout 2025."  However, this statement was materially false or materially misleading when made, since growth in AMTAGVI infusions had just **decelerated**.  This point is demonstrated through the information presented in the chart below:

| Quarter | Number of AMTAGVI Infusions | Change in the Number of Infusions From the Prior Quarter | Was the Number of AMTAGVI Infusions Accelerating or Decelerating Based on the Prior Quarter? |
|---|---|---|---|
| 2Q 2024 | 25 | N/A | N/A |
| 3Q 2024 | 82 | 57 | Accelerating |
| 4Q 2024 | 95 | **13** | **Decelerating** |

197.    Defendant Vogt also stated at this time that growth in AMTAGVI infusions was "going to go up and down as we go." Previously, however, Defendant Vogt had stated (*e.g.*, during Iovance's Q2 2024 Earnings Call on August 8, 2024) that Iovance expected **significant quarter-over-quarter** growth in product revenue "to continue throughout 2024, 2025, and beyond." Thus, Iovance, at this time, switched its narrative from significant quarter-over-quarter growth in product revenue continuing "throughout 2024, 2025, and beyond" to growth that was "going to go up and down as we go."

198.    Meanwhile, Iovance itself, in its Q4 2024 Earnings 8-K (February 27, 2025), contradicted Defendant Vogt's assertion here by stating that "AMTAGVI adoption is on track to **continue accelerating throughout 2025**." [emphasis added]  A continuation of acceleration in AMTAGVI adoption necessarily required both continued and increasing AMTAGVI adoption – but according to Defendant Vogt at this time, growth was "going to go up and down as we go." Thus, at this time, Iovance (including through Defendant Vogt) was being internally inconsistent in its own public communications.

199. Moreover, only four days later, at the TD Cowen 45th Annual Healthcare Conference on March 3, 2025, CFO Bellemin further undermined Iovance's continued-acceleration narrative. CFO Bellemin stated that growth in the number of AMTAGVI infusions was "a little bit sometimes flattening [i.e., decelerating] and then accelerating again." Growth that was "flattening" before "accelerating again" was inconsistent with Iovance's representation on February 27, 2025, four days earlier, that "AMTAGVI adoption is on track to continue accelerating throughout 2025."

200. Furthermore, Defendant Vogt stated at this time that Iovance "successfully drove **strong early adoption** for our U.S. commercial launch of AMTAGVI." [emphasis added] However, notwithstanding Iovance's public communications (including throughout 2024 and here), AMTAGVI did not experience strong early adoption.

201. Additionally, during Iovance's Q4 2024 and Full Year 2024 Earnings Call on February 27, 2025, Defendant Vogt stated that Iovance was "pleased with the **robust initial uptake**" [emphasis added] for AMTAGVI. However, contradicting what Defendant Vogt had stated here, AMTAGVI had not experienced a robust initial uptake.

202. Iovance also stated at this time that among its approximately 70 onboarded authorized treatment centers in 2024, 76% had completed tumor resections and 64% had infused one or more patients with AMTAGVI. From this information, the following details could be discerned:

- Nearly **1 in 4** of Iovance's authorized treatment centers (24%) had ***not completed a single surgery to successfully harvest tumor tissue from a patient***

93

*in 2024*;[28] and

- More than **1 in 3** of Iovance's authorized treatment centers (36%) had ***not*** *performed a single AMTAGVI infusion in 2024*.[29]

203.    Defendant Vogt also announced at this time that while some of Iovance's authorized treatment centers were performing well, "we've got **a lot more** that are **working their way up**." [emphases added]

204.    Moreover, Defendant Vogt also acknowledged at this time that, with respect to each of Iovance's authorized treatment centers:

> **Each** individual ATC has its own little bottlenecks or whatever it might be.  Some of them have staffing issues.  Some of them have financial clearance challenges that we're helping out with.  **But all these things are pretty easily resolvable,** and we've been able to show that a good portion of our ATCs can really fly right now, **and we think we can get a lot more there pretty soon**.  [emphases added]

However, more than five months earlier, at the Baird 2024 Global Healthcare Conference on September 10, 2024, VP Gastman had made a similar statement – in response to a question from an industry analyst as to "pain points" or "bottlenecks" at Iovance's authorized treatment centers (as described in Paragraph 178 above) – stating as follows:

> I can't say there's been a lot of actual pain points in the sense that they weren't surmountable.  **Pretty much everything that we've seen are things that have been easily and quickly addressable**.  [emphasis added]

---

[28]    Since, in 2024 (as Iovance subsequently disclosed on February 27, 2025), 76% of Iovance's authorized treatment centers had completed tumor resections (*i.e.*, surgeries to harvest tumor tissues from patients), this meant that **24% of them** (*i.e.,* 100% - 76%) had not completed a single surgery to successfully harvest tumor tissue from a patient in 2024.

[29]    Since, in 2024 (as Iovance subsequently disclosed on February 27, 2025), 64% of Iovance's authorized treatment centers had infused one or more patients, this meant that **36% of them** (*i.e.,* 100% - 64%) had not performed a single AMTAGVI infusion in 2024.

Taking into account that (i) VP Gastman had previously described, on September 10, 2024, that "pretty much everything" that Iovance saw at its authorized treatment centers was "easily and quickly addressable"; but (ii) now, more than five months later, Defendant Vogt stated that each of its authorized treatment centers was having bottlenecks, all of which were "pretty easily resolvable," it was apparent that certain issues at Iovance's authorized treatment centers were lingering or were not, in fact, "easily and quickly addressable."

205.    Nevertheless, even in the face of severely underwhelming growth in AMTAGVI infusions and issues that Iovance could no longer minimize or trivialize, Iovance again **reaffirmed** its total product revenue guidance for 2025 of $450 to $475 million.

206.    Of further significant note, Defendant Vogt stated during Iovance's Q4 2024 and Full Year 2024 Earnings Call on February 27, 2025, that, at that time, **Iovance was going to decline to provide AMTAGVI infusion numbers**. He claimed, among other matters, that this information was "prone to over interpretation," stating as follows:

> We're not -- from -- in the press release and on the call, we're not going to be providing the infusions right now. We're not sure how useful that metric was to long investors. **And as some of you know, it was prone to over interpretation. We provided some different metrics this time around, including the potential for growth at the ATCs.** And that actually is a part of the answer to your second question,[30] if you look at our press release and heard Dan's commentary, within the 70 ATCs that we have right now, only 13% of ATCs infused more than 10 patients, which gives you a very good idea of the upside that we're expecting, the acceleration we're expecting in the second half and second quarter of 2025 here as we go through. So, we still have confidence in those numbers because the growth curve for this type of product can accelerate quite a bit, and we see that happening

---

[30]    CEO Vogt was responding here to questions posed by industry analyst Andrea Newkirk, at Goldman Sachs. Ms. Newkirk's questions were posed as follows:

> Fred [*i.e.,* CEO Vogt], on prior calls, you've provided an update on the number of patients infused thus far in the quarter. Just wondering if you'd be willing to share where you stand as of today? And then just remind us or help us understand what gives you the confidence that the range for full year 2025, which was set when you were only one quarter into the launch is still intact? Thanks so much.

95

across our ATC network right now. We see the potential for that in those ATCs. [emphasis added]

Thus, here, Defendant Vogt was effectively taking the position that the "potential for growth" at Iovance's authorized treatment centers would be more useful to "long investors" (which included Plaintiff) than raw AMTAGVI infusion numbers. However, as had already been demonstrated through Iovance's results over the course of 2024, the number of its authorized treatment centers and their "potential for growth" did not serve as an adequate proxy for – and did not tightly correlate with – significant growth in AMTAGVI infusions.

207. Defendant Vogt's statements in Paragraph 206 concerning Iovance's decision not to disclose infusion numbers, its use of authorized-treatment-center growth potential as a substitute metric, the expected acceleration in 2025, and its continuing confidence in the guidance were materially false or materially misleading when made, and omitted material information necessary to make them not misleading. First, as alleged in Paragraphs 83 and 111 above, the alleged monthly manufacturing-slot limitation materially constrained the number of AMTAGVI infusions that could be generated. Second, as alleged in Paragraphs 84, 143, and 192 above, the higher potency threshold and elevated "out-of-specification" risk further undermined manufacturing capacity and revenue assumptions. Third, as alleged in Paragraphs 81, 108, 138–139, 149, 168, and 191 above, many authorized treatment centers did not have the infrastructure, readiness, patient flow, or practical ability to support the growth potential Iovance was touting. Fourth, the manufacturing-slot waits described in Paragraphs 110 further undermined reliance on generalized authorized-treatment-center growth potential in place of infusion counts. Fifth, as alleged in Paragraphs 194–200 and 206 above, Iovance's disclosed infusion trend and statements that growth could go "up and down" or sometimes "flatten" undercut its continuing assertion that adoption was on track to accelerate. Accordingly, replacing actual infusion counts with generalized growth-

96

potential statements was misleading because the omitted infusion and operational data would have revealed that the growth narrative and guidance were not supported.  The authorized-treatment-center activity metrics described in Paragraph 202 reinforced this conclusion.

208.    Also at this time, Defendant Bilinsky stated that Iovance's manufacturing experience was "consistent with prior clinical experience," and that Iovance's fourth quarter gross margin again improved quarter-over-quarter.  However, this was in tension with Iovance's disclosure that its costs associated with patient drop-off and manufacturing results that did not meet required specifications had increased from the prior quarter (*i.e.*, from $8.3 million in the third quarter of 2024 to $9.1 million in the fourth quarter of 2024).

209.    Additionally, during Iovance's Q4 2024 and Full Year 2024 Earnings Call on February 27, 2025, Defendant Vogt pointed to the fact that Iovance's gross margin (*i.e.*, product sales revenue minus cost of goods sold) had improved from the third quarter to the fourth quarter of 2024, while also stating that there would be "continued increases in revenue and gross margin." However, Iovance's statement regarding its gross margin improvement from the prior quarter in connection with continued increases in gross margin was misleading because Iovance's product sales revenue had been temporarily boosted by a forward-stocking of PROLEUKIN by wholesalers in 2024.  As a result of this forward-stocking, PROLEUKIN sales generated approximately twice the revenue that they otherwise would have been expected to contribute to Iovance's gross margin.

210.    Further at this time, Defendant Vogt stated that Iovance's manufacturing side had staffed capacity to supply more than 1,200 patients annually.  Iovance thus shifted from emphasizing "as-built" capacity exceeding 2,000 patients annually to disclosing then-current

97

staffed capacity exceeding 1,200 patients annually – a measure more directly relevant to near-term operating throughput.

211.    Plaintiff, at this time, ***finally realized*** that (i) Iovance's commercial underperformance was indicative of deeper commercial struggles that management was attempting to mask through materially misleading statements and representations; and (ii) Iovance, notwithstanding its statements and representations, was not close to being on track to achieve its projected total product revenue for 2025.

212.    Accordingly, Plaintiff (through Dr. Kambam) decided to liquidate its entire open position in Iovance on the very next business day, February 28, 2025.  Following Iovance's February 27, 2025 after-market disclosures, Iovance common stock opened on February 28, 2025 at $3.93, approximately 25.3% below its $5.26 prior close, and closed at $4.24, down approximately 19.4%, while the S&P 500 and Nasdaq Composite each rose approximately 1.6% that day.  Plaintiff's remaining position consisted of 3,800 January 16, 2026 call options with a $7.50 exercise price and 3,800 short June 20, 2025 call options with a $12.00 exercise price.  That call-spread position had a net mark-to-market value of approximately $415,340.00 at the close on February 27, 2025 and yielded approximately $205,677.06 in net liquidation proceeds the next morning, a decline of approximately $209,662.94, or 50.5%, over the event window.

**L.    Post-Liquidation Developments Later Corroborated the Operational Concerns Alleged Above.**

213.    Iovance's May 8, 2025 statements later corroborated the operational concerns alleged above.

214.    On May 8, 2025, Iovance announced its earnings results for the first quarter of 2025.  At this time, Iovance materially reduced its 2025 total product revenue guidance from a range of $450 million to $475 million to a range of $250 million to $300 million.

215.    During Iovance's 1Q 2025 Earnings Call on May 8, 2025, an industry analyst (*i.e.*, Reni Benjamin at Citizens JMP) stated as follows: "I guess we were all kind of surprised to begin with when last year, you provided guidance for this year.  I'm kind of curious as to -- I get being conservative now, why provide guidance for 2025 way back in 2024 to begin with?" Defendant Vogt stated as follows:

> I guess I can get the second part of your question, Reni.  Back in August [2024], we were trying to give investors our best line of sight to what we thought was going to happen.  At that point, we were very well aware of the high demand for the product, and we were ramping up our manufacturing as fast as we could.  So, we built our model on the back of how many manufacturing slots we would make available maximum ramp.  **Now, as we've gone, we've learned a lot about the launch, especially recently as we watch some of the dynamics with the ATCs, we looked at our experience with growth trajectories there.  We look at the time lines it takes for new ATCs to come on board and begin treating their first patients and how they work through their processes**.  We're onboarding these large community practices, which takes some time, and we're doing the community referral process, which takes a lot of time, too.  And as we looked at that, we just decided that it was better and more accurate for us to forecast guidance that we gave today to show you that we can still make this product grow very, very substantially.  **But now what we're going to do is we're just going to limit some of our manufacturing slots**.  It ends up being essentially almost a neutral with respect to how we use our cash, and we'll roll forward and we'll continue to succeed on the launch.  **But we think we'll do it on terms that are, I think, a little bit more in line with what we actually see at the ATCs**.  [emphases added]

216.    Defendant Vogt's statement supports Plaintiff's inference because the factors that he identified on May 8, 2025 – authorized-treatment-center growth trajectories, the time required for new centers to treat their first patients, internal processes, community referrals, and available manufacturing slots – substantially overlapped with the categories of operational information that Iovance had claimed to see and understand when it issued and repeatedly reaffirmed the guidance. Plaintiff alleges that this later statement corroborated that the earlier guidance did not reflect the actual pace at which authorized treatment centers were becoming operational and generating completed infusions.

217.    During 2024, Iovance expressly claimed visibility into operational inputs that substantially overlapped with those that Defendant Vogt later identified on May 8, 2025.  On August 8, 2024, Defendant Vogt stated that Iovance had used its "visibility" into the growth rate of AMTAGVI infusions, authorized-treatment-center adoption, manufacturing capacity, and other launch dynamics in formulating its 2025 total product revenue guidance.  He further stated that Iovance could "see the launch," knew "all the dynamics," knew how many authorized treatment centers were coming on board and what Iovance expected them to do, knew its manufacturing capacity and "all the details around that stuff," and was providing investors with "clarity on what we're seeing."  On September 10, 2024, Iovance likewise stated that it could "see the launch dynamic," including authorized treatment centers bringing patients, manufacturing-slot scheduling, and patient selection.  Iovance issued and repeatedly reaffirmed its 2025 total product revenue guidance while receiving updated information concerning authorized-treatment-center growth trajectories, the time required for new centers to begin treating patients, internal processes, referrals, and manufacturing-slot availability.  The later-disclosed 2024 authorized-treatment-center activity metrics described in Paragraph 202 were consistent with Plaintiff's inference that the time required for centers to become operational and work through their internal processes had been material to the guidance all along.

218.    Defendant Vogt also stated that Iovance would "limit some of our manufacturing slots."  That decision was consistent with the materially reduced demand and throughput assumptions reflected in the revised guidance.  Plaintiff does not plead that the decision itself established what Defendants knew in 2024; rather, Plaintiff alleges that it corroborated the extent to which Iovance had revised the operational assumptions underlying its earlier growth narrative.

219.    Iovance also announced at this time that "more than 80" AMTAGVI infusions had

100

occurred in the first quarter of 2025, but without providing the precise number.  On information

and belief, 85 AMTAGVI infusions occurred in the first quarter of 2025.[31]

220.    This "more than 80" (estimated to be 85[32]) AMTAGVI infusion result in the first

quarter of 2025 further confirmed Plaintiff's observations by reflecting a **decrease** in the number

of AMTAGVI infusions from the fourth quarter of 2024 – along with further **deceleration** in

growth in the number of AMTAGVI infusions – as is demonstrated through the information

presented in the chart below:

| Quarter | Number of AMTAGVI Infusions | Change in the Number of Infusions From the Prior Quarter | Was the Number of AMTAGVI Infusions Accelerating or Decelerating Based on the Prior Quarter? |
|---|---|---|---|
| 2Q 2024 | 25 | N/A | N/A |
| 3Q 2024 | 82 | 57 | Accelerating |
| 4Q 2024 | 95 | 13 | Decelerating |
| 1Q 2025 | 85 (Estimated) | **-10** | **Decelerating** |

221.    Iovance also announced at this time that its costs associated with patient drop-off

and manufacturing results that did not meet required specifications amounted to $15 million.  This

---

[31]    Iovance reported $43.6 million in AMTAGVI revenue in the first quarter of 2025.  Dividing $43.6 million by the amount generated by Iovance per AMTAGVI infusion (*i.e.*, approximately $515,000) yields the result of approximately 85 AMTAGVI infusions in the first quarter of 2025.

[32]    *See supra* note 31 (explaining how this estimate of 85 AMTAGVI infusions was calculated).

represented a significant **increase** from the $9.1 million cost for such matters over the fourth quarter of 2024 (the prior quarter).  Thus, notwithstanding Iovance's narrative that patient selection and manufacturing success were improving, this was not materializing.

222.    On July 15, 2025, Goldman Sachs downgraded Iovance Biotherapeutics from Buy to Sell and cut its price target from $8.00 to $1.00 (*i.e.,* an **87.5% price cut)**, citing "slower-than-expected adoption" of AMTAGVI as the principal reason for this downgrade.[33]  Goldman Sachs identified multiple adoption-related problems, including (i) persistent operational and logistical challenges – and ongoing complexities – at Iovance's authorized treatment centers **more than one year after launch**; and (ii) limited patient access despite AMTAGVI's clinical profile.    Since this downgrade occurred more than four months after Plaintiff liquidated its entire remaining Iovance option position on February 28, 2025, Plaintiff does not plead the downgrade as a corrective disclosure or loss-causing event and does not seek damages based on it.  Rather, the downgrade is pleaded solely as subsequent third-party corroboration that the operational and adoption concerns underlying Plaintiff's February 27, 2025 conclusion, as alleged in Paragraph 211, were well-founded.

**M.    Iovance Raised Substantial Capital While Maintaining the Allegedly Misleading Narrative, Including After Representing That It Had Sufficient Cash on Hand.**

223.    Iovance raised substantial capital by selling shares of its common stock into the market through an at-the-market ("ATM") equity financing facility while the allegedly misleading public narrative remained in place.

---

[33]    *See* "Goldman Sachs downgrades Iovance Biotherapeutics stock to Sell on Amtagvi adoption challenges," Investing.com (July 15, 2025), https://www.investing.com/news/analyst-ratings/goldman-sachs-downgrades-iovance-biotherapeutics-stock-to-sell-on-amtagvi-adoption-challenges-93CH-4134831 (last accessed July 28, 2026).

224.    As alleged in Paragraph 107 above, on March 4, 2024, CFO Bellemin stated at the TD Cowen 44th Annual Healthcare Conference that Iovance had "enough cash until well into [the] second half of 2025" and was "well capitalized at the moment" and that "[w]e don't need to do anything," as follows:

> **We have enough cash until well into [the] second half of 2025**.  So we are well capitalized at the moment, strong balance sheet.  **We don't need to do anything**.  If we have to do something to bridge with the breakeven profitability, then we'll do certainly, but opportunistically at the right price for the shareholders.  [emphases added]

225.    Additionally, as alleged in Paragraph 135 above, on May 13, 2024, CBO Johnson stated at the Citizens JMP Life Sciences Conference that "we feel great about the cash position.  It takes us late into next year [*i.e.,* late into 2025]."  [emphases added]

226.    Yet, notwithstanding these statements from CFO Bellemin and CBO Johnson, between April and June 2024 (*i.e., even **before** the second half of 2024 had begun*), Iovance raised approximately $152.4 million through the sale of its common stock into the market, using an "at-the-market" (ATM) equity financing facility that it had in place.[34]  Furthermore, by July 24, 2024, Iovance reported that the net proceeds raised using its ATM facility had reached approximately $200 million.  This information indicated that between July 1, 2024 and July 24, 2024 – which was shortly before Iovance issued its 2025 total product revenue guidance on August 8, 2024 –

---

[34]    *See* Iovance Biotherapeutics, Inc., Quarterly Report (Form 10-Q), at 22, 45–46 (Aug. 8, 2024) (reporting approximately $152.4 million in net proceeds from common-stock sales under its at-the-market offering program during the second quarter of 2024).

An at-the-market ("ATM") equity financing facility is an arrangement that allows a public company to raise cash by issuing and selling shares of its common stock into the public market from time to time, typically at then-prevailing market prices.  Such sales can dilute existing shareholders and place downward pressure on the company's stock price.

Iovance had raised approximately an additional $47.6 million (*i.e.*, $200 million raised by July 24, 2024 minus $152.4 million raised between April and June 2024).[35]

227.   On information and belief, Iovance dedicated a portion of the proceeds of these stock sales to address material manufacturing issues that had arisen.[36] The stock sales could have dilutive effects or exert ordinary selling pressure on Iovance's stock price.  Plaintiff does not seek to recover any price effect attributable solely to dilution or ordinary ATM selling pressure; transaction-specific expert analysis will exclude those effects from any recoverable federal damages.

228.   Moreover, in the press release furnished by Iovance as Exhibit 99.1 to its August 8, 2024 Form 8-K regarding Q2 2024 financial results, Iovance represented that its "current cash position and anticipated product revenue are expected to be sufficient to fund current and planned operations, including manufacturing expansion, into early 2026."  Yet, Iovance nevertheless continued to sell stock through its ATM facility even after making this representation regarding its cash sufficiency.  In its Form 10-Q for Q1 2025, filed on May 8, 2025, Iovance disclosed that between January 1, 2025 and March 31, 2025 (*i.e.,* prior to May 8, 2025, when Iovance significantly reduced its total product revenue guidance for 2025), it raised approximately $148.9 million in additional proceeds by selling its common stock into the market, using its ATM facility.

---

[35]   *See* Iovance Biotherapeutics, Inc., Quarterly Report (Form 10-Q), at 22, 45–46 (Aug. 8, 2024); Iovance Biotherapeutics, Inc., Current Report (Form 8-K), Ex. 99.1, "Second Quarter and First Half 2024 Financial Results" (Aug. 8, 2024); Iovance Biotherapeutics, Inc., Quarterly Report (Form 10-Q), at 46 (Nov. 7, 2024).

[36]   *See* Iovance Biotherapeutics, Inc., Quarterly Report (Form 10-Q), at 41 (Aug. 8, 2024) (reporting period costs associated in part with unsuccessful manufacturing results and ongoing manufacturing-quality initiatives); Iovance Biotherapeutics, Inc., Current Report (Form 8-K), Ex. 99.1, "Cash Position" and "Manufacturing Capacity Expansion" (Aug. 8, 2024); Iovance Biotherapeutics, Inc., Quarterly Report (Form 10-Q), at 42–43 (Nov. 7, 2024).

229.    These capital raises provide supplemental evidence of the corporate benefit obtained while the allegedly misleading narrative was maintained.  Plaintiff does not rely on a generalized corporate desire to raise capital, or on the stock sales themselves, as an independent basis for liability.  Rather, the stock sales are alleged as context showing that Iovance obtained financing at market prices while continuing to make or maintain the challenged statements and omissions, including after representing that its cash on hand was sufficient for the ensuing period.  Any market-price effect attributable solely to dilution or ordinary ATM selling pressure is excluded from Plaintiff's claimed recoverable federal loss.

230.    On information and belief, Iovance's public narrative was also influenced by pressure to maintain an acquisition-ready image and an elevated market valuation.  Iovance promoted itself as a potential "bolt-on" acquisition candidate.  Its public filings also identified Wayne Rothbaum, a director and significant shareholder, as having taken a leadership role in transforming Iovance, including restructuring and reorganizing its Board of Directors, senior management, and clinical operations and strategy.  Plaintiff does not allege at this stage that Mr. Rothbaum personally made any of the allegedly false or misleading public statements challenged in this Complaint.  These allegations provide supplemental context concerning Iovance's incentive to project commercial readiness, operational maturity, and acquisition attractiveness.

## V.    COURSE OF CONDUCT AND PATTERN OF MATERIAL MISREPRESENTATIONS AND MISLEADING HALF-TRUTHS

### A.    Defendants Presented a Misleading Picture of Existing Commercial Readiness.

231.    Defendants' materially false and misleading statements and omissions were not isolated, accidental, or confined to a single earnings call.  Taken together, they formed a recurring

pattern of materially false statements and misleading half-truths through which Defendants cultivated and maintained a misleading public narrative regarding:

- Iovance's manufacturing capabilities;

- The readiness and operational status of its authorized treatment centers;

- Patient conversion;

- Iovance's revenue trajectory;

- Iovance's cash position; and

- Iovance's acquisition attractiveness.

The theory pleaded here is not that Iovance simply missed an ambitious forecast. Rather, Defendants repeatedly made present-tense and then-existing factual representations about the operational inputs that would determine whether patients would actually be infused with AMTAGVI (and, accordingly, whether Iovance would actually generate AMTAGVI-based revenue).

232. That recurring pattern had several related components: (i) Iovance promoted itself as commercially mature, acquisition-ready, and capable of being "bolted on" to a larger pharmaceutical company; (ii) Iovance repeatedly linked the number and growth of its authorized treatment centers to expected patient volume and revenue; (iii) Iovance portrayed its authorized treatment centers as operationally ready, and indeed "ready to go," upon AMTAGVI's commercial launch; (iv) Defendants represented that Iovance's manufacturing infrastructure, manufacturing flexibility, and manufacturing success rate could support a large-scale launch, while omitting or minimizing the practical effects of the FDA's higher potency requirement and monthly manufacturing slot limitation; (v) after early launch results undercut that narrative, Defendants told investors that Iovance's August 2024 total product revenue guidance could be relied upon and was

supported by Iovance's then-current visibility into infusion growth, authorized treatment center adoption, manufacturing capacity, and other launch dynamics; and (vi) Defendants repeatedly and emphatically reaffirmed that guidance, even as the operational facts later disclosed by Iovance showed that authorized treatment center activity, manufacturing performance, and patient conversion were not producing the results embedded in that guidance.

233.    Iovance's public narrative presented AMTAGVI's commercialization as far more linear and scalable than it actually was.  AMTAGVI was not a conventional drug that could be stocked, prescribed, and dispensed.  Revenue was generated only if a patient successfully progressed through a multi-step sequence involving, among other matters, identification, screening, tumor resection, shipment of tumor tissue, manufacturing, AMTAGVI infusion, and post-infusion interleukin-2 (PROLEUKIN) treatment.  Various factors, including (i) patient drop-off; (ii) inadequate or unusable harvested tumor tissue; (iii) the FDA's higher potency requirement, which could have contributed to "out-of-specification" manufacturing results; (iv) the FDA's monthly manufacturing slot limitation, which restricted how many patient-specific AMTAGVI batches could be started; (v) inpatient bed constraints; and (vi) coordination failures between authorized treatment centers and Iovance's manufacturing side, could prevent an AMTAGVI infusion and eliminate the corresponding revenue.

234.    Before AMTAGVI's FDA approval, Defendants told the market that Iovance was looking to treat "thousands of patients a year out of the gate," that Iovance's iCTC manufacturing facility was "ready to go," and that Iovance's authorized treatment centers were "stood up" and "ready to go."  Defendant Bilinsky also stated that Iovance had consistently achieved a manufacturing success rate of more than 90% in its prior clinical experience.  Defendants further represented that Iovance had the capacity, know-how, and infrastructure that made it a true "bolt-

107

on" acquisition opportunity. After AMTAGVI's FDA approval, Defendants carried the same narrative forward by representing that launch demand was going well, exceeding expectations, and supported by both Iovance's authorized treatment center side and its manufacturing side.

235. The statements referenced in Paragraph 234 concerning Iovance's commercial readiness and post-approval performance were materially misleading half-truths because Defendants did not merely remain silent about generalized launch risk. They chose to speak repeatedly and specifically about the current operational readiness of Iovance's authorized treatment centers, current manufacturing capacity and slot availability, current manufacturing performance, current patient conversion, current cash sufficiency, and then-current internal visibility supporting Iovance's 2025 total product revenue guidance. By stating that authorized treatment centers were "ready to go" and that growth in their number would drive patient volume, Defendants conveyed that onboarded centers were operationally capable of moving patients to infusion. Plaintiff does not allege that Defendant Bilinsky's historical statement that Iovance had consistently achieved a manufacturing success rate of more than 90% in its prior clinical experience was itself false when made. Rather, that statement supplied a concrete benchmark against which Defendants' later representations that Iovance's commercial manufacturing experience remained consistent with its clinical experience would reasonably be understood. Against that backdrop, those later representations conveyed that Iovance's then-existing commercial manufacturing performance was materially comparable to the greater-than-90% manufacturing success benchmark and could support the represented commercial ramp. Later real-world evidence, including the Oregon Health & Science University Study's 38.5% "out-of-specification" rate among patients in its single-center cohort who underwent tumor harvesting – which indicated a manufacturing success rate of only 61.5% for that cohort – corroborated the

108

nature and materiality of the alleged commercial manufacturing problems.  Plaintiff does not rely on that later-published study, standing alone, to establish Defendants' earlier knowledge or Iovance's companywide commercial manufacturing-success rate.  By stating that Iovance was well capitalized and that its guidance rested on reliable internal visibility, Defendants conveyed that then-existing cash and operational data supported those representations.  Plaintiff alleges that Defendants omitted material qualifying facts that made those affirmative statements incomplete or misleading.

> **B.** **Defendants Used Authorized Treatment Center Counts as a Misleading Proxy for Completed Infusions.**

236.    As is reflected in the illustrative chart below, Iovance repeatedly correlated the number and growth of its authorized treatment centers with the number of patients the market could expect to see treated with AMTAGVI, thereby encouraging investors to treat authorized treatment center count and growth as a proxy for future infusions and revenue:

**Number of Authorized Treatment Centers (and Their Growth) Tied to Expected Patient Volume**

| Event and Date | Speaker | Statement |
|---|---|---|
| Iovance AMTAGVI FDA Approval Call (held on February 16, 2024) | Fred Vogt | "we're expecting a lot of patients in each center… planning for approximately 30 centers at the time of launch." |
| Iovance AMTAGVI FDA Approval Call (held on February 16, 2024) | Fred Vogt | "at each center, we think there's a backlog of a number of patients… from a few patients all the way up to … double digits waiting for AMTAGVI… The sites, as you probably know, we spend a lot of time talking about this can handle anywhere from a few patients a month to several times that." |
| Iovance Q4 2023 Earnings Conference Call (held on February 28, 2024) | Fred Vogt | "when you average that out across 30 moving to 50 ATCs, that's a very large number of patients every month for us to contend with … so we think we're |

| Event and Date | Speaker | Statement |
|---|---|---|
|  |  | going to be really busy here for the next couple of months." |
| Iovance Q1 2024 Earnings Conference Call (held on May 9, 2024) | Jim Ziegler | "We are observing month over month growth and we anticipate sustained growth throughout the year as the number of ATCs expand and there is broader utilization of AMTAGVI." |
| Iovance press release and Form 8-K regarding Q1 2024 financial results (issued on May 9, 2024) | Fred Vogt | "We expect our launch momentum to remain strong and continue to build as we ramp up the U.S. launch throughout 2024 with the authorization of additional ATCs." |

Additionally, as is reflected in the illustrative chart below, Iovance repeatedly portrayed its authorized treatment centers as operationally ready – and indeed "ready to go" – upon AMTAGVI's commercial launch, even though, as it turned out, "onboarding" did not mean that an authorized treatment center was actually ready to move patients through tumor harvest, manufacturing coordination, lymphodepletion, infusion, and post-infusion treatment:

**Authorized Treatment Centers Portrayed as Operationally Ready**:

| Event and Date | Speaker | Statement |
|---|---|---|
| Iovance Q1 2023 Earnings Call (held on May 9, 2023) | Fred Vogt | "We have the ATCs stood up ... saw how ready they were ... the sites are ready to go as soon as the product is approved ... Everything will be ready for the launch..." |
| Iovance Q2 2023 Earnings Call (held on August 8, 2023) | Jim Ziegler | "We are actively working with ATCs to operationalize their TIL service line capabilities and to ensure multidisciplinary teams at each center are ready to administer the lifileucel treatment regimen upon FDA approval." |

110

| Event and Date | Speaker | Statement |
|---|---|---|
| Iovance Q3 2023 Earnings Call (held on November 7, 2023) | Jim Ziegler | "Approximately 30 centers have completed preapproval onboarding steps to establish their TIL service line capabilities.  These centers are educated in all aspects of the Lifileucel treatment regimen with staff and processes to begin treating patients pending the approval." |
| Iovance Q3 2023 Earnings Call (held on November 7, 2023) | Jim Ziegler | "When we say that these centers are ready to go, they're ready to go." |
| Iovance press release regarding AMTAGVI FDA approval (issued on February 16, 2024) | Jim Ziegler | "more than 30 ATCs are prepared to collect and ship tumor tissue from patients for AMTAGVI manufacturing." |
| H.C. Wainwright 2nd Annual Cell Therapy Virtual Conference (held on March 26, 2024) | Jean-Marc Bellemin | "… all our ATCs are super excited to bring on board patients and add new patients" |
| Iovance Q4 2023 Earnings Call (held on February 28, 2024) | Fred Vogt | "Thirty authorized treatment centers or ATCs were ready for approval..." |
| Jefferies Global Healthcare Conference (held on June 6, 2024) | Fred Vogt | "the existing ATCs are ramping up.  New ATCs are coming on." |

237.    Iovance's framing of the number and growth of its "onboarded" authorized treatment centers as a proxy for near-term infusions and revenue was materially misleading.  By repeatedly linking authorized treatment center counts to expected patient volume and revenue, Defendants conveyed that an onboarded center was operationally capable of moving patients through tumor harvest, manufacturing coordination, lymphodepletion, infusion, and post-infusion treatment.  In fact, inpatient bed constraints, staffing, surgical scheduling, manufacturing slot availability, cryostorage, and other logistical constraints materially affected whether a patient

111

received an AMTAGVI infusion.  Iovance nevertheless used authorized treatment center growth – from approximately 30 centers around launch to approximately 70 centers by the end of 2024 – as a marker of commercial progress.  Iovance later disclosed that, by the end of 2024, approximately 24% of its onboarded authorized treatment centers had not completed a single successful tumor-harvesting surgery and approximately 36% had not completed a single AMTAGVI infusion.

### C.      Defendants Minimized or Omitted Material Manufacturing Constraints.

238.    Iovance's manufacturing narrative likewise consisted of misleading half-truths. Defendants represented that the iCTC facility was "built, ready to go" to support more than 2,000 patients annually, that manufacturing slots were sufficiently available, that authorized treatment centers were reporting a positive scheduling experience, and that commercial manufacturing was consistent with clinical experience.  Those statements conveyed that Iovance's then-existing manufacturing infrastructure, capacity, quality, scheduling, and slot availability could support the represented commercial ramp.  Plaintiff alleges that the statements were misleading because Defendants omitted or minimized material qualifying facts, including (i) the practical effects of the FDA's higher potency requirement and monthly manufacturing slot limitation; (ii) practical iCTC build-out and technology limitations; (iii) longer-than-anticipated waits at certain authorized treatment centers for manufacturing slots; and (iv) manufacturing failures and "out-of-specification" results allegedly occurring at rates materially less favorable than Defendants represented.  These alleged constraints directly affected whether patient-specific manufacturing could begin, whether a usable AMTAGVI batch could be completed, whether a patient progressed to infusion, and whether Iovance recognized AMTAGVI product revenue.

239.   Iovance also had continuing access to the very operational information needed to assess whether its public narrative was accurate.  After AMTAGVI's commercial launch, Iovance had access to data from its authorized treatment centers and manufacturing side concerning inpatient bed availability, staffing, scheduling constraints, scheduled tumor harvests, financial clearance, manufacturing slot availability, delays and cancellations, patient drop-offs, "out-of-specification" manufacturing results, other operational bottlenecks, and completed infusions. Iovance also knew, on information and belief, how the FDA's higher potency requirement and monthly manufacturing slot limitation were affecting actual manufacturing throughput.  Since authorized treatment centers had to reserve beds, schedule surgeries, obtain financial clearance, and coordinate manufacturing slots in advance, Iovance had weeks or months of line of sight into whether its statements about a "large bolus" of patients, immediate authorized treatment center ramping, and a "steady ramp" in infusions were actually true – and later into whether the aggressive growth embedded in its 2025 total product revenue guidance was attainable.

D.   **The August 2024 Guidance and Reaffirmations Maintained the Misleading Narrative.**

240.   Iovance's August 8, 2024 guidance was a central component of the recurring pattern.  On that date, Iovance disclosed that only 25 patients had been infused with AMTAGVI in the second quarter of 2024, the first full commercial quarter after launch.  This result materially undercut Iovance's prior narrative regarding patient backlog, rapid authorized treatment center ramping, manufacturing flexibility, and near-term infusion growth.  Rather than disclose the alleged operational implications of that result, including the practical effects of the FDA's higher potency requirement and monthly manufacturing slot limitation, Iovance touted AMTAGVI's purported "early success," introduced 2025 total product revenue guidance of $450 million to $475 million, and stated that "the whole point" of issuing the guidance was so investors could "rely" on

113

Iovance's internal understanding of AMTAGVI infusions and PROLEUKIN demand and "see what the upswing is going to look like here." In context, the guidance contained both a projection of future revenue and a present-tense assurance that Iovance's then-existing internal information concerning completed infusions, authorized treatment center adoption, manufacturing capacity, manufacturing slot availability, and launch dynamics supported a steep 2025 revenue ramp.

241. The 2025 total product revenue guidance was especially important because, on information and belief, Iovance needed more than 700 AMTAGVI infusions in 2025 – more than 175 AMTAGVI infusions per quarter on average – to achieve the $450 million to $475 million range. That implied a dramatic acceleration from the 25 infusions disclosed for the second quarter of 2024, the 82 infusions later disclosed for the third quarter of 2024, and the 95 infusions later disclosed for the fourth quarter of 2024. It also implied that Iovance could overcome the practical consequences of the FDA's higher potency requirement and any FDA-imposed monthly manufacturing slot limitation. If, as alleged, the FDA had limited Iovance to approximately 30–32 manufacturing slots per month at launch, then Iovance's annual manufacturing-start capacity would have been only approximately 360–384 patients before accounting for slots dedicated to confirmatory trials, patient drop-off, and "out-of-specification" manufacturing results. This constraint was materially inconsistent with the steep infusion ramp embedded in Iovance's 2025 total product revenue guidance unless it had been lifted, supplemented, or otherwise overcome – none of which Iovance adequately disclosed. In context, the guidance necessarily communicated that Iovance's authorized treatment centers, manufacturing network, patient-conversion rates, manufacturing success rates, manufacturing slot availability, and operational execution were capable of producing a steep and sustained ramp in completed infusions.

114

242.   Iovance's repeated reliance, visibility, and confidence statements were therefore highly material.  Iovance did not merely say that it hoped the guidance could be achieved.  It told investors that:

- "**The whole point**" of issuing total product revenue guidance for 2024 and 2025 was so the market could "**rely**" on Iovance's internal understanding;

- This guidance was based on Iovance's "ongoing experience and confidence" and its "**visibility**" into infusion growth, authorized treatment center adoption, manufacturing capacity, and other launch dynamics;

- Iovance knew "all the dynamics";

- Iovance knew how many authorized treatment centers were coming on board, what it thought they were going to do, its manufacturing capacity, and "all the details around that stuff";

- Iovance was "very, very confident" because it had "such a good picture of launch dynamics right now";

- Authorized treatment center readiness reinforced Iovance's confidence behind its guidance;

- Iovance would not have offered this guidance without "great confidence" in meeting it;

- Iovance's line of sight into AMTAGVI launch dynamics – including authorized treatment centers bringing patients, manufacturing slot scheduling, and patient selection – made it "really confident" and that "we know and we are confident that **the trajectory is set already**" [emphasis added]; and

- Iovance remained "confident about achieving" the $450 million to $475 million range because trends in activated authorized treatment centers, patient enrollment, and manufacturing capacity were "holding up very well."

These statements repeatedly tied Iovance's 2025 total product revenue guidance to purportedly existing operational visibility rather than to generic hope.

243. These statements also transformed the guidance from generic optimism into a representation that the guidance rested on then-existing, reliable internal information about AMTAGVI infusions, authorized treatment center performance, patient conversion, manufacturing capacity, manufacturing quality, manufacturing slot availability, and launch dynamics. Plaintiff does not allege fraud merely because Iovance failed to predict the future. Plaintiff alleges that when Iovance issued and reaffirmed its total product revenue guidance for 2025, the same categories of internal information that Iovance claimed to possess showed, on information and belief, that the guidance's operational assumptions were materially unreliable, including because many authorized treatment centers were not yet translating paper onboarding into completed infusions at the pace Iovance was representing, the FDA's higher potency requirement was contributing to manufacturing failures, and the undisclosed monthly manufacturing slot limitation made the necessary infusion ramp highly impracticable.

244. Iovance carried the same pattern forward through the remainder of 2024 and into 2025. It continued to reaffirm its 2025 total product revenue guidance after (i) reporting only 82 AMTAGVI infusions in the third quarter of 2024 and only 95 in the fourth quarter of 2024; (ii) disclosing $8.3 million and then $9.1 million in costs associated with patient drop-off and manufacturing results that did not meet required specifications; (iii) acknowledging that some authorized treatment centers had struggled with tumor harvesting and patient selection; and (iv)

116

declining on February 27, 2025 to provide then-current infusion numbers while urging investors to focus on the "potential for growth" at its authorized treatment centers. On May 8, 2025, Iovance reduced its 2025 total product revenue guidance from $450 million–$475 million to $250 million–$300 million. Defendant Vogt then explained that the revised forecast was "more in line with what we actually see at the ATCs" after accounting for authorized treatment center growth trajectories, the time required for new centers to treat their first patients, community referrals, treatment timelines, and manufacturing-slot availability. Plaintiff alleges that these later statements confirmed that paper onboarding had not translated into active treatment activity across a material portion of the network and that the earlier guidance did not reflect the actual operational pace.

245.    Industry analysts repeatedly placed the precise operational subjects at issue before Defendants, including manufacturing-slot shortages, patient selection, patient attrition, inpatient-bed constraints, surgical coordination, manufacturing quality, authorized treatment center activity, and infusion counts. Iovance repeatedly characterized the relevant problems as rare, "not many," "nothing unexpected," consistent with clinical experience, or readily addressable. When Iovance stated that it could not call any authorized treatment center underperforming, it did not disclose the actual activity data that it later quantified for 2024: approximately 24% of its onboarded authorized treatment centers had not completed a single successful tumor-harvesting surgery, and approximately 36% had not completed a single AMTAGVI infusion. These reassurances were also allegedly misleading because Iovance did not disclose the FDA-imposed monthly manufacturing-slot limitation when analysts raised concerns about insufficient slots and backlog, and because it continued to portray commercial manufacturing as consistent with clinical experience (*see* Paragraphs 175, 180, and 183 above) while allegedly possessing contrary manufacturing information. Later real-world evidence corroborated the nature and materiality of

117

the manufacturing problems that Iovance allegedly tracked and minimized. The Oregon Health & Science University Study reported a 38.5% "out-of-specification" rate among patients in its single-center cohort who underwent tumor harvesting, indicating a manufacturing success rate of only 61.5% for that cohort – more than 28.5 percentage points below the greater-than-90% prior clinical experience manufacturing success rate represented by Defendant Bilinsky, as alleged in Paragraph 68 above.

**E.   Iovance's Capital Raises Provide Supplemental Evidence of the Pattern.**

246.   Iovance's capital raises provide supplemental evidence of the corporate benefit obtained while the allegedly misleading narrative was maintained. Plaintiff does not rely on a generalized desire to maintain Iovance's stock price or raise capital as an independent basis for liability, and it does not allege that the mechanics of the ATM sales were independently deceptive. Rather, Plaintiff alleges that, while promoting Iovance as a company with billions of dollars of revenue coming and as an attractive "bolt-on" acquisition candidate – and while publicly minimizing its need for additional capital – Iovance raised (i) approximately $152.4 million between April and June 2024; (ii) approximately $47.6 million shortly before August 8, 2024, and (iii) approximately $148.9 million during the first quarter of 2025. These transactions provide context showing that Iovance obtained substantial financing while continuing to make or maintain the challenged statements and omissions.

**F.   The Pattern of Misrepresentations and Half-Truths Affected Plaintiff's Actual Option Transactions.**

247.   Taken together, Iovance's affirmative statements and omissions presented investors with a materially distorted picture. The alleged half-truths can be stated directly. First, by representing that authorized treatment centers were ready, ramping, and a reliable indicator of future patient volume, Defendants conveyed that paper onboarding was translating into active

118

treatment capacity, while omitting the alleged operational constraints and activity data that materially qualified that representation.  Second, by representing that manufacturing capacity, manufacturing-slot availability, scheduling, and manufacturing performance were sufficient or consistent with clinical experience, Defendants conveyed that then-existing manufacturing conditions could support the represented ramp, while omitting the alleged FDA constraints, practical capacity and technology limitations, delays, and manufacturing failures.  Third, by representing that Iovance was well capitalized and had sufficient cash for the represented period, Defendants conveyed a materially more favorable picture of then-existing cash sufficiency while Iovance continued to raise substantial capital.  Fourth, by stating that investors could rely on Iovance's internal understanding and visibility supporting its 2025 total product revenue guidance, Defendants conveyed that then-existing operational data supported the projected ramp, while allegedly omitting contrary authorized treatment center, patient-conversion, manufacturing, and infusion data.  Iovance's May 8, 2025 statements and guidance reduction later confirmed, according to Plaintiff, that the earlier model had not reflected the actual pace at which authorized treatment centers became operational, moved through their internal processes, coordinated with available manufacturing slots, and generated completed AMTAGVI infusions.

248.    The recurring pattern directly affected Plaintiff.  Plaintiff, through Dr. Kambam, carefully reviewed Iovance's statements and disclosures and understood from his oncology experience the practical difficulties that can derail a cellular-therapy launch, but nevertheless directed Plaintiff not to take the substantial February 2024 profit in its January 2025 call options. Instead, Plaintiff purchased additional January 17, 2025 calls with a $10.00 exercise price in June and August 2024; adjusted portions of its January 2025 exposure from a $5.00 exercise price to a $10.00 exercise price, then to a $9.00 exercise price, and later to a $7.50 exercise price; and

ultimately entered into a January 2026 / June 2025 call-spread position. Plaintiff alleges that, had Iovance disclosed the material qualifying facts concerning the FDA-imposed monthly manufacturing slot limitation, the FDA's higher potency requirement, authorized treatment center readiness and activity, patient conversion, manufacturing performance, cash needs, and the present basis for Iovance's 2025 total product revenue guidance, Plaintiff would not have made, rolled, extended, or maintained those transactions as alleged. Plaintiff's continued holding is pleaded as reliance and but-for-causation context; the federal claim is tied to actual purchases, rolls, extensions, sales, and liquidation transactions, not to a free-standing holder claim.

## VI.   SCIENTER

### A.   Defendants Claimed Detailed, Present-Tense Visibility Into the Relevant Operational Data.

249. Plaintiff alleges scienter principally through strong circumstantial evidence of conscious misbehavior or deliberate recklessness. The capital-raising transactions and acquisition-positioning allegations described below provide additional context, but Plaintiff does not rely on a generalized desire to maintain Iovance's stock price, on Defendants' corporate titles, on the importance of AMTAGVI standing alone, or on the mere fact that Iovance's guidance later proved inaccurate. Rather, the strong inference of scienter arises from the allegations considered collectively: Defendants (i) claimed detailed, present-tense visibility into the very operational facts that determined whether purported demand would become completed AMTAGVI infusions and revenue; (ii) possessed or had access to data that contradicted or materially undercut their public statements; (iii) continued making and reaffirming specific assurances after months of commercial experience and after industry analysts directed their attention to the relevant problems; and (iv) later made disclosures and admissions materially inconsistent with their earlier narrative.

120

250.   AMTAGVI was not a peripheral product.   It was the centerpiece of Iovance's business model, financial condition, commercial story, acquisition-readiness narrative, and market valuation.   The challenged statements concerned observable operational matters that determined whether purported demand would become completed infusions and revenue, including (i) authorized treatment center readiness; (ii) patient conversion; (iii) manufacturing capacity and quality; (iv) manufacturing-slot availability; and (v) financial capacity to support commercialization.   Plaintiff does not allege scienter merely because AMTAGVI was important, because Defendant Vogt and Defendant Bilinsky held senior titles, or because the launch later encountered difficulties.   The inference instead rests on Defendants' own detailed statements about those matters, their claimed access to then-current information concerning them, and the contrary facts alleged herein.

251.   Iovance's own statements show that its senior executives claimed to have and use detailed, then-current operational information.   When issuing and reaffirming Iovance's 2025 total product revenue guidance, Iovance stated that investors could "rely" on its internal understanding of AMTAGVI infusions and PROLEUKIN demand; that the guidance was based on Iovance's "visibility" into infusion growth, adoption across its authorized treatment center network, manufacturing capacity, and additional launch dynamics; that it could "see the launch" and knew "all the dynamics"; that it knew how many authorized treatment centers were coming on board, what Iovance expected them to do, its manufacturing capacity, and "all the details around that stuff"; and that it had "such a good picture of launch dynamics right now."   Iovance also repeatedly represented that it was "very, very confident," had "great confidence" in meeting and hopefully exceeding its guidance, was "really confident" because it could see launch dynamics, and remained "confident about achieving" the $450 million to $475 million range.   CFO Bellemin tied that

121

confidence to Iovance's asserted line of sight into authorized treatment centers bringing patients, manufacturing-slot scheduling, and patient selection, and stated that "we know and we are confident that the trajectory is set already." In context, these were present-tense representations that Iovance's existing internal data supported the projected revenue ramp.

**B.      Defendants Had Access to Contrary Information Yet Repeatedly Reinforced Their Narrative.**

252.    Defendants also possessed or had access to contrary information. Before the FDA approved AMTAGVI, Iovance knew, on information and belief, that the FDA had imposed a higher potency requirement that increased the threshold number of TIL cells Iovance had to grow or manufacture for each patient to 7.5 billion cells, and a monthly manufacturing-slot limitation that restricted how many patient-specific AMTAGVI batches could be started. These were then-existing facts bearing directly on manufacturing success, throughput, and the number of patients likely to progress to infusion. After launch, Iovance received real-time information concerning inpatient beds, staffing and scheduling constraints, scheduled tumor harvests and financial-clearance issues, manufacturing-slot availability, delays and cancellations, patient drop-offs and other operational bottlenecks, "out-of-specification" manufacturing results, and completed infusions. Because AMTAGVI treatment took a number of weeks and required advance coordination between authorized treatment centers and Iovance's manufacturing operations, Iovance had weeks or months of visibility into whether onboarding, enrollment, and purported demand were translating into completed infusions.

253.    By August 8, 2024, when Iovance issued its 2025 total product revenue guidance after reporting only 25 infusions in the first full commercial quarter, Iovance had months of commercial experience and internal data with which to assess whether its launch narrative and guidance had a reasonable basis. That information included, on information and belief, (i) the

122

practical consequences of the FDA's higher potency requirement and monthly manufacturing-slot limitation; (ii) actual manufacturing-slot availability; (iii) "out-of-specification" manufacturing results; (iv) patient drop-off; and (v) authorized treatment center throughput. Before Iovance issued the guidance, public summaries of the Piper Sandler July 29, 2024 Report had described field work with six authorized treatment centers indicating that certain centers had experienced longer-than-anticipated waits for manufacturing slots, potentially up to six weeks. That information concerned the same manufacturing-slot availability that Iovance was monitoring internally. The inference strengthened as Iovance repeatedly reaffirmed the guidance through the remainder of 2024 and into early 2025 despite later disclosures reflecting costs from patient drop-off and manufacturing results that did not meet required specifications, incomplete authorized treatment center activity, and continuing operational bottlenecks.

254.    The analysts' questions do not, standing alone, prove the existence of the concealed facts or Defendants' knowledge of them. They are nevertheless probative because they placed the precise subjects of the alleged fraud directly before Defendants – including manufacturing-slot shortages, patient attrition, authorized treatment center performance, bottlenecks, manufacturing results, infusion counts, and the basis for Iovance's 2025 total product revenue guidance – and gave Defendants repeated opportunities to correct or qualify their prior statements. Instead, Iovance continued to state that investors could "rely" on its internal view, that it had "such a good picture" of launch dynamics, that it knew and was confident that "the trajectory is set already," that commercial manufacturing was not materially different from the clinical setting, and that the identified problems were rare, expected, or easily and quickly addressable.

255.    Iovance's responses followed a repeated minimizing pattern. When asked about patient attrition, bottlenecks, manufacturing-slot shortages, inpatient-bed constraints, surgical

123

coordination, tumor quality, and manufacturing results, Iovance characterized the issues as rare, "not many," "nothing unexpected," consistent with clinical experience, or easily and quickly addressable.   When asked whether any authorized treatment centers were underperforming, Iovance VP Gastman stated that he could not call any center underperforming.   Iovance later disclosed, however, that approximately 24% of its onboarded authorized treatment centers had not completed a tumor-harvesting surgery in 2024 and approximately 36% had not performed a single AMTAGVI infusion in 2024.   Iovance also did not disclose the FDA-imposed monthly manufacturing-slot limitation when analysts raised concerns about insufficient slots and backlog, and it continued portraying commercial manufacturing as consistent with clinical experience even though, on information and belief, the higher potency requirement increased the likelihood of "out-of-specification" results.   The repeated choice to provide categorical reassurance rather than disclose or qualify the contrary information alleged herein supports an inference of knowing or deliberately reckless misconduct.

C.    **Later Disclosures Corroborate the Earlier Knowledge and Recklessness Allegations.**

256.    Iovance's later disclosures and admissions further support the inference.   In November 2024, after previously comparing commercial manufacturing favorably to clinical experience, Iovance stated that it hoped it would "eventually" achieve the manufacturing experience it had during the clinical studies and disclosed $8.3 million in costs associated in part with manufacturing results that did not meet required specifications.   It also acknowledged that some authorized treatment centers had struggled with tumor harvesting and patient selection.   In February 2025, Iovance disclosed that approximately 24% of its authorized treatment centers had not completed a single surgery to harvest tumor tissue from a patient and approximately 36% had not performed a single AMTAGVI infusion, acknowledged continuing bottlenecks, and declined

124

to provide then-current infusion numbers even while reaffirming guidance.  Finally, on May 8, 2025, Iovance cut its 2025 total product revenue guidance, and Defendant Vogt stated that the revised forecast was "more in line with what we actually see" at the authorized treatment centers. That admission is probative because Iovance had previously made its claimed visibility into authorized treatment center performance, infusion growth, manufacturing capacity, and launch dynamics a centerpiece of the guidance it told investors they could rely upon.

257.    Real-world results later corroborated that the manufacturing problems Iovance had minimized were concrete and commercially significant.  The Oregon Health & Science University Study reported that, among the patients in its single-center cohort who proceeded to tumor-harvesting surgery, the "out-of-specification" rate for the AMTAGVI batches generated by Iovance was 38.5% (i.e., more than one in three).  Stated in manufacturing-success terms, that result indicated a success rate of only 61.5% for the Oregon cohort – more than 28.5 percentage points below the greater-than-90% manufacturing success rate that Defendant Bilinsky represented that Iovance had consistently achieved in its clinical experience prior to AMTAGVI's launch, as alleged in Paragraph 68 above.  The magnitude of that disparity materially undercut Defendant Bilinsky's representations, alleged in Paragraphs 180 and 183 above, that Iovance's commercial manufacturing experience was consistent with its prior experience.

258.    Plaintiff does not rely on this later-published study, standing alone, to establish Defendants' earlier knowledge.  Rather, the study corroborates the nature and materiality of the same manufacturing-specification results that Iovance allegedly generated and tracked on a patient-by-patient basis during the Relevant Period.

### D.    Iovance's Capital Raises and Acquisition Positioning Provide Supplemental Context.

259.    Iovance's capital-raising transactions and acquisition-positioning statements

125

provide supplemental support for the inference of scienter, although Plaintiff does not rely on either as an independent motive-and-opportunity theory. As alleged in Paragraphs 224–229 above, Iovance raised substantial capital while maintaining the challenged demand, launch, guidance, cash-sufficiency, and acquisition-readiness narrative. Those transactions provide supplemental context concerning the corporate benefit obtained while the allegedly misleading narrative remained in place. As alleged in Paragraphs 76–77 above, Defendant Bilinsky personally described Iovance as "by definition" a "bolt-on opportunity" because it was "truly fully integrated" and had built its own manufacturing facility, while Defendant Vogt personally reinforced that portrayal by describing Iovance as a "true bolt-on" for which an acquirer would "not have to do anything" because Iovance already had "all the capacity," "all the know-how," and "everything you need." These statements are relevant because they show that each Individual Defendant personally adopted the operational-readiness narrative and tied Iovance's asserted acquisition attractiveness directly to the same manufacturing capacity, operational maturity, and commercial readiness that Defendants allegedly overstated. They therefore provide supplemental context for the holistic inference of scienter.

E.    **Defendant Vogt's Scienter.**

260.    Defendant Vogt's scienter rests on his own statements and conduct, not merely on his position as Iovance's Interim Chief Executive Officer and President. Before AMTAGVI's commercial launch, Defendant Vogt personally described Iovance as a "true bolt-on" for which an acquirer would "not have to do anything" because Iovance already had "all the capacity," "all the know-how," and "everything you need." This statement is relevant not as a standalone motive allegation, but because it shows that Defendant Vogt personally adopted and promoted an acquisition-readiness narrative premised on Iovance's then-existing manufacturing capacity and

126

operational completeness – the same premises materially undercut by the contrary facts alleged in Paragraphs 80–81 above. After AMTAGVI's commercial launch, Defendant Vogt personally told investors that "the whole point" of issuing guidance was so they could "rely" on Iovance's internal understanding of AMTAGVI infusions and PROLEUKIN demand. He further stated that Iovance could "see the launch," knew "all the dynamics," knew how many authorized treatment centers were coming on board and what Iovance expected them to do, and had "such a good picture of launch dynamics right now." Defendant Vogt thus placed his and Iovance's claimed present-tense knowledge of infusion growth, authorized treatment center performance, manufacturing capacity, and launch dynamics at the center of the guidance he asked investors to rely upon.

261.    Defendant Vogt made and reaffirmed the post-launch guidance and confidence statements described above after Iovance had accumulated months of commercial-launch data and, by August 8, 2024, had reported only 25 AMTAGVI infusions for the first full commercial quarter. He continued supporting the guidance despite Iovance's access to data concerning authorized treatment center activity, patient throughput, manufacturing-slot availability, patient drop-off, manufacturing results, and completed infusions. His later May 8, 2025 statement that the revised forecast was "more in line with what we actually see" at the authorized treatment centers further supports the inference that the earlier guidance and confidence statements lacked the reliable present basis he represented they possessed. At a minimum, the facts alleged support a strong inference that Defendant Vogt acted with deliberate recklessness in disregarding that (i) many authorized treatment centers were not operationally ready or producing the volume implied by Iovance's narrative; (ii) completed infusions were not tracking the represented growth trajectory; (iii) manufacturing constraints were materially affecting throughput; and (iv) the 2025 guidance rested on assumptions inconsistent with Iovance's then-current data.

127

### F.    Defendant Bilinsky's Scienter.

262.    Defendant Bilinsky's scienter likewise rests on his own operational statements and conduct, not merely on his title as Chief Operating Officer.  He told investors that the iCTC facility was "built, ready to go" to handle more than 2,000 patients per year and later repeated that the iCTC, as built, could provide TIL products for more than 2,000 patients annually.  Defendant Bilinsky also personally described Iovance as "by definition" a "bolt-on opportunity" because it was "truly fully integrated."  This statement is relevant not as a standalone motive allegation, but because it shows that Defendant Bilinsky personally adopted and promoted an acquisition-readiness narrative premised in part on the completeness and readiness of the manufacturing operations for which he was responsible – the same premises materially undercut by FE1's account alleged in Paragraph 80 above.  Defendant Bilinsky also personally supplied the greater-than-90% clinical experience manufacturing-success benchmark alleged in Paragraph 68 above and later represented, as alleged in Paragraphs 180 and 183 above, that Iovance's commercial manufacturing experience remained consistent with that clinical experience.  He repeatedly addressed the manufacturing and scheduling process, tumor-sample quality, commercial manufacturing performance, patient attrition, and authorized treatment center ramping.  When he described the launch as exceeding expectations, going very well, or potentially reflecting "the most successful cell therapy launch in history so far," he was speaking about operational execution within the subjects he personally addressed to investors.

263.    Defendant Bilinsky's scienter is further supported by the particular source and nature of the contrary information.  As alleged in Paragraph 80 above, the detailed source allegations in the Iovance Class Complaint identify FE1 as an individual who (i) served as Iovance's Senior Vice President of Technical Operations from May 2019 through February 2024;

128

(ii) reported directly to Defendant Bilinsky after Defendant Bilinsky joined Iovance in March 2021; and (iii) attended FDA meetings concerning AMTAGVI's approval and launch (*see* Iovance Class Complaint ¶ 117). The Iovance Class Complaint cited FE1 as a source for allegations that, among other matters, (i) only approximately one quarter of the existing iCTC space had been completed; (ii) the iCTC could not accommodate the represented 2,000-patient volume upon AMTAGVI's approval; (iii) Iovance lacked the manufacturing technology necessary to produce AMTAGVI for more than 2,000 patients annually; and (iv) the FDA had limited Iovance to approximately 30–32 manufacturing slots per month at launch (*see id.* ¶¶ 128, 131–37, 140, 144, 171). Plaintiff does not allege merely that Defendant Bilinsky should have known these facts because he was Chief Operating Officer. The direct reporting relationship identified in those detailed source allegations, Defendant Bilinsky's responsibility for and repeated public discussion of Iovance's manufacturing operations, and the detailed operational nature of the contrary information collectively support a strong inference that Defendant Bilinsky knew, or acted with deliberate recklessness in disregarding, that his statements concerning iCTC capacity, manufacturing readiness, manufacturing-slot availability, manufacturing performance, and launch execution were materially false or misleading. FE1's account supports the inference concerning Defendant Bilinsky's knowledge of prelaunch capacity and FDA constraints. After launch, Defendant Bilinsky's scienter is separately supported by Iovance's real-time tracking of manufacturing slots, scheduled tumor harvests, delays, cancellations, patient drop-offs, manufacturing results, and completed infusions, together with Defendant Bilinsky's continued detailed statements about those same subjects.

264. The later-published Oregon Health & Science University Study provides additional corroboration specific to Defendant Bilinsky's manufacturing statements. As alleged

in Paragraph 257 above, the study reported a 38.5% manufacturing failure rate for the AMTAGVI batches generated for patients in its single-center cohort who proceeded to tumor-harvesting surgery, indicating a manufacturing success rate of only 61.5%. That success rate was more than 28.5 percentage points below Defendant Bilinsky's claim, alleged in Paragraph 68 above, that Iovance had consistently achieved a manufacturing success rate of more than 90% in its clinical experience prior to AMTAGVI's commercial launch, and materially undercut his later representations, alleged in Paragraphs 180 and 183 above, that Iovance's commercial manufacturing experience remained consistent with its prior experience. Plaintiff does not rely on the study, standing alone, to establish Defendant Bilinsky's earlier knowledge or Iovance's companywide commercial manufacturing-success rate. Rather, the study corroborates the nature and materiality of manufacturing failures that allegedly occurred in Iovance-manufactured AMTAGVI batches and that Iovance tracked on a patient-by-patient basis during the Relevant Period. The scienter inference rests on Defendant Bilinsky's alleged access to the contemporaneous contrary information described in Paragraph 263 above, not on the study's later publication.

## G.    Iovance's Scienter and the Holistic Inference.

265.    Defendant Vogt's and Defendant Bilinsky's scienter is attributable to Iovance. Each was a senior Iovance officer acting within the scope of his authority when he made, materially participated in making, authorized, approved, reaffirmed, or failed to correct the challenged investor-facing statements. Defendant Vogt personally made and reaffirmed statements concerning launch readiness, authorized treatment center activity, infusion growth, manufacturing capacity, internal visibility, cash sufficiency, and Iovance's 2025 total product revenue guidance. Defendant Bilinsky personally made and reaffirmed statements concerning iCTC capacity,

130

manufacturing readiness and performance, manufacturing-slot availability, scheduling, patient attrition, authorized treatment center throughput, launch execution, and the guidance. Their knowledge or deliberate recklessness concerning those statements is therefore attributable to Iovance.

266.    Considering the allegations collectively, the inference that Defendants acted knowingly or with deliberate recklessness is cogent and at least as compelling as any opposing nonfraudulent inference. Defendants may contend that they were merely optimistic about a difficult, first-of-its-kind commercial launch and revised their expectations as additional experience accumulated. That inference is less compelling in light of the particular facts alleged. Defendants did not merely make broad predictions about an uncertain future. They repeatedly made specific present-tense statements concerning existing manufacturing capacity, manufacturing-slot availability, authorized treatment center readiness, patient conversion, manufacturing performance, and their current visibility into launch dynamics. They expressly told investors that they possessed a reliable internal understanding of the facts supporting their guidance. They continued making and reaffirming those statements after receiving months of patient-level, authorized-treatment-center, and manufacturing data; after reporting only 25 infusions in the first full commercial quarter; and after analysts repeatedly directed their attention to the precise operational problems alleged herein. They also failed to disclose then-existing FDA manufacturing constraints and later made disclosures and admissions materially inconsistent with the earlier narrative. Taken together, these allegations support a strong inference that Iovance, Defendant Vogt, and Defendant Bilinsky knew, or acted with deliberate recklessness in disregarding, that the public narrative they presented was materially inconsistent with the operational facts available to them.

## VII. LOSS CAUSATION AND DAMAGES

### A. Plaintiff's Federal Securities Losses Are Tied to Actual Option Transactions and a Series of Disclosures and Reassurances.

267. Plaintiff alleges that Defendants' materially false and misleading statements and omissions kept the market price of Iovance common stock artificially high and, because Plaintiff's call options derived much of their value from that stock price, also kept the price of those options artificially high. The truth did not emerge all at once. Instead, parts of the concealed manufacturing, patient-conversion, manufacturing-slot, and authorized-treatment-center problems became public over time and appeared in Iovance's operating results. Plaintiff's federal loss-causation theory is tied to actual option transactions: Plaintiff purchased or rolled options at prices affected by the alleged inflation, continued to hold or sell options as some of that inflation was removed, and liquidated its remaining position on February 28, 2025 after important concealed facts came to light. Plaintiff does not allege that every trading loss was caused by fraud, that every dollar of option premium is recoverable, or that any one disclosure caused the entire loss.

268. Plaintiff's February 2024 unrealized profit is not the federal damages claim. Plaintiff alleges that it would have reduced or exited its position after FDA approval if Iovance had disclosed the truth. That allegation explains Plaintiff's reliance and why it remained exposed, but Plaintiff does not seek recovery for profits it could have earned by selling at the February 2024 peak. The federal claim is limited to losses tied to actual purchases, sales, rolls, extensions, and liquidation transactions.

269. Plaintiff did not simply buy options once and hold them. It built a long-term bullish position in 2023, kept most of that position after it became highly profitable in February 2024, added and changed positions in June, August, September, October, and November 2024, and later extended part of its exposure into 2026 through a January 2026 / June 2025 call-spread position.

132

Plaintiff alleges that those decisions were made in reliance on Iovance's repeated statements that AMTAGVI was commercially ready, scalable, supported by authorized treatment center momentum and manufacturing capacity, and on track for substantial 2025 revenue growth.

270.     Plaintiff's initial accumulation of long-term January 17, 2025 Iovance call options occurred between September 29, 2023 and December 18, 2023.  By December 18, 2023, Plaintiff held 5,000 January 17, 2025 call options with an exercise price of $5.00 and 1,250 January 17, 2025 call options with an exercise price of $10.00.  This position was established while Iovance was representing that it was preparing to treat "thousands of patients a year out of the gate," that its iCTC manufacturing facility had been built to handle 2,000 or more patients per year, and that its authorized treatment centers were "stood up" and "ready to go."

271.     Plaintiff's trades made on or before December 18, 2023 also built on Iovance's representation, made in New York, New York, that it was an attractive "bolt-on" opportunity.  At the Jefferies Global Healthcare Conference in New York on June 9, 2023, Iovance's executives portrayed Iovance as a fully integrated cell-therapy company suitable for acquisition as a "bolt-on" by a larger pharmaceutical company.  Defendant Bilinsky described Iovance as "by definition" a "bolt-on opportunity," citing, among other things, Iovance's research capabilities, clinical team, manufacturing facility, intellectual-property position, and experience.  Defendant Vogt reinforced that representation by describing Iovance as a "true bolt-on" for which an acquirer would not "have to do anything," because Iovance already had "all the capacity," "all the know-how," and "everything you need."  These New York statements were material to Plaintiff's 2023 trading thesis because a credible M&A "bolt-on" narrative depended on Iovance actually possessing the operational, manufacturing, and commercial capabilities that it claimed to possess.

133

272. Plaintiff did not purchase call options merely in anticipation of FDA approval and then ignore later events. Its trading decisions reflected continuing reliance on Iovance's representations that AMTAGVI's commercial launch infrastructure was already in place. After selling 550 January 17, 2025 call options with an exercise price of $10.00 on January 8 and 9, 2024, Plaintiff retained a substantial long-term bullish position consisting of 5,000 January 17, 2025 call options with an exercise price of $5.00 and 700 January 17, 2025 call options with an exercise price of $10.00. Plaintiff's retention of this substantial position through the FDA's approval reflected continued reliance on Iovance's statements that AMTAGVI was commercially ready, that authorized treatment centers could begin treating patients, and that Iovance had the manufacturing infrastructure necessary to scale the product.

273. After the FDA approved AMTAGVI on February 16, 2024 and AMTAGVI commercially launched on February 20, 2024, Iovance's stock appreciated sharply. By February 28, 2024, Plaintiff's January 2025 Iovance call option position had substantial intrinsic value and had an estimated mark-to-market value of approximately $6.922 million, reflecting an estimated mark-to-market profit of approximately $5.681 million. Plaintiff could have monetized that substantial profit. Instead, Plaintiff continued holding most of its long-term position because it relied on Iovance's continuing representations that AMTAGVI's launch was strong, that manufacturing was performing successfully, that authorized treatment centers were ready and ramping, and that any launch-related issues being identified by analysts were manageable or consistent with expectations.

274. Plaintiff's decision not to sell in February 2024 helps explain why it remained exposed, but it is not itself a measure of damages. Plaintiff's federal claim is based on actual purchases, rolls, sales, and liquidation transactions at prices allegedly affected by artificial

inflation, and on losses suffered when fraud-related inflation came out while Plaintiff held the affected options. Plaintiff does not seek damages merely because it continued to hold the options. Plaintiff, through Dr. Kambam, understood from his medical background that AMTAGVI's commercial success would depend on real-world operational factors, including (i) patient screening; (ii) tumor harvesting; (iii) authorized treatment center readiness; (iv) manufacturing success; (v) manufacturing slot availability; (vi) patient attrition; and (vii) coordination between authorized treatment centers and manufacturing facilities. The concealed monthly manufacturing slot limitation and the concealed practical consequences of the FDA-imposed heightened potency requirement were especially important because they directly affected whether Iovance could manufacture usable AMTAGVI at the scale required for the projected revenue growth. Iovance's alleged misstatements and omissions concerned these same factors.

275. Plaintiff's June 2024 trades further reflected reliance on Iovance's post-approval statements, including additional statements made in New York, New York in May and June 2024. In the first half of 2024, Iovance continued to reassure the market that the AMTAGVI launch was progressing favorably, that manufacturing was setting a new bar for cell-therapy launches, that it had ample capacity, and that the Company was well capitalized. At the Citizens JMP Life Sciences Conference in New York, New York on May 13, 2024, Iovance Chief Business Officer Howard Johnson stated that Iovance was "very pleased with the initial launch metrics," that "everything is very positive" in terms of the metrics that one might look at to gauge the strength of the launch, and that Iovance had ample manufacturing capacity in place to handle then-current demand, demand for the rest of 2024, and demand going into 2025. At the same New York conference, Iovance also stated that it "feel[s] great about the cash position" and that its cash position would take it "late into next year," meaning late 2025.

135

276.    Likewise, on June 6, 2024, at the Jefferies Global Healthcare Conference in New York, New York, Defendant Vogt stated that the "main things" giving Iovance confidence were that its existing authorized treatment centers were "ramping up," that new authorized treatment centers were coming on, and that Iovance was seeing community referrals and a "ramping up" in AMTAGVI infusions.  These New York statements provided additional bases for Plaintiff's reliance because they addressed the same operational predicates underlying Plaintiff's bullish Iovance thesis: positive launch metrics, authorized treatment center ramping, community referrals, manufacturing capacity, cash sufficiency, and the expected conversion of post-approval demand into increasing AMTAGVI infusions.  Yet, as alleged above, Iovance was raising substantial cash through at-the-market stock sales while downplaying or omitting material manufacturing and commercial problems.

277.    Against that backdrop, Plaintiff did not exit its position.  On June 4, 2024, Plaintiff purchased 300 additional January 17, 2025 call options with an exercise price of $10.00, increasing the number of call options it held at that exercise price from 700 to 1,000.  Between June 13, 2024 and June 24, 2024, Plaintiff purchased another 4,700 January 17, 2025 call options with an exercise price of $10.00 and sold 1,907 of its January 17, 2025 call options with an exercise price of $5.00.  Plaintiff thereby used approximately $710,373.35 in proceeds from sales of calls with a $5.00 exercise price, plus approximately $156,947.42 in additional cash, to purchase a total of 5,000 additional January 17, 2025 calls with a $10.00 exercise price at a cost of approximately $867,320.77.  By doing so, Plaintiff increased its exposure at a $10.00 exercise price and acquired greater leverage for a potential rise in Iovance's stock price.  Those June 2024 purchases followed Iovance's May 13, 2024 and June 6, 2024 reassurances, which Plaintiff alleges kept the remaining artificial inflation in Iovance's stock and option prices.

136

278.    Plaintiff continued to maintain and adjust that exposure after Iovance's August 8, 2024 disclosures and guidance.  On August 2 and August 5, 2024, Plaintiff sold 543 January 17, 2025 call options with an exercise price of $5.00, reducing the call option position with an exercise price of $5.00 to 2,550 contracts while continuing to hold 5,700 January 17, 2025 call options with an exercise price of $10.00.  Then, on August 19, 2024, shortly after Iovance issued total product revenue guidance for the first time and stated that "**the whole point**" of this guidance was so the public could "**rely**" on its internal understanding of AMTAGVI infusions and PROLEUKIN demand and "**see what the upswing is going to look like**," Plaintiff purchased 1,250 additional January 17, 2025 call options with an exercise price of $10.00 and sold 50 January 17, 2025 call options with an exercise price of $5.00.  As of August 19, 2024, Plaintiff's January 17, 2025 Iovance call position consisted of 2,500 call options with an exercise price of $5.00 and 6,950 call options with an exercise price of $10.00.

279.    Plaintiff then continued to reposition its January 2025 Iovance call exposure in September and October 2024.  On August 20, 2024, Plaintiff purchased 50 additional January 17, 2025 call options with an exercise price of $10.00, increasing that position to 7,000 contracts. Between September 10, 2024 and October 7, 2024, Plaintiff sold a total of 7,300 January 17, 2025 call options with an exercise price of $10.00, consisting of the 7,000 such call options it had held, plus 300 additional call options with an exercise price of $10.00 that it purchased on September 10 and September 18, 2024.  During the same general period, Plaintiff purchased 6,500 January 17, 2025 call options with an exercise price of $9.00 at a cost of approximately $1,334,980.78. These transactions were not a retreat from Iovance; they replaced Plaintiff's exposure at an exercise price of $10.00 with call options with a lower exercise price of $9.00, maintained the

same January 2025 expiration date, and increased Plaintiff's bullish exposure to Iovance at a lower exercise price.

280.    Plaintiff again repositioned its long-term Iovance exposure in November 2024, in reliance on Iovance's reaffirmation (on November 7, 2024) of its total product revenue guidance for 2025.  Plaintiff sold 500 January 17, 2025 call options with an exercise price of $5.00 on November 15 and November 18, 2024, reducing that position from 2,500 contracts to 2,000 contracts.  Also on November 18, 2024, Plaintiff sold its 6,500 January 17, 2025 call options with an exercise price of $9.00 and purchased 6,500 January 17, 2025 call options with an exercise price of $7.50, lowering the exercise price of this portion of its call option position while maintaining the January 2025 expiration date.  This roll-down transaction increased Plaintiff's bullish exposure by moving into deeper-in-the-money call options.  The next day, at the Stifel 2024 Healthcare Conference in New York, Iovance continued reinforcing its launch narrative, with Defendant Bilinsky stating that he thought that it was "very underappreciated" that Iovance was executing what may have been "the most successful cell therapy launch in history so far."

281.    By December 2024 and January 2025, Plaintiff's trades reflected both the damage caused by Iovance's alleged misstatements and Plaintiff's continuing reliance on the possibility that Iovance's represented 2025 upswing would materialize.  On December 18, 2024, Plaintiff sold all 6,500 January 17, 2025 call options with an exercise price of $7.50 at a significant loss, along with 900 January 17, 2025 call options with an exercise price of $5.00, leaving Plaintiff with 1,100 January 17, 2025 call options with an exercise price of $5.00.  But Plaintiff did not exit Iovance entirely.  Instead, beginning on December 18, 2024 and continuing through January 15, 2025, Plaintiff purchased 3,800 January 16, 2026 call options with an exercise price of $7.50 and sold 3,800 June 20, 2025 call options with an exercise price of $12.00 against them, creating a bullish

138

call spread structure that extended Plaintiff's Iovance exposure into 2026.  This trade structure reflected Plaintiff's continued reliance on Iovance's representations that the AMTAGVI commercial trajectory would improve and that its 2025 total product revenue guidance (and the required revenue upswing) remained attainable.

282.    Plaintiff's ultimate liquidation confirms the reliance and loss-causation narrative. On January 14 and 15, 2025, Plaintiff sold its remaining 1,100 January 17, 2025 call options with an exercise price of $5.00, but continued to hold onto its 3,800-pair call spread (consisting of 3,800 long January 16, 2026 call options with an exercise price of $7.50 and 3,800 short June 20, 2025 call options with an exercise price of $12.00 against them).  On February 27, 2025, Iovance disclosed Q4 2024 and full-year 2024 results that revealed important additional facts about the launch.  Among other matters, Iovance reported only 95 AMTAGVI infusions for the fourth quarter and disclosed that, among approximately 70 authorized treatment centers onboarded during 2024, only 76% had completed even one successful tumor-harvesting surgery and only 64% had performed even one AMTAGVI infusion, thereby revealing that **24% had not completed a single successful tumor-harvesting surgery and 36% had not performed a single AMTAGVI infusion**.  Iovance also acknowledged continuing operational bottlenecks and costs associated with patient drop-off and manufacturing results that did not meet required specifications and declined to provide then-current infusion numbers while again reaffirming its 2025 guidance.  These disclosures revealed that paper onboarding of authorized treatment centers had not translated into the patient throughput, manufacturing success, completed infusions, and revenue acceleration implied by Defendants' prior statements, and that the operational trajectory required to achieve the 2025 guidance was materially weaker than Defendants had represented.  Plaintiff consequently liquidated its entire remaining Iovance option position at the market open on the next business day,

February 28, 2025, between approximately 9:38 a.m. and 9:54 a.m.  The May 8, 2025 guidance reduction and accompanying admissions later confirmed the same concealed operational facts; Plaintiff does not seek recovery for the May 9, 2025 stock-price decline because Plaintiff no longer held the relevant option position at that time.

283.    Accordingly, Plaintiff's trading history supports both reliance and loss causation. Plaintiff built its initial position in 2023 based on Iovance's pre-approval representations that it was commercially ready and scalable, and had been presented in New York as an acquisition-ready M&A "bolt-on" opportunity.  Plaintiff then kept the position after February 2024 rather than realizing substantial gains because Iovance continued to represent that the AMTAGVI launch was strong and that operational issues were manageable.  Limited adverse information emerged in May 2024, but Iovance simultaneously or promptly responded with reassurances concerning launch strength, patient conversion, manufacturing-slot availability, manufacturing performance, and internal visibility.  Plaintiff increased, changed, or extended its bullish exposure in (i) June 2024; (ii) August 2024; (iii) September and October 2024; (iv) November 2024; and (v) December 2024 through January 2025 because Iovance continued to represent that AMTAGVI was on a path toward substantial revenue growth.  The principal disclosures, reassurances, positions, and market reactions are summarized in the chart below:

**Summary of Disclosures, Reassurances, and Market Reactions[37]**

| Date and Information Disclosed | Options Held and Market Reaction | Why It Matters to Loss Causation |
|---|---|---|
| **May 9, 2024 disclosures; May 10, 2024 market reaction** | After the market closed on May 9, 2024, Iovance said that more than 100 patients had enrolled for AMTAGVI treatment, and that most were expected to be ready for infusion during the second and early third quarters of 2024. Iovance did not say how many enrolled patients had undergone tumor resection or received an infusion, and it acknowledged some patient drop-off and manufacturing issues. At the same time, Iovance said the launch was strong, manufacturing slots were sufficiently available, and commercial manufacturing was consistent with clinical experience. Plaintiff then owned 5,000 January 17, 2025 calls with a $5.00 exercise price and 700 January 17, 2025 calls with a $10.00 exercise price. On May 10, 2024, Iovance common stock fell approximately 15.9%, and the combined value of those calls fell from approximately $4,970,299.00 to approximately $3,560,536.00, a decline of approximately $1,409,763.00, or 28.4%. The S&P 500 rose approximately 0.2%, and the Nasdaq Composite was essentially flat. | Plaintiff alleges that the May disclosures and the May 10 market reaction partly revealed that manufacturing and launch operations were weaker than represented. Iovance's favorable statements allegedly kept the market from learning the full extent of the problems. The May 10 decline applies only to the options Plaintiff owned that day. Plaintiff does not claim that the entire decline was caused by fraud; expert analysis will separate any fraud-related loss from other causes. |

---

[37]    Option values are drawn from Plaintiff's brokerage mark-to-market and transaction records. Stock and market-index percentages are approximate and are based on publicly available closing-price data. The May 10, 2024 and November 8, 2024 option changes cover only the long-term positions identified in the chart, not every option in the account. The chart presents factual reference points; it does not allege that each full market reaction is recoverable. Expert analysis will determine the portion caused by the alleged fraud and will exclude losses caused by ordinary option decay, unrelated volatility changes, market-wide or industry-wide movements, dilution or ordinary ATM selling pressure, and unrelated company news.

141

| Date and Information Disclosed | Options Held and Market Reaction | Why It Matters to Loss Causation |
|---|---|---|
| **August 8, 2024 disclosures; August 9, 2024 market reaction** | Iovance reported 25 second-quarter infusions. At the same time, it issued 2025 total product revenue guidance of $450 million–$475 million and said investors could rely on its internal view of infusions and demand. Plaintiff then owned 2,550 January 17, 2025 calls with a $5.00 exercise price and 5,700 January 17, 2025 calls with a $10.00 exercise price. On August 9, 2024, Iovance common stock rose approximately 24.9%, and the combined value of those calls rose from approximately $1,955,548.50 to approximately $2,923,461.00, an increase of approximately $967,912.50, or 49.5%. | Plaintiff claims no loss from the August 9 rise. It alleges that the sharply positive stock and option reaction shows that Iovance's new guidance and claimed internal visibility outweighed the weak infusion figure, kept the remaining inflation in place, and led Plaintiff to maintain and increase its exposure. |
| **November 7, 2024 disclosures; November 8, 2024 market reaction** | Iovance reported 82 third-quarter infusions, disclosed $8.3 million of costs related to patient drop-off and manufacturing success rates, acknowledged that some authorized treatment centers had struggled, and said that it expected only "eventually" to reach the manufacturing success rate or manufacturing experience achieved in its clinical studies, while reaffirming its 2025 guidance. Plaintiff then owned 2,500 January 17, 2025 calls with a $5.00 exercise price and 6,500 January 17, 2025 calls with a $9.00 exercise price. Iovance common stock fell approximately 13.8%, and the combined value of those calls fell from approximately $4,229,645.00 to approximately $2,934,470.00, a decline of approximately $1,295,175.00, or 30.6%. The S&P 500 rose approximately 0.4%, and the Nasdaq Composite rose approximately 0.1%. | Plaintiff alleges that these disclosures removed part of the remaining inflation while it still owned the calls. The stock and option declines, while the broad market rose, support that claim. Iovance's simultaneous guidance reaffirmation and reassurances allegedly prevented a full correction. Expert analysis will determine how much of the decline was caused by the alleged fraud. |
| **January 13, 2025 reaffirmation** | Iovance reaffirmed that it expected significant growth in line with its 2025 guidance and made no adverse operational disclosure. Plaintiff still owned 1,100 January 17, 2025 calls with a $5.00 exercise price and continued building the 3,800-pair January 2026 / June 2025 call spread through January 15, 2025. | Plaintiff claims no loss from January 13. It alleges that the reaffirmation kept the remaining inflation in place and led it to continue the call-spread position. |

| Date and Information Disclosed | Options Held and Market Reaction | Why It Matters to Loss Causation |
|---|---|---|
| **February 27, 2025 disclosures; February 28, 2025 liquidation** | Iovance effectively disclosed that approximately 24% of its authorized treatment centers had not completed a tumor-harvest surgery in 2024 and approximately 36% had not completed an AMTAGVI infusion; acknowledged continuing bottlenecks; declined to provide then-current infusion numbers; and described then-current staffed capacity to supply more than 1,200 patients annually, a shift from emphasizing "as-built" capacity exceeding 2,000 patients annually. Plaintiff then held the 3,800-pair call spread. Iovance common stock opened approximately 25.3% below the prior close and closed down approximately 19.4%, while the S&P 500 and Nasdaq Composite rose approximately 1.6%. The spread declined approximately $209,662.94, or 50.5%, from its value at the prior close to the net liquidation proceeds on February 28, 2025, when Plaintiff sold the position. | Plaintiff alleges that this was the principal disclosure that removed the remaining inflation while it still owned options. The large decline, while the broad market rose, supports a company-specific cause. Plaintiff sold the position the next morning. |
| **May 8, 2025 disclosures; May 9, 2025 market reaction** | Iovance cut its 2025 guidance to $250 million–$300 million and made statements concerning authorized-treatment-center growth, treatment timelines, referrals, and manufacturing-slot availability. Iovance common stock fell approximately 44.8%, but Plaintiff no longer held an Iovance option position. | These later developments are included only to confirm the earlier allegations. Plaintiff no longer owned Iovance options and claims no loss from the May 2025 decline. |

284.    The truth began to emerge before August 2024, but only in pieces. On May 9, 2024, Iovance said that most of the more than 100 enrolled patients were expected to be ready for infusion only during the second and early third quarters of 2024. Iovance did not say how many enrolled patients had undergone tumor resection or received an infusion, and it acknowledged some patient drop-off and manufacturing issues. On May 10, 2024, Iovance common stock fell approximately 15.9%, and the combined value of Plaintiff's 5,000 January 17, 2025 calls with a $5.00 exercise price and 700 January 17, 2025 calls with a $10.00 exercise price fell by

143

approximately $1,409,763.00, or 28.4%, while the S&P 500 rose approximately 0.2% and the Nasdaq Composite was essentially flat. Plaintiff alleges that the May disclosures and the May 10 market reaction partly revealed that enrolled patients were not moving to infusion as quickly as Iovance had represented and that manufacturing and launch operations were weaker than represented. At the same time, Iovance said that the launch was strong, manufacturing slots were sufficiently available, and commercial manufacturing was consistent with clinical experience. Plaintiff alleges that those favorable statements kept the market from learning the full extent of the problems. The May 10 decline applies only to the options Plaintiff owned on that date; Plaintiff does not attribute any May 10 loss to calls purchased later in June 2024. Those later calls were purchased after Iovance's May 13 and June 6 reassurances and are tied to later disclosures and market reactions. On August 8, 2024, Iovance reported only 25 AMTAGVI infusions for the first full commercial quarter, which undercut its earlier statements about a patient bolus, a rapid authorized-treatment-center ramp, and manufacturing flexibility. At the same time, Iovance issued its 2025 guidance and said investors could rely on its internal view of the expected growth. On August 9, 2024, Iovance common stock rose approximately 24.9%, and the combined value of Plaintiff's 2,550 January 17, 2025 calls with a $5.00 exercise price and 5,700 January 17, 2025 calls with a $10.00 exercise price rose from approximately $1,955,548.50 to approximately $2,923,461.00, an increase of approximately $967,912.50, or 49.5%. Plaintiff claims no loss from that rise. Instead, Plaintiff alleges that the favorable market reaction shows that the new guidance and claimed internal visibility outweighed the weak infusion figure, kept the remaining inflation in place, and led Plaintiff to maintain and increase its exposure.

285. Plaintiff alleges that the November 7, 2024 disclosures removed part of the remaining inflation. Iovance reported 82 third-quarter infusions, disclosed $8.3 million of costs

144

related to patient drop-off and manufacturing success rates, acknowledged that some authorized treatment centers had struggled with resections and patient selection, and said that it expected only "eventually" to reach the manufacturing success rate or manufacturing experience achieved in its clinical studies. On November 8, 2024, Iovance common stock fell approximately 13.8%, and the combined value of Plaintiff's 2,500 January 17, 2025 calls with a $5.00 exercise price and 6,500 January 17, 2025 calls with a $9.00 exercise price fell from approximately $4,229,645.00 to approximately $2,934,470.00, a decline of approximately $1,295,175.00, or 30.6%. The S&P 500 rose approximately 0.4%, and the Nasdaq Composite rose approximately 0.1%. Plaintiff alleges that this company-specific decline reflected some of the concealed problems involving patients moving to infusion, manufacturing, and authorized treatment center performance becoming public. Iovance's simultaneous reaffirmation of its 2025 guidance and its reassurances allegedly prevented the full truth from being reflected in the market price. Plaintiff later realized losses on the calls with a $9.00 exercise price when it sold them on November 18, 2024 and purchased January 17, 2025 calls with a $7.50 exercise price while, according to Plaintiff, some artificial inflation remained.

286.     Iovance's January 13, 2025 reaffirmation allegedly kept the remaining inflation in place and led Plaintiff to continue holding the January 2026 / June 2025 call-spread position. On February 27, 2025, Iovance disclosed that approximately 24% of its authorized treatment centers had not completed a tumor-harvest surgery in 2024 and approximately 36% had not completed an AMTAGVI infusion, acknowledged continuing bottlenecks, declined to provide then-current infusion numbers, and described then-current staffed capacity to supply more than 1,200 patients annually, materially below the previously touted annual "as built" capacity of more than 2,000 patients. The next morning, Iovance common stock opened approximately 25.3% below the prior

145

close and Plaintiff's call spread declined approximately $209,662.94, or 50.5%, from its value at the February 27 close to the net liquidation proceeds, while the broad market rose.  Plaintiff alleges that the timing and size of the decline, compared with the rising broad market, show that the February 27 disclosures caused a substantial part of the remaining inflation to come out of the price.  Plaintiff liquidated the entire January 2026 / June 2025 call-spread position between approximately 9:38 a.m. and 9:54 a.m.  The approximately $209,662.94 decline from the prior close to the liquidation proceeds is different from the approximately $504,681.14 total realized loss on the position: the first compares the position's value at the February 27 close with the February 28 liquidation proceeds, while the second compares the total cost of the position with the total proceeds.

287.     The May 8, 2025 disclosures are included only as later confirmation, not as a loss event for Plaintiff.  Iovance reduced its 2025 total product revenue guidance from $450 million–$475 million to $250 million–$300 million, and Defendant Vogt explained that the revised forecast was more consistent with what Iovance actually saw at the authorized treatment centers after considering growth trajectories, treatment timelines, referral processes, and manufacturing-slot availability.  Plaintiff had already liquidated its remaining position and does not seek recovery for the May 9, 2025 stock-price decline.  Information first disclosed on May 8, 2025 cannot be the cause of the losses Plaintiff claims from the November 8, 2024 and February 28, 2025 market reactions.

### B.     **Damages Calculation.**

288.     Plaintiff's current calculation of approximately $1,875,664.24 is the aggregate net economic loss from the specifically identified January 17, 2025 and January 16, 2026 long-call positions after crediting the offsetting gain from the June 20, 2025 short calls.  It measures the

overall economic result from the selected positions using broker-reported proceeds and basis adjusted to prevent the same wash-sale loss from being counted more than once; it is not the amount automatically recoverable under the federal securities laws.  It does not purport to capture every IOVA transaction reflected in Plaintiff's account ledger.  The May 10, 2024, November 8, 2024, and February 28, 2025 market reactions are factual reference points.  Plaintiff does not claim that each full decline was caused by fraud.  Nor does Plaintiff count gross premiums paid, cash added to a roll, or the same economic loss reflected in successive positions as separate damages.  Plaintiff seeks only the difference between the actual prices at which the relevant options were purchased, rolled, sold, or liquidated and the prices those options would have had if the alleged fraud had not affected Iovance's stock and option prices.

289.    Plaintiff will use transaction-specific expert analysis to calculate the recoverable amount.  The analysis will first estimate the fraud-related movement in Iovance common stock using standard event-study methods and comparisons with the broader market, the biotechnology industry, and relevant benchmarks.  It will then value each affected option using its actual exercise price, expiration date, underlying stock price, intrinsic value, time value, implied volatility, option sensitivities including delta, gamma, vega, and theta, transaction timing, bid-ask effects, and commissions where appropriate.  The analysis will exclude ordinary time decay, volatility changes unrelated to the alleged fraud, market-wide and industry-wide movements, disclosed risks, any price effect attributable solely to dilution or ordinary ATM selling pressure, and company-specific developments unrelated to the challenged statements and omissions.  It will also avoid counting the same economic loss more than once across sales, rolls, extensions, and liquidation.

## VIII. ACTUAL RELIANCE AND, IN THE ALTERNATIVE, THE FRAUD-ON-THE-MARKET PRESUMPTION

290.    Plaintiff actually and directly relied on the statements and omissions identified throughout Section IV in making the option purchases, rolls, sales, extensions, and liquidation decisions alleged herein.  Through Dr. Kambam, Plaintiff reviewed and monitored Iovance's SEC filings, press releases, earnings calls, and investor-conference statements, including Defendants' repeated representations concerning commercial readiness, authorized treatment center activity, manufacturing capacity and performance, cash sufficiency, and the present operational basis for Iovance's 2025 total product revenue guidance.  Plaintiff alleges that those representations materially affected its decisions to establish, maintain, increase, reposition, extend, and ultimately liquidate its long-term Iovance option exposure.

291.    In the alternative, Plaintiff is entitled to the rebuttable presumption of reliance under the fraud-on-the-market doctrine.  The market for Iovance common stock was open, well-developed, and efficient at all relevant times.  Defendants' public and material statements and misleading half-truths allegedly caused or maintained artificial inflation in Iovance common stock.  Plaintiff's standardized, exchange-traded call options derived a material portion of their value from the market price of that stock.  Accordingly, artificial inflation embedded in Iovance's common-stock price was transmitted into the market premiums of Plaintiff's call options, subject to option-specific factors that Plaintiff's expert will address.  Plaintiff does not allege that each option series must be treated as a separate efficient market; the alleged presumption concerns the integrity of the efficient market price of the underlying Iovance common stock and the derivative effect of that price on the options.

292.    At all relevant times, the market for Iovance common stock was efficient for the following reasons, among others:

148

(i)     Iovance common stock met the requirements for listing and was listed and actively traded on the Nasdaq Global Market, a national, automated securities market;

(ii)    Iovance filed periodic public reports with the SEC and was subject to applicable Nasdaq listing and disclosure requirements;

(iii)   Iovance regularly communicated with investors through established market mechanisms, including SEC filings, national newswire releases, earnings calls, investor presentations, and investor conferences;

(iv)    Iovance was followed by securities analysts whose research was distributed to institutional and other clients, and information from that research entered the public market through publicly available summaries, analyst rating and price-target changes, financial-news coverage, and resulting trading activity; and

(v)     Iovance common stock reacted promptly and substantially to company-specific information, including an approximately 15.9% decline on May 10, 2024 while the S&P 500 rose and the Nasdaq Composite was essentially flat; an approximately 24.9% increase on August 9, 2024 after Iovance issued its guidance and visibility assurances; an approximately 13.8% decline on November 8, 2024 while both broad-market indexes rose; and an opening decline of approximately 25.3% on February 28, 2025 while the broad market again rose.

293.    As a result of the foregoing, the market for Iovance common stock promptly digested publicly available information and reflected that information in Iovance's stock price.

149

Plaintiff alleges that it purchased or rolled the relevant options after the challenged public statements and before the corresponding truth was fully revealed. Plaintiff therefore pleads direct and individualized reliance and, in the alternative, reliance on the integrity of the efficient market price of Iovance common stock and the resulting option premiums. The presumption is pleaded as rebuttable and in addition to – not as a substitute for – Plaintiff's allegations of actual reliance.

## IX.  NO SAFE HARBOR

294.    The statutory safe harbor for forward-looking statements does not protect the materially false and misleading present-tense statements and misleading half-truths alleged in this Complaint. Many of the strongest challenged statements concerned then-existing facts and conditions, including existing iCTC capacity, existing authorized treatment center readiness, then-current manufacturing-slot availability, then-current launch metrics, then-current patient conversion and attrition, then-current cash sufficiency, then-current manufacturing performance, then-current internal visibility into infusion growth and authorized treatment center activity, and then-existing FDA manufacturing constraints, including the higher potency threshold and monthly manufacturing slot limitation.

295.    Iovance's 2025 total product revenue guidance included a forward-looking projection of future revenue, but the challenged statements surrounding that guidance also conveyed separate present-tense representations. Defendants stated that the guidance rested on Iovance's existing internal understanding, current visibility, ongoing experience, knowledge of "all the dynamics," authorized treatment center activity, manufacturing capacity, manufacturing-slot scheduling, patient selection, and then-current launch performance. Those present-tense statements concerning the existing basis for the guidance are independently actionable even if the projected revenue range itself is treated as forward-looking.

150

296.    The cautionary language accompanying Iovance's forward-looking statements was not meaningful as to the particular facts alleged herein.  For example, Iovance's 2023 Form 10-K warned conditionally that it "may encounter difficulties in production" and that supply "could be delayed or stopped" if such difficulties occurred.  *See* Iovance Biotherapeutics, Inc., Annual Report (Form 10-K), at 35–41 (Feb. 28, 2024).  Plaintiff alleges, however, that the omitted facts were not merely possible future risks: the FDA's higher potency requirement and monthly manufacturing slot limitation were then-existing constraints, practical iCTC capacity and technology limitations already existed, and Iovance was receiving current information concerning manufacturing-slot availability, patient drop-off, manufacturing results, authorized treatment center activity, and completed infusions.  Conditional warnings about what might occur did not disclose that the warned-of conditions allegedly existed or were already materially affecting the launch narrative and the present basis for the guidance.

297.    Defendants acted knowingly or with deliberate recklessness as to the present-tense statements and misleading half-truths alleged herein.  To the extent a particular statement is held to be genuinely forward-looking and otherwise within the statutory safe harbor, Plaintiff alleges that the natural-person speaker made the statement with actual knowledge that it was false or misleading.  To the extent a genuinely forward-looking statement is attributed to Iovance, Plaintiff alleges that it was made by or with the approval of an executive officer who actually knew that the statement was false or misleading when made or approved.

## X.  COUNT I – VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5(b)
### (Against All Defendants)

298.    Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

A.      **Material Misstatements and Misleading Half-Truths Under Rule 10b-5(b).**

299.    For the reasons alleged in Section IX, the challenged statements are not protected by the statutory safe harbor for forward-looking statements or by the bespeaks-caution doctrine.

300.    This Count asserts primary liability under Rule 10b-5(b) for materially false statements and misleading half-truths.  The recurring-pattern allegations in Section V provide factual context concerning falsity, materiality, scienter, reliance, and loss causation.  Plaintiff does not rely on the same alleged statements and omissions as a separate or independent scheme claim under Rule 10b-5(a) or Rule 10b-5(c).

301.    Iovance made the challenged statements contained in its SEC filings, press releases, earnings releases, prepared investor presentations, social-media posts, and other corporate communications over which Iovance had ultimate authority.  Iovance is also responsible for statements made on its behalf by senior officers and agents acting within the scope of their authority and for Iovance's benefit, as alleged herein.

302.    Defendant Vogt is liable under Rule 10b-5(b) for the materially false or misleading statements that he personally made or over which he had ultimate authority.  Those statements included his representations concerning (i) Iovance's ability to treat thousands of patients per year out of the gate; (ii) Iovance's claimed status as a "true bolt-on" for which an acquirer would not "have to do anything" because it already had "all the capacity," "all the know-how," and "everything you need"; (iii) authorized treatment center readiness and ramping; (iv) patient volume; (v) launch momentum; (vi) manufacturing-slot availability; (vii) cash sufficiency; (viii) Iovance's 2025 total product revenue guidance; and (ix) Iovance's claimed present-tense internal understanding and visibility supporting that guidance.

303.   Defendant Bilinsky is liable under Rule 10b-5(b) for the materially false or misleading statements that he personally made or over which he had ultimate authority.  Those statements included his representations concerning (i) Iovance's claimed status as "by definition" a "bolt-on opportunity" because it was "truly fully integrated"; (ii) iCTC capacity and readiness; (iii) manufacturing flexibility and success; (iv) manufacturing-slot availability and scheduling; (v) tumor-sample quality; (vi) patient attrition; (vii) authorized treatment center activity; (viii) launch execution; (ix) month-over-month growth; and (x) confidence in Iovance's 2025 total product revenue guidance.

304.   Defendants' omissions are actionable because they made the affirmative statements alleged herein and omitted material facts necessary to make those statements not misleading.  By stating that authorized treatment centers were ready, ramping, and a reliable indicator of patient volume, Defendants allegedly omitted material facts concerning actual operational readiness and activity.  By stating that manufacturing capacity, manufacturing-slot availability, scheduling, and commercial manufacturing performance were sufficient or consistent with clinical experience, Defendants allegedly omitted the FDA constraints and practical manufacturing limitations described herein.  By portraying Iovance as a fully integrated, ready-made "bolt-on" acquisition opportunity, Defendants allegedly omitted practical iCTC capacity and technology limitations, authorized treatment center readiness problems, and other operational deficiencies that materially qualified that portrayal.  By stating that Iovance was well capitalized and that its guidance rested on reliable internal visibility, Defendants allegedly omitted material cash and operational facts that made those statements misleading.

305.   The challenged statements and misleading half-truths were material because they concerned Iovance's flagship commercial product, the operational chain required to convert

153

patient demand into completed AMTAGVI infusions and revenue, the achievability of Iovance's public guidance, Iovance's cash needs, and the matters most likely to affect Iovance's stock price and the value of Plaintiff's options.

306.   Defendants acted with scienter for the reasons alleged in Section VI.  Defendant Vogt's and Defendant Bilinsky's knowledge or deliberate recklessness is attributable to Iovance because each acted within the scope of his authority when making, approving, adopting, or reaffirming the challenged statements.  As to any genuinely forward-looking statement for which the statutory safe harbor otherwise applies, Plaintiff alleges the actual knowledge specified in Section IX.

### B.      Reliance, Loss Causation, and Damages.

307.   Plaintiff actually and directly relied on the challenged statements and misleading half-truths in making the option transactions alleged herein.  In the alternative, Plaintiff relied on the integrity of the efficient market price of Iovance common stock and is entitled to the rebuttable fraud-on-the-market presumption for the reasons alleged in Section VIII.

308.   The alleged fraud was in connection with Plaintiff's actual purchases, rolls, extensions, sales, and liquidation of exchange-traded Iovance call options.  The options were securities whose value depended materially on Iovance's common-stock price and the market's assessment of Iovance's publicly disclosed prospects.  Plaintiff's continued holding of positions is alleged as reliance and but-for-causation context; it is not pleaded as an independent federal holder claim.

309.   Defendants' materially false statements and misleading half-truths allegedly caused or maintained artificial inflation in Iovance common stock, which in turn affected the market

154

premiums of Plaintiff's call options.  Plaintiff entered into, rolled, extended, sold, and liquidated actual option positions at prices affected by that alleged inflation and its later removal.

310.    Plaintiff suffered fraud-related economic loss for the reasons alleged in Section VII. The May 10, 2024, November 8, 2024, and February 28, 2025 market reactions provide factual reference points for the alleged removal of inflation, and the August 9, 2024 positive reaction supports the allegation that the new guidance and claimed internal visibility maintained or increased the remaining inflation.  Expert analysis will determine the fraud-related portion, and will exclude ordinary time decay, unrelated changes in implied volatility, market-wide and industry-wide movements, any price effect attributable solely to dilution or ordinary ATM selling pressure, and unrelated company-specific information.

311.    By reason of the foregoing, Iovance, Defendant Vogt, and Defendant Bilinsky violated Section 10(b) of the Exchange Act and Rule 10b-5(b).

312.    As a direct and proximate result of Defendants' violations of Section 10(b) and Rule 10b-5(b), Plaintiff is entitled to recover compensatory damages in an amount to be proven at trial, together with pre- and post-judgment interest, taxable costs, and such other relief as the Court may deem just and proper, without duplication of any recovery under another Count.

## XI.  COUNT II – CONTROL-PERSON LIABILITY UNDER SECTION 20(a)
### (Against Vogt, Bilinsky, and, to the extent applicable, Iovance)

313.    Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

314.    This Count is asserted under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), against Defendant Vogt and Defendant Bilinsky and, to the extent applicable, Iovance.  It is pleaded in addition to, and in the alternative to the extent necessary to, Plaintiff's primary-liability claim under Section 10(b) and Rule 10b-5(b).

155

315.    As alleged in Count I, Iovance, Defendant Vogt, and Defendant Bilinsky committed primary violations of Section 10(b) and Rule 10b-5(b) by making materially false statements and misleading half-truths concerning AMTAGVI's commercial launch, authorized treatment center readiness and activity, manufacturing capacity and quality, manufacturing-slot availability, the FDA's higher potency requirement and monthly manufacturing slot limitation, patient attrition, cash sufficiency, and Iovance's 2025 total product revenue guidance.

316.    Defendant Vogt controlled or had the power to control Iovance and the officers, employees, and agents who participated in Iovance's corporate disclosure process.  As Interim President and Chief Executive Officer, Defendant Vogt had authority to direct or influence Iovance's SEC filings, press releases, earnings releases, earnings-call remarks, investor presentations, guidance, and other investor communications.  He therefore had the power to control or influence Iovance as a primary violator and the subordinate personnel who prepared, approved, or disseminated the challenged corporate statements.

317.    Defendant Vogt was a culpable participant in the primary violations.  He personally placed Iovance's claimed present-tense knowledge at the center of the guidance by telling investors that they could "rely" on Iovance's internal understanding, that Iovance could "see the launch," knew "all the dynamics," and had "such a good picture of launch dynamics right now."  He continued to make or reaffirm the challenged statements despite the contrary operational facts and data alleged in Sections IV and VI.  These allegations also negate any good-faith defense at the pleading stage.

318.    Defendant Bilinsky controlled or had the power to control Iovance's manufacturing and operational personnel and the manufacturing- and launch-related information used in Iovance's public communications.  As Chief Operating Officer, he had authority to direct or

influence Iovance's operations, manufacturing disclosures, authorized treatment center and patient-throughput communications, and the personnel whose data and analysis informed those statements. He therefore had the power to control or influence Iovance as a primary violator and the persons responsible for the manufacturing- and operations-related statements alleged herein.

319. Defendant Bilinsky was a culpable participant in the primary violations. He personally made detailed statements concerning iCTC capacity, manufacturing readiness and success, manufacturing-slot availability and scheduling, patient attrition, tumor-sample quality, authorized treatment center performance, launch execution, and guidance. FE1, Iovance's former Senior Vice President of Technical Operations, reported directly to Defendant Bilinsky and was a source for allegations concerning the FDA constraints, practical iCTC limitations, and manufacturing technology described herein. Together with Iovance's post-launch operational data, these facts support the inference that Defendant Bilinsky knew or recklessly disregarded the contrary facts and negate any good-faith defense at the pleading stage.

320. To the extent applicable, Iovance controlled Defendant Vogt, Defendant Bilinsky, and the other identified officers, employees, and agents whose statements constitute primary violations. Iovance employed those persons, directed and supervised its corporate disclosure process, controlled access to the non-public operational information underlying the challenged statements, and had the ability to cause its controlled persons to correct or refrain from making the challenged statements. Iovance is not alleged to be a controlling person of itself; this alternative theory applies only to its control over identified natural-person primary violators.

321. By reason of their respective control, culpable participation, and lack of good faith as alleged above, Defendant Vogt, Defendant Bilinsky, and, to the extent applicable, Iovance are

157

jointly and severally liable with, and to the same extent as, the primary violator or violators each controlled, as provided by Section 20(a).

322.    As a direct and proximate result of the Section 20(a) violations, Plaintiff is entitled to recover compensatory damages in an amount to be proven at trial, together with pre- and post-judgment interest, taxable costs, and such other relief as the Court may deem just and proper, without duplication of any recovery under another Count.

## XII.  COUNT III – COMMON-LAW FRAUD
### (Against All Defendants)

323.    Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

324.    This Count is asserted against Iovance, Defendant Vogt, and Defendant Bilinsky. Under New York law or, alternatively, under the law determined applicable by the Court, each Defendant is liable for common-law fraud based on his or its own conduct alleged herein.  As alleged above, each Defendant, as applicable, made, authorized, approved, caused, disseminated, reaffirmed, failed to correct, materially participated in making, or is otherwise legally responsible for materially false and misleading statements and omissions of then-existing fact.  Defendant Vogt and Defendant Bilinsky are each individually liable because each personally made and/or materially participated in making, authorizing, approving, causing to be made, reaffirming, or failing to correct material misrepresentations and omissions of then-existing fact, and because each had direct access to, or control over, internal information that made those statements false or misleading when made.

325.    Defendants, including Defendant Vogt and Defendant Bilinsky through their own investor-facing statements and their participation in Iovance's public disclosures, made, authorized, approved, caused, participated in, or are otherwise legally responsible for material

misrepresentations and omissions of then-existing fact concerning, among other matters, (i) AMTAGVI's commercial launch; (ii) Iovance's manufacturing capacity and technology limitations at its iCTC facility; (iii) Iovance's manufacturing success rate and "out-of-specification" manufacturing results; (iv) Iovance's manufacturing slot availability, limitations, and scheduling process, including any FDA-imposed monthly manufacturing slot limitation; (v) the FDA's higher potency threshold, including its practical implications and consequences; (vi) authorized treatment center readiness, staffing, operational capabilities, and throughput; (vii) patient screening, conversion, attrition, and drop-offs; (viii) tumor harvesting and coordination between authorized treatment centers and Iovance's manufacturing facilities; (ix) Iovance's cash sufficiency; (x) Iovance's need to raise cash, including through sales of its own stock while its stock price was allegedly artificially inflated; (xi) Iovance's claimed visibility into AMTAGVI infusion growth, patient demand, manufacturing capacity, authorized treatment center performance, and launch dynamics; and (xii) the then-existing factual basis, or lack thereof, for Iovance's 2025 total product revenue guidance.

326. Iovance is liable for common-law fraud because Iovance made the material misrepresentations and omissions alleged herein through its own public communications and through statements made by its senior executives and agents acting within the scope of their authority and for Iovance's benefit. These communications included, among other means, SEC filings, press releases, earnings releases, earnings calls, investor presentations, investor-conference statements, social-media statements, and other public communications. Through these communications, Iovance represented that (i) AMTAGVI's commercial launch was strong, successful, positive, and on track; (ii) its authorized treatment centers were ready, prepared, staffed, operational, stood up, and able to begin treating patients; (iii) the number and growth of

its authorized treatment centers would translate into significant growth in patients infused with AMTAGVI; (iv) its manufacturing side had sufficient capacity, flexibility, manufacturing slot availability, and manufacturing quality to support Iovance's public launch narrative; (v) patient drop-offs, patient attrition, manufacturing issues, manufacturing slot issues, tumor-sample issues, and operational bottlenecks were rare, in line with expectations, manageable, easily addressable, quickly addressable, or consistent with Iovance's clinical experience; (vi) its cash position was strong, that it felt great about its cash position, and that it did not need to raise cash except to bridge to breakeven profitability; and (vii) its 2025 total product revenue guidance rested on Iovance's then-existing internal understanding, visibility, line of sight, and knowledge concerning AMTAGVI infusions, authorized treatment center adoption, manufacturing capacity, manufacturing slot scheduling, patient selection, PROLEUKIN demand, and launch dynamics.

327.    Iovance is not alleged to have had a free-standing duty to disclose every adverse fact.   Its omissions are actionable because they made its affirmative corporate statements materially misleading.  By representing that AMTAGVI's launch and authorized treatment centers were ready, strong, and capable of translating demand into infusions, Iovance omitted material qualifying facts concerning authorized treatment center readiness, activity, throughput, patient conversion, and operational bottlenecks.   By representing that manufacturing capacity, manufacturing-slot availability, scheduling flexibility, and manufacturing quality were sufficient or consistent with clinical experience, Iovance omitted the alleged FDA constraints, practical capacity and technology limitations, delays, and "out-of-specification" risks described herein.  By representing that its cash position was strong and sufficient, Iovance omitted the allegedly greater need to raise capital.  By representing that its 2025 total product revenue guidance rested on then-existing internal understanding, visibility, and knowledge, Iovance omitted material facts allegedly

showing that the guidance's operational predicates were inconsistent with what Iovance was seeing at its authorized treatment centers and within its manufacturing operations.

328. Defendant Vogt is liable in his individual capacity because he personally made and/or materially participated in making, authorizing, approving, causing to be made, reaffirming, or failing to correct material misrepresentations and omissions alleged herein. Among other matters, Defendant Vogt represented to investors that (i) Iovance was looking to treat "thousands of patients a year out of the gate" and that this was why its iCTC facility was "built to go to 2,000 [patients] today"; (ii) Iovance's authorized treatment centers were "stood up," "ready to go," and "ramping right away"; (iii) Iovance expected a "large bolus" of patients to come through and "a lot of patients" in each authorized treatment center; (iv) Iovance's authorized treatment centers could handle patient volumes far greater than the initial patient numbers that Iovance had disclosed; (v) Iovance's AMTAGVI commercial launch was "really going well"; (vi) Iovance had "billions of dollars of revenue coming"; (vii) Iovance's commercial manufacturing was "setting a new bar for cell therapy launches"; (viii) Iovance's authorized treatment centers had observed "sufficient availability of manufacturing slots" and reported "positive experience" in the scheduling process; (ix) "most" enrolled AMTAGVI patients were expected to be ready for infusion across the second and early third quarters of 2024; and (x) Iovance's 2025 total product revenue guidance had a reasonable present basis and could be relied upon because Defendant Vogt, speaking on Iovance's behalf, stated that "the whole point" of providing the guidance was so that investors could "rely" on Iovance's internal understanding of AMTAGVI infusions and PROLEUKIN demand and "see what the upswing is going to look like here," and because Defendant Vogt further represented that the guidance was based on Iovance's "ongoing experience and confidence," "visibility," and knowledge of AMTAGVI uptake, infusion growth, authorized

treatment center adoption, manufacturing capacity, and other launch dynamics. Defendant Vogt also represented that Iovance was a "true bolt-on" for which an acquirer would not "have to do anything" because Iovance already had "all the capacity," "all the know-how," and "everything you need."

329. Defendant Vogt is not alleged to have had a free-standing duty to disclose every adverse fact or to correct every statement made by another person. His omissions are alleged only in connection with statements that he personally made, authorized, adopted, reaffirmed, or for which he was otherwise legally responsible. In connection with those statements, Defendant Vogt omitted material qualifying facts concerning (i) authorized treatment center readiness, activity, and the unreliable relationship between paper onboarding and completed infusions; (ii) patient conversion, throughput, attrition, and drop-off; (iii) the FDA's monthly manufacturing slot limitation and higher potency requirement; (iv) manufacturing-slot availability, scheduling, quality, capacity, and "out-of-specification" risk; (v) the present operational basis for Iovance's 2025 total product revenue guidance; and (vi) Iovance's cash sufficiency and need to raise additional capital. Plaintiff alleges that those omitted facts contradicted or materially undercut Defendant Vogt's own statements and the corporate statements that he authorized, adopted, or reaffirmed.

330. Defendant Bilinsky is likewise liable in his individual capacity because he personally made and/or materially participated in making, authorizing, approving, causing to be made, reaffirming, or failing to correct material misrepresentations and omissions alleged herein. Among other matters, Defendant Bilinsky represented to investors that (i) Iovance's iCTC facility was "built, ready to go" to handle more than 2,000 patients per year; (ii) Iovance's iCTC facility "as built today has the capacity to provide TIL products for more than 2,000 patients annually";

162

(iii) Iovance's commercial manufacturing was "setting a new bar for cell therapy launches"; (iv) Iovance's manufacturing side had sufficient flexibility, manufacturing slot availability, and scheduling capacity to support AMTAGVI's commercial launch; (v) Iovance's launch was "going very well" and "exceeding our expectations"; (vi) AMTAGVI patient volume was on a "steady ramp"; (vii) Iovance's authorized treatment centers were doing well in navigating the AMTAGVI patient treatment journey and were commenting positively on manufacturing slot availability and the overall scheduling process; (viii) tumor-sample quality, commercial manufacturing performance, patient attrition, and patient drop-offs were consistent with Iovance's clinical experience or expectations, and there was "nothing unexpected" in Iovance's commercial manufacturing experience; (ix) a team at Iovance was doing a "fantastic job" in making sure authorized treatment centers harvested tissue properly for manufacturing; and (x) Iovance was confident in achieving its 2025 total product revenue guidance. Defendant Bilinsky also represented that Iovance was "by definition" a "bolt-on opportunity" because it was "truly fully integrated." He also supplied the greater-than-90% clinical experience manufacturing-success benchmark against which his later representations that Iovance's commercial manufacturing experience remained consistent with its prior clinical experience would reasonably be understood.

331. Defendant Bilinsky is not alleged to have had a free-standing duty to disclose every adverse fact or to correct every statement made by another person. His omissions are alleged only in connection with statements that he personally made, authorized, adopted, reaffirmed, or for which he was otherwise legally responsible. In connection with those statements, Defendant Bilinsky omitted material qualifying facts concerning (i) practical iCTC capacity, build-out, and manufacturing technology; (ii) the FDA's monthly manufacturing slot limitation and higher potency requirement; (iii) manufacturing-slot availability, scheduling flexibility, manufacturing

163

quality, and "out-of-specification" risk; (iv) patient attrition, conversion, tumor harvesting, tumor-sample quality, and scheduling constraints; (v) authorized treatment center readiness, activity, and throughput; and (vi) the present operational basis for Iovance's 2025 total product revenue guidance. Plaintiff alleges that those omitted facts contradicted or materially undercut Defendant Bilinsky's own operational statements and the corporate statements that he authorized, adopted, or reaffirmed.

332. The Individual Defendants are not alleged to be liable under this Count merely because of their corporate titles or positions. Defendant Vogt personally told investors that they could "rely" on Iovance's internal understanding supporting its guidance, stated that Iovance could "see the launch" and knew "all the dynamics," and made or reaffirmed statements concerning authorized treatment center readiness, patient demand, launch momentum, manufacturing-slot availability, cash sufficiency, and guidance. Defendant Bilinsky personally made detailed statements concerning iCTC capacity, manufacturing readiness and performance, manufacturing-slot availability and scheduling, tumor-sample quality, patient attrition, authorized treatment center throughput, launch execution, and guidance. FE1 reported directly to Defendant Bilinsky and was a source for the prelaunch manufacturing and FDA-constraint allegations described herein. Iovance also allegedly tracked patient-level, authorized-treatment-center, manufacturing-slot, manufacturing-result, and infusion data in real time. These particular facts – not corporate titles standing alone – support Plaintiff's allegation that each Individual Defendant had access to or control over information necessary to know or recklessly disregard the falsity or misleading nature of the statements for which he is alleged to be responsible.

333. Plaintiff does not allege that Defendants had a free-standing duty to disclose every operational or financial fact. The omissions are actionable because each Defendant made,

164

authorized, adopted, or reaffirmed identified affirmative statements about authorized treatment center readiness and throughput, patient demand and conversion, manufacturing capacity and quality, manufacturing-slot availability and scheduling, cash sufficiency, and the present basis for Iovance's 2025 total product revenue guidance. Having spoken on those subjects, each Defendant had a duty not to omit material facts necessary to make the statements for which that Defendant was legally responsible not false or misleading. A failure to correct another person's statement is alleged only where the Defendant authorized, adopted, reaffirmed, or otherwise assumed legal responsibility for that statement. The challenged statements were misleading half-truths because they conveyed that AMTAGVI's launch infrastructure was ready, scalable, reliable, and producing the trajectory necessary to support Iovance's guidance, while omitting the contrary facts alleged herein.

334. These misrepresentations and omissions were material and were not merely failed predictions, generalized optimism, or hindsight-based attacks on forecasts. AMTAGVI was Iovance's flagship commercial product and the centerpiece of its business model, financial condition, acquisition-readiness narrative, and market valuation. The challenged statements concerned then-existing facts in the revenue chain: patient referral and screening, tumor harvesting, authorized treatment center throughput, manufacturing-slot availability, manufacturing suitable and in-specification AMTAGVI batches, completion of the treatment regimen, and ultimate infusion. By representing that investors could "rely" on Iovance's internal understanding of AMTAGVI infusions and PROLEUKIN, Defendants represented that Iovance's guidance rested on reliable, then-existing internal information.

335. Defendants knew, or recklessly disregarded, that their statements and omissions were false or misleading when made, and intended that investors, including Plaintiff, would rely

165

on them. Iovance had direct access to launch, authorized-treatment-center, manufacturing, patient-conversion, cash, and guidance data. Defendant Vogt and Defendant Bilinsky had access to, or control over, those categories of information through their senior executive roles and their direct involvement in investor communications. Before and after AMTAGVI's commercial launch, Defendants knew or recklessly disregarded that (i) FDA-imposed manufacturing constraints and potency requirements materially restricted throughput; (ii) practical iCTC capacity, manufacturing technology, scheduling, manufacturing quality, and out-of-specification risks were materially less favorable than represented; (iii) many authorized treatment centers were inactive, only minimally active, or unable to move patients through the AMTAGVI treatment regimen at meaningful volume, and bottlenecks, patient drop-offs, attrition, and tumor-harvesting constraints were preventing purported demand from translating into completed AMTAGVI infusions; (iv) Iovance's cash position was materially weaker, and its need to raise additional capital was materially greater, than represented; and (v) Iovance's 2025 total product revenue guidance lacked a reasonable present basis. Defendants nevertheless made, authorized, approved, caused, participated in, reaffirmed, or failed to correct the misrepresentations and omissions alleged herein through investor-facing communications, including SEC filings, press releases, earnings releases, earnings calls, investor presentations, investor-conference statements, and social-media statements.

336. Plaintiff actually, reasonably, and justifiably relied upon the misrepresentations and misleading half-truths for which each Defendant is alleged to be responsible. Through Dr. Kambam, Plaintiff reviewed and monitored Iovance's investor-facing communications and the statements made personally by Defendant Vogt and Defendant Bilinsky, and relied on those communications in making the purchases, rolls, extensions, sales, and call-spread transactions

166

alleged herein. This actual reliance was reasonable and justifiable because Defendants held themselves out as speaking from direct knowledge of the operational and financial facts they described and because many of the challenged facts were uniquely or primarily within Defendants' knowledge. The relationship between Iovance's common-stock price and the value of Plaintiff's exchange-traded options explains the economic significance of the statements; it is not pleaded as a substitute for Plaintiff's actual reliance under this Count.

337. As a direct and proximate result of Defendants' common-law fraud, Plaintiff suffered transaction-specific, out-of-pocket losses in an amount to be proven at trial on its actual purchases, rolls, extensions, sales, call-spread transactions, and final liquidation. Plaintiff does not seek under this Count profits it could have earned by selling at the February 2024 peak, ordinary option erosion unrelated to the alleged fraud, or duplicate recovery of the same economic loss under multiple Counts. Iovance's May 8, 2025 guidance cut and Defendant Vogt's statement that the revised forecast was "a little bit more in line with what we actually see at the ATCs" further confirmed, according to Plaintiff, that the earlier statements concerned then-existing operational facts and that the prior guidance and launch narrative did not reflect the actual pace at which authorized treatment centers became operational, converted referrals into treated patients, coordinated with manufacturing slots, and generated AMTAGVI infusions. By reason of the foregoing, Iovance, Defendant Vogt, and Defendant Bilinsky are liable to Plaintiff for common-law fraud, jointly and severally to the extent permitted by applicable law and without duplication of recovery, in an amount to be proven at trial, together with pre- and post-judgment interest, taxable costs, and such other relief as the Court may deem just and proper.

## XIII.  PRAYER FOR RELIEF

338.    WHEREFORE, Plaintiff prays for judgment against Defendants on Counts I, II, and III as follows:

(1)    Awarding Plaintiff all compensatory and out-of-pocket damages recoverable under the federal securities laws and applicable common law, without duplication, in an amount to be proven at trial, together with pre- and post-judgment interest to the extent permitted by law;

(2)    Awarding Plaintiff its taxable costs and disbursements and such attorneys' fees and expert fees, if any, as are authorized by applicable law; and

(3)    Granting such other and further relief as the Court may deem just and proper.

## XIV.  JURY DEMAND

339.    Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: New York, New York
July 29, 2026

WILK AUSLANDER LLP

By: /s/ Scott Watnik
    Scott Watnik (SW8120)
    Stuart M. Riback (SR2443)
    T. Jackson Brake (6043954)
825 Eighth Avenue, Suite 2900
New York, NY 10019
Tel: (646) 375-7648
swatnik@wilkauslander.com
sriback@wilkauslander.com
tjbrake@wilkauslander.com

*Attorneys for Plaintiff*